# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

OPTIMUM COMMUNICATIONS, INC.;
CSC HOLDINGS, LLC,

        Plaintiffs,

        v.

APOLLO CAPITAL MANAGEMENT,
L.P.; ARES MANAGEMENT LLC;
BLACKROCK FINANCIAL
MANAGEMENT, INC.; GOLDENTREE
ASSET MANAGEMENT LP; J.P.
MORGAN INVESTMENT
MANAGEMENT INC.; LOOMIS, SAYLES
& COMPANY, L.P.; OAKTREE CAPITAL
MANAGEMENT, L.P.; PGIM, INC.; Doe
Entities #1-#1000.

        Defendants.

Case No. 25-cv-9785

**COMPLAINT FOR VIOLATIONS
OF THE SHERMAN ACT AND
NEW YORK STATE LAW**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 4

FACTUAL ALLEGATIONS ............................................................................................ 14

I.     IN RECENT YEARS, INTER-CREDITOR COOPERATIVES HAVE ARISEN TO
OBSTRUCT COMPETITION IN THE LEVERAGED-FINANCE MARKET ............... 14

    A.    The Importance Of Loans And Bonds As Economic Instruments ......................... 14

    B.    The Leveraged-Finance Market .............................................................................. 19

    C.    Secondary Markets And Tools For Refinancing Debt .............................................. 24

    D.    The Advent Of Debt With Flexible Covenants ......................................................... 29

    E.    Cooperation Agreements That Stifle Inter-Creditor Competition ........................... 31

II.    DEFENDANTS FORMED AN INTER-CREDITOR COOPERATIVE TO LOCK
OPTIMUM OUT OF THE U.S. LEVERAGED-FINANCE MARKET ......................... 38

    A.    Optimum's Capital Structure And The Cooperative's Formation ........................... 38

    B.    The Cooperative's Anticompetitive Constraints ..................................................... 45

III.   THE COOPERATIVE EXERCISES MARKET POWER IN TWO RELEVANT
MARKETS ..................................................................................................................... 51

    A.    The U.S. Leveraged-Finance Market ...................................................................... 53

    B.    The Market For Outstanding Optimum Debt ........................................................... 70

IV.   DEFENDANTS' GROUP BOYCOTT HAS SUBSTANTIALLY HARMED
COMPETITION IN THE RELEVANT MARKETS ....................................................... 72

V.    OPTIMUM HAS SUFFERED AND WILL SUFFER ANTITRUST INJURY ............... 81

CLAIMS FOR RELIEF .................................................................................................. 84

COUNT ONE .................................................................................................................. 84

COUNT TWO .................................................................................................................. 86

COUNT THREE ........................................................................................................ 86

COUNT FOUR ........................................................................................................ 88

# INTRODUCTION

1.     This antitrust case concerns a horizontal group boycott among rival creditors to freeze Optimum out of the U.S. credit market.[1]  Optimum is a telecommunications company that provides (among other things) broadband internet access to millions of Americans.  In 2015, during a period of low interest rates, Optimum raised capital from a wide array of institutional debt investors.  The low prevailing rates allowed Optimum to secure credit on favorable terms, affording it contractual flexibility to renegotiate with its lenders down the road.  Optimum now seeks to use that bargained-for flexibility to negotiate a deal with individual creditors so it can refinance, repurchase, or exchange the debt they hold.  Such transactions would improve Optimum's financial health and free up cash to fund its operations and investments, helping connect millions of Americans to the internet.  But Defendants have conspired to block them.

2.     Defendants are the massive financial institutions that currently hold Optimum's debt.  All are sophisticated debt investors intimately familiar with leveraged loans and high-yield bonds, and together they control at least 88% of the relevant credit market.  They are also each other's direct rivals.  Under normal market conditions, Defendants compete with each other to offer new credit to leveraged companies and to refinance the debt they already hold in such companies.  Those conditions *should* apply to Optimum today.  If Optimum's creditors were acting in a free market, each would vie to offer Optimum access to new capital or to entice Optimum to repurchase or exchange the creditor's individual debt on mutually beneficial terms.

3.     Defendants orchestrated a conspiracy to squelch that competition.  Their goal was as simple as it was illegal:  they wanted to stop each other from dealing with Optimum in ways

---

[1] "Optimum" refers to Plaintiffs Optimum Communications, Inc. and its subsidiary CSC Holdings, LLC.  Optimum Communications, Inc. was formerly Altice USA, Inc., which was its corporate name for most of the time period relevant to this complaint.

that might hurt their collective interests. Each creditor feared that, without collusion, its rivals might help themselves by negotiating unilaterally with Optimum to refinance their own debt. For example, a single creditor that engaged with Optimum by selling back or exchanging its own debt at a discount to par (but above the current trading price) could improve its own position and do better than if it waited for the debt to mature. But such a discount might weaken the position of rival creditors and reduce the creditors' bargaining power as a whole. So Defendants chose another route. They banded together to form what they call a "Cooperative," with the goal of extinguishing each member's competitive incentives and fixing the price of Optimum's debt.

4.      Unlike most antitrust conspirators, Defendants put their conspiracy in writing. They created the Cooperative on July 3, 2024 by executing a written "Cooperation Agreement" effective that day. That contract, which now binds nearly every creditor holding Optimum's debt, bars every signatory from dealing with Optimum unless a two-thirds supermajority of competing creditors approves the deal. It also bars individual creditors from even negotiating with Optimum without group consent. PJT Partners LP ("PJT"), the Cooperative's lead financial advisor, described in writing how this group blacklist works. The Cooperation Agreement, PJT explained in a January 2025 slide deck, means there can be "no transfers to [Optimum] or its affiliates, including through open market purchases." And that no-dealing clause, PJT warned in an accompanying email, blocks Optimum from "repurchasing Co-Op debt at a discount" to par. Optimum's debt is now trading at such a discount. So the Cooperative, by its own admission, restrains Optimum from engaging in transactions at the prevailing market price.

5.      The Cooperative is a classic illegal cartel. Through the Cooperation Agreement, competing debt investors have agreed to lock Optimum out of the credit market unless Optimum offers terms the entire Cooperative deems acceptable. This is a traditional group boycott –

horizontal competitors refusing to deal in concert – that the Sherman Act has long condemned as per se illegal. It is also classic price fixing: the Cooperative is collectively dictating terms to Optimum by forcing it to transact only at loan and bond prices the whole group will accept. These restraints decimate competition and obstruct the capital markets from working as intended.

6. The named Defendants are the eight members of the Cooperative's Steering Committee. The Steering Committee directs the Cooperative's decision-making, serves as its liaison with Optimum, and dictates terms to other Cooperative members. The Steering Committee (often through PJT) also browbeat other creditors into joining the Cooperative by imposing coercive deadlines and exploiting reluctant creditors' fears of exclusion from future deals. The tactics worked. As PJT boasted to Optimum earlier this year, the Cooperative has captured a staggering 99% of its outstanding loans and bonds. And the Cooperative's dominant position in the capital structure dooms any effort by Optimum to break the cartel through market negotiations. They have constructed, as one Defendant's affiliate put it, "a 100% coop."

7. The Cooperation Agreement's prohibitions sweep broadly. They bind not just existing Cooperative members, but also anyone to whom those members might later sell Optimum's debt. So if any new investor wants to buy Optimum's debt from an existing creditor, it must join the Cooperative first. Still worse, the Cooperative locks up its members' affiliates too, so that every time an investor buys Optimum's debt, the investor's affiliates must likewise agree to join the conspiracy. For these conspirators – credit funds with myriad affiliates controlled by massive institutions like Apollo or BlackRock – this affiliate-lockup provision is breathtaking in scope. It has extended the boycott to envelop virtually the entire credit market.

8. In executing their conspiracy, Defendants also functionally rewrote Optimum's credit documents to obtain a more favorable deal for themselves than what each accepted when

they invested.  The credit documents generally allow Optimum to negotiate with individual creditors; only in rare circumstances do they require Optimum to obtain majority (but never supermajority) consent before taking action to address its capital structure.  These flexible terms formed a material part of the parties' bargain and reflected the borrower-friendly market conditions Optimum enjoyed when it borrowed the money at issue.  Defendants have not sought to negotiate bilaterally with Optimum to amend those contract provisions.  Instead, they simply rewrote the contracts through a concerted refusal to deal:  they all agreed *with each other* to require and withhold consent for transactions the credit documents otherwise allow.

9.      This Cooperative is an especially bad case in an epidemic of creditor collusion that has swept across the market in recent years.  Dozens of creditor groups – often comprising the same institutions, aided by the same advisors – have executed similar cooperation agreements to snuff out competition for other borrowers' debt.  Those cooperatives violate the antitrust laws as well.  But this Cooperative is, to Optimum's knowledge, the largest of them all.  And unlike some cooperatives, which often stymie competition among owners of a single type of debt instrument (like a single bond type), this one restricts competition *across* debt classes too. Relevant here, Optimum has three classes of outstanding debt:  Loans, Senior Guaranteed Notes, and Senior Non-Guaranteed Notes.  Under the Cooperation Agreement, Optimum must obtain two-thirds approval from the holders of all three class types before it can transact with any one creditor in any class.  That cross-class boycott stifles virtually all trading activity and makes this (to Optimum's knowledge) the most restrictive creditor cooperative ever formed.

10.     Defendants and their advisors have sought to justify their conspiracy by claiming they need it to curtail "creditor-on-creditor violence."  In this telling, leveraged debtors like Optimum often play creditors off each other by enticing some creditors to strike unilateral deals

that help themselves while potentially undermining competitors. Because this process induces rival creditors to act against each other's interests, Defendants like to call it "violence." But that is just a pejorative term for *competition*. The antitrust laws' founding principle – that competitors should compete – does not evaporate just because the competitors here collectively dislike it. In a free market, competing creditors *should* work against each other to unilaterally help their own position. That process, of course, may ultimately help some creditors at the expense of others. But that is hardly a reason to allow this conspiracy. When these creditors decry "creditor-on-creditor violence," they are really just articulating the traditional logic of a cartel: the belief that collusion between rivals yields better outcomes for those in the cartel.

11. Nor does this cartel produce any procompetitive benefits. It is not, for example, a means to facilitate mutual forbearance among creditors of an insolvent or defaulting borrower, as might be true in a bankruptcy. In that context, creditors sometimes agree that none will immediately demand full payment of its debt, thereby preventing a run on the borrower's assets and keeping the borrower's business intact. While that sort of mutual forbearance can benefit borrowers and creditors alike, the Cooperative here serves no such purpose. Optimum is neither bankrupt nor in default; it has remained at all times in full compliance with all its debt obligations. And far from promoting forbearance to provide the breathing room necessary for a consensual work-out, the Cooperative harms Optimum by obstructing transactions that might otherwise improve its capital structure and avoid a bankruptcy. Indeed, by blocking Optimum's access to capital, the Cooperative makes a bankruptcy far more likely – thus risking the very harms that other, narrower types of creditor agreements are typically meant to forestall.

12. The Cooperative impairs Optimum's access to two relevant markets. The first is the Leveraged-Finance Market, in which creditors (the sellers) provide money to borrowers (the

buyers) through leveraged loans and high-yield bonds. The second is the Market for Outstanding Optimum Debt, a subset of the first market in which Optimum transacts with creditors that hold its already-issued debt. The product in both markets is *leveraged* debt, which provides money to borrowers with lower credit ratings who offer higher returns in exchange for higher credit risk. The Leveraged-Finance Market differs from the one for investment-grade credit: it comprises specialized investors, involves distinct terms and rating conventions, is tracked in separate indexes, and receives independent recognition from industry participants and analysts. Leveraged borrowers like Optimum cannot realistically access investment-grade credit. The Leveraged-Finance Market is the credit market in which those borrowers actually participate.

13.     The Cooperative dominates both antitrust markets. Its ongoing distortion of market prices offers the most direct evidence of that market power. Indeed, the Cooperative has already raised the price Optimum is forced to pay *non-members* for credit. Even when Optimum can find new investors willing to lend it money – itself a gargantuan task given the Cooperative's hammerlock on the capital supply – Optimum has to pay a premium to entice them to extend credit in the face of a Cooperative that has otherwise wrecked the market. Lender negotiations, contemporaneous third-party analyses, and recent deal terms all corroborate the point. Together they show that the Cooperative has already driven up the price of new capital for Optimum.

14.     The Cooperative also controls an outsized share of both markets. Its members, including Doe Entities #1-#1000, belong to huge institutions that control at least 88% of the entire U.S. Leveraged-Finance Market. And Defendants themselves boast that they have locked up the whole market. As Defendant PGIM stressed at a January 2025 meeting about the Cooperative: "we ***are*** the high yield market." The message to Optimum was simple. So long as the boycott persists, Optimum cannot access the market except on the Cooperative's terms.

15.     The Cooperative has effectively locked Optimum out of the Leveraged-Finance Market altogether.  Through its no-dealing and affiliate-lockup provisions, the Cooperation Agreement drastically constricts Optimum's options for managing its debt.  It also precludes Optimum from raising enough new capital to support its operations, to refinance its debt, or to deleverage through liability-management strategies.  This is not some byproduct of Defendants' scheme; it is the whole point.  As the Steering Committee stated this year, it intends to block Optimum from any meaningful deleveraging unless Optimum first amends its credit documents to waive all its bargained-for debt-management flexibility – and agrees to pay the Cooperative's exorbitant advisor fees too.  Such a surrender would worsen Optimum's financial position and impede it from pursuing the sort of deleveraging it needs to fund its planned innovation and growth.  So the cartel is now threatening to starve Optimum of capital until it has to capitulate.

16.     Optimum's recent attempts to raise fresh capital show just how coercive this conspiracy is.  In July, with no way to access the Leveraged-Finance Market, Optimum had to pledge some of its most valuable fiber assets to raise $1 billion via an asset-backed loan from non-Cooperative members.  The Cooperative drove up the price of that loan, both by constricting the supply of lenders and by causing the remaining ones to demand a premium for a loan they knew they could neither sell nor syndicate.  The resulting cost was 200 to 300 basis points above ordinary rates for similarly rated asset-backed borrowings.  That is direct evidence of the Cooperative's market power and the injury it inflicted.  But more important, there is not enough asset-backed capital – which involves a distinct type of credit that trades in a distinct market – to replace all the leveraged-finance capital the Cooperative has locked away.  So Optimum faces a choice:  either break the Cooperative and restore its access to the Leveraged-Finance Market, or let the Cooperative freeze it out of the capital markets altogether and force it into bankruptcy.

17. Optimum brings this lawsuit under the Sherman Act to halt the illegal Cooperative and to remedy the harm it has inflicted. It seeks (1) a declaration that the Cooperation Agreement is illegal and void; (2) an injunction barring Defendants from enforcing the Cooperation Agreement; and (3) treble damages for the harm the Cooperation Agreement has caused Optimum. It also brings breach-of-contract claims to remedy Defendants' collusion-enabled breach of the consent requirements reflected in the parties' credit documents.

## PARTIES

18. Plaintiff Optimum Communications, Inc. is a publicly traded Delaware corporation with its principal place of business at 1 Court Square West, Long Island City, New York 11101. CSC Holdings, LLC ("CSC"), which is Optimum Communications, Inc.'s wholly owned subsidiary, is a Delaware limited liability company with its principal place of business at 1 Court Square West, Long Island City, New York 11101. As of December 31, 2024, Optimum had roughly $23 billion in outstanding debt, comprising roughly $6.5 billion in outstanding Loans and $16.8 billion in outstanding Notes.[2] Optimum Communications, Inc. and CSC are both the direct (and intended) victims of Defendants' anticompetitive conduct. Defendants' cartel has prevented CSC from competing in the market for its own debt and has caused both Optimum Communications, Inc. and CSC direct economic injury stemming from the reduction in market-wide competition in the two antitrust markets alleged below.

19. Defendant Apollo Capital Management, L.P. ("Apollo") is a Delaware limited partnership with its principal place of business at 9 West 57th Street, New York, New York

---

[2] Unless otherwise specified, this complaint uses market data as of December 31, 2024, which was six months into Defendants' conspiracy and so provides a reasonable snapshot of Defendants' market power and the anticompetitive effects on Optimum. The outstanding Loans and Notes figures in this Paragraph come from Optimum's 2024 Form 10-K filing. They exclude debt issued by Lightpath, a separate subsidiary that houses the fiber enterprise business.

10019.  Apollo owns or manages holdings in Optimum's Loans and Notes.  Apollo is a member of the Cooperative's Steering Committee.

20.     Defendant Ares Management LLC ("Ares") is a Delaware limited liability company with its principal place of business at 1800 Avenue of the Stars, Suite 1400, Los Angeles, California 90067.  Ares owns or manages holdings in Optimum's Loans and Notes.  Ares is a member of the Cooperative's Steering Committee.

21.     Defendant BlackRock Financial Management, Inc. ("BlackRock") is a Delaware corporation with its principal place of business at 50 Hudson Yards, New York, New York 10001.  BlackRock owns or manages holdings in Optimum's Loans and Notes.  BlackRock is a member of the Cooperative's Steering Committee.

22.     Defendant GoldenTree Asset Management LP ("GoldenTree") is a Delaware limited partnership with its principal place of business at 300 Park Avenue, 21st Floor, New York, New York 10022.  GoldenTree owns or manages holdings in Optimum's Loans and Notes. GoldenTree is a member of the Cooperative's Steering Committee.

23.     Defendant J.P. Morgan Investment Management Inc. ("JPM IM") is a Delaware corporation with its principal place of business at 383 Madison Avenue, New York, New York 10179.  JPM IM owns or manages holdings in Optimum's Loans and Notes.  JPM IM is a member of the Cooperative's Steering Committee.

24.     Loomis, Sayles & Company, L.P. ("Loomis") is a Massachusetts limited partnership with its principal place of business at One Financial Center, 5th Floor, Boston, Massachusetts 02111.  Loomis owns or manages holdings in Optimum's Loans and Notes. Loomis is a member of the Cooperative's Steering Committee.

25.     Oaktree Capital Management, L.P. ("Oaktree"), is a Delaware limited partnership with its principal place of business at 333 South Grand Avenue, 28th Floor, Los Angeles, California 90071.  Oaktree owns or manages holdings in Optimum's Loans and Notes.  Oaktree is a member of the Cooperative's Steering Committee.

26.     PGIM, Inc. ("PGIM") is a New Jersey corporation with its principal place of business at 655 Broad Street, Newark, New Jersey 07102.  PGIM owns or manages holdings in Optimum's Loans and Notes.  PGIM is a member of the Cooperative's Steering Committee.

27.     Defendants Doe Entities #1-#1000 are business entities whose legal names and States of formation are presently unknown to Plaintiffs.  On information and belief, Doe Entities have joined the Cooperative as members and have supported its illegal conduct by conspiring with the named Defendants to advance the Cooperative's anticompetitive aims.  The identities of Doe Entities #1-#1000 – which are Optimum's other current and historical creditors who have joined the Cooperative – are not publicly available and are not readily ascertainable without discovery.  In fact, the named Defendants have declined to reveal the identities of the Doe Entities and have refused Optimum's requests to view the Cooperation Agreement and the documents accompanying it.  Once Optimum confirms the rest of the Cooperative's membership, it intends to amend this complaint to add the other conspiring creditors as defendants.

## JURISDICTION AND VENUE

28.     This action arises in part under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15.  The Court has subject-matter jurisdiction over the federal claims under 28 U.S.C. §§ 1331 and 1337(a), as well as 15 U.S.C. §§ 15 and 26.

29.     The Court has supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367(a).  Those claims arise from the same common nucleus of operative fact as the federal

claims, and exercising jurisdiction over both will avoid unnecessary duplication and advance interests of judicial economy, convenience, and fairness.

30.     The Court has personal jurisdiction over Defendants under Federal Rule of Civil Procedure 4(k)(1)(A) and N.Y. C.P.L.R. § 302(a)(1), because Defendants transacted business in New York by extending loans and buying bonds and entering contracts for such transactions in New York.  Alternatively, the Court has personal jurisdiction under Rule 4(k)(1)(C), based on Defendants' contacts with the United States as a whole, as authorized under 15 U.S.C. § 22.  The Court also has personal jurisdiction because Defendants consented to jurisdiction in New York.[3]

31.     Venue in this District is proper under 15 U.S.C. §§ 15, 22, and 26, and under 28 U.S.C. § 1391(b) and (c).  Each Defendant resides, transacts business, is found, or has agents in this District.  Venue is also proper because Defendants consented to suit in any New York court.

32.     Defendants' conduct, both individually and collectively, substantially affects interstate trade and commerce by, among other things, stopping the buying and selling of millions or billions of dollars of debt between and among interstate entities.

### FACTUAL ALLEGATIONS

**I.     IN RECENT YEARS, INTER-CREDITOR COOPERATIVES HAVE ARISEN TO OBSTRUCT COMPETITION IN THE LEVERAGED-FINANCE MARKET**

**A.     The Importance Of Loans And Bonds As Economic Instruments**

33.     This case concerns a horizontal agreement to restrain trade in the U.S. Leveraged-Finance Market.  "Leveraged finance" describes the market in which leveraged companies like Optimum raise debt capital by borrowing – in the form of loans and bonds – from investors like

---

[3] *See*, *e.g.*, Credit Agreement § 9.15; 5.75% Senior Notes Indenture (July 10, 2019) § 12.08.

Defendants.[4]  That market has long fueled the U.S. and global economy.  Indeed, the "economic

development of nearly every major civilization – east, west, north, or south – has depended on a

form of lending practices to provide capital to business."[5]  Loans, bonds, and similar debt

instruments facilitate global commerce by connecting those who have capital (investors) with

those who can profitably use that capital (companies and entrepreneurs).  Investors extend credit

to earn steady, predictable returns, while businesses and entrepreneurs borrow debt to fund new

projects and develop innovative products.  Virtually every product manufactured today, from

iPhones to aircraft carriers, has involved at least some debt financing.

     34.    Modern corporate credit markets use two main instruments:  loans and bonds.  A

loan is an agreement by a lender or group of lenders to extend money temporarily to a borrower,

on the promise that the borrower will repay that money with interest by a certain date.  A bond is

a security in which the issuer (borrower) promises to pay the holder (lender) a specified sum by a

maturity date.  Corporate bonds are also called "notes."  In the context of corporate lending,

loans and bonds both typically set repayment structures that hinge on the borrower's cash flow or

ability to repay from its operating earnings or refinancing activities.

     35.    Historically, loans and bonds served similar functions with one primary

difference:  bonds were traded on open markets while loans were privately negotiated.  Today,

---

[4] "Leverage" means the ratio of a company's debt-to-EBITDA, debt-to-equity, or debt-to-assets ratio – measuring the extent to which a company uses debt to fund its operations.  Loans issued to companies with below-investment-grade credit risk are often called "leveraged loans."  *See, e.g.*, Gary L. Storck & Mark D. Sheely, *Leveraged Lending:  Evolution, Growth and Heightened Risk*, Fed. Deposit Ins. Corp. (July 22, 2025) (factors to determine whether a loan is "leveraged" include "overall borrower risk, loan pricing, and measures of leverage (in terms of debt to income)"), https://bit.ly/4jjjoF2.  This complaint uses "leveraged finance" to refer collectively to non-investment-grade loans and bonds.  *Infra* ¶¶ 131-138 (defining market).

[5] *The Handbook of Loan Syndications and Trading* 18-19 (Lee M. Shaiman & Bridget K. Marsh eds., 2d ed. 2022).

this distinction has blurred, as many modern loans trade much like bonds on secondary markets.[6] Loans and bonds that trade on such markets compose the "public" credit market, which is distinct from "private credit," a smaller market comprising illiquid, privately negotiated debt neither listed on public exchanges nor traded freely on secondary markets.

36.     The public markets for loans and bonds confer significant benefits on borrowers and lenders that private lending does not provide. Properly functioning public debt markets increase liquidity, allowing a broader range of investors to earn returns from debt instruments and a broader range of borrowers to access investor capital. Public markets also serve a price-discovery function, enabling the efficient allocation of capital by providing signals through competitive bidding about the proper price of a borrower's debt. Open-market transparency and liquidity typically allow borrowers to obtain lower interest rates for actively traded loans and bonds than they could from a private lender.

37.     Written agreements between borrowers and creditors govern both loans and bonds. A loan is typically governed by a credit agreement between the borrower and lenders, while a bond is typically governed by an indenture between the borrower and a trustee for the bondholders. The terms of these agreements substantially affect the value of the debt.

38.     Borrowers often finance their operations by issuing multiple series (or "classes") of loans or bonds. Each class of debt is typically governed by its own contract. For example, a borrower may take out two loans or issue two series of bonds in separate transactions. The debt issued in each of these transactions constitutes its own "class" of debt and is subject to a specific

---

[6] For simplicity, this complaint refers to loans and bonds collectively as "debt" or "credit." Likewise, the complaint refers to lenders and bondholders/noteholders collectively as "creditors," and to loan borrowers and bond/note issuers collectively as "borrowers."

contract that governs that class of debt. The creditors who hold debt from a specific class belong to the "class" of creditors holding that debt.

39.     Investors in debt markets typically make money through a fixed return specified in the loan or bond. That is why debt markets are often called "fixed income" markets. An interest rate specified in the debt instrument usually sets the creditor's return. The contractual interest rate is one key determinant of a loan or bond's value.

40.     Another determinant of a loan or bond's value is credit risk, meaning the risk the borrower will not repay the lender at maturity. This can occur, for instance, if the borrower becomes insolvent. Credit risk also arises when one creditor's debt becomes subordinated to another loan or bond, such that senior creditors have payment priority and/or greater security.

41.     Creditors often seek to mitigate credit risk through covenants that limit the borrower's flexibility to engage in certain transactions. Such covenants might, for example, restrict a borrower's ability to incur new debt, sell or transfer assets, or issue dividends. Although covenants can reduce the risk a creditor faces, they also make loans or bonds less attractive for borrowers by reducing the borrower's flexibility to invest and return capital to equity holders. In general, a loan or bond with strict covenants is less attractive to a borrower than one with more flexible covenants. Such covenants directly affect the value proposition for both the lender and the borrower: all else equal, a borrower may trade a higher interest rate for greater covenant flexibility, or a lender may accept a lower interest rate for stricter covenants.

42.     These value considerations typically set the terms of competition in the Leveraged-Finance Market. In a well-functioning market, creditors compete for the opportunity to provide capital to borrowers by offering credit on terms favorable to borrowers, such as low interest rates or flexible covenants. As the law firm that advises Defendants' Cooperative put it,

the "competitive financing market" has provided "greater leverage and control" for borrowers, which produced "an expansion in debt document flexibility" for those borrowers.[7]  Conversely, borrowers compete for capital by offering higher interest rates or more restrictive covenants. The outcome of such competition in a given case hinges on standard considerations:  the amount of available credit; other sources of credit; the terms other borrowers are willing to offer; how badly the borrower needs capital; and the credit risk the borrower presents, among others.

43.    A debt instrument's negotiated terms remain critical well after it is issued.  Other investors rely on these terms to determine the price they are willing to pay for the loan or bond on the secondary market; prospective new creditors and equity investors rely on them to evaluate the borrower's business and determine whether to invest (and on what terms); investors in securitized loan obligations rely on them to determine what prices they are willing to pay; independent credit analysts rely on them to provide market guidance about the borrower's financial condition; and borrowers themselves rely on them to plan their operations.

44.    For those reasons, debt instruments in the Leveraged-Finance Market reflect intense negotiation.  Borrowers and creditors in the Leveraged-Finance Market are sophisticated entities that hire sophisticated investment banks, law firms, and other advisors to assist them. These market participants and their advisors study market conditions, create financial projections, determine agreeable prices, and bargain over the covenants and other contract terms. This negotiation process can take months and cost millions of dollars in advisor fees.

---

[7] Sam Brodie et al., *Liability Management Exercises:  A Transatlantic Perspective*, Akin Gump Strauss Hauer & Feld LLP (June 1, 2023), https://bit.ly/4gTrB12.

### B.    The Leveraged-Finance Market

45.    Traditionally, loans were simple, bilateral transactions:  a bank would lend a company money, hold the loan on its books, collect interest over a period of years, and receive repayment of the principal at maturity.  While this system was simple, the simplicity had drawbacks.  When a single bank issued a large loan, it assumed undiversified risk that the borrower would default.  So most banks were reluctant to lend to unfamiliar borrowers, and few were willing to lend money to borrowers that needed lots of capital or posed higher credit risks.

46.    The one-bank-one-loan system began to give way in the 1980s, with the advent of loan syndication and securitization.[8]  "Syndication" is when multiple banks pool money to issue a single loan, thus spreading that credit risk across multiple lenders while allowing each lender to diversify by spreading money across multiple syndicated loans.[9]  Loan syndications generally involve (1) a debt issuer (the borrower), (2) a lead arranger and/or administrative agent (typically a bank that lines up investors and organizes the syndication), and (3) a group of lenders (the loan "syndicate").  Although multiple lenders participate in a syndicated loan, the loan itself is typically governed by a single credit agreement between the borrower, the arranger or administrative agent, and the lenders.  The rights and obligations of the borrower and creditors are carefully negotiated up front and typically depend on the parties' relative bargaining power.

47.    Lenders also use "securitization" to manage their risk.  Securitization occurs when banks pool loans together in securities called Collateralized Loan Obligations ("CLOs") and sell

---

[8] *See generally* Kim-Song Le et al., *The Development of the International Market for Syndicated Loans (1980-2007):  A Review*, 16th Conf. on Theories & Pracs. of Sec. & Fin. Mkts. (Dec. 5, 2008).

[9] Off. of Comptroller of Currency, *Leveraged Lending:  Comptroller's Handbook* 3 (Feb. 2008) (noting loan syndication "ensur[es] appropriate risk diversification" in lenders' portfolios), bit.ly/4g6GFHx.

interests in those securities to other investors. Banks similarly securitize bonds in Collateralized Bond Obligations ("CBOs"), and sometimes pool loans and bonds together into a single instrument called Collateralized Debt Obligations ("CDOs"). Like syndication, securitization allows lenders to spread the risk of a single loan across many investors.

48.     Together, syndication and securitization reduce single-name exposure for creditors and open the credit markets to more investors. These techniques also allow creditors to tailor their portfolios to their risk preferences, while expanding the universe of creditors available to borrowers. Large companies ordinarily borrow from syndicated lenders because syndicated loans "allow borrowers to access a larger pool of capital than any one single lender."[10]

49.     Syndication and securitization contributed to the boom of the Leveraged-Finance Market in the United States. In recent decades, both syndicated loans and high-yield bonds have exploded in popularity. Most famously, institutional investors working with Drexel Burnham Lambert started investing in high-yield bonds in the 1980s, after determining that their risk-adjusted returns typically exceeded the risk-adjusted returns of other financial instruments.

50.     Today, the Leveraged-Finance Market principally comprises two instruments that trade in different ways: leveraged loans (which banks arrange for leveraged borrowers and syndicate to institutional lenders) and high-yield bonds (which leveraged borrowers issue mostly to institutional investors). While these two instruments trade separately, both provide leveraged borrowers with debt capital and trade on transparent, liquid secondary markets.

51.     The Leveraged-Finance Market has sparked the growth of many prominent companies: Amazon used high-interest debt to grow from an online bookstore to a full-spectrum

---

[10] Off. of Comptroller of Currency, *Leveraged Lending: Comptroller's Handbook* 3 (Feb. 2008), bit.ly/4g6GFHx.

e-commerce platform; Netflix used high-interest debt to develop its vast library of streaming content; and Tesla used high-interest debt to produce its Model 3 electric car. Companies like Ford Motor Company, Hilton Hotels, Charter Communications, AT&T, and Dell Technologies have likewise used high-interest debt to finance growth or weather economic turbulence.

52. In recent decades, the Leveraged-Finance Market has enjoyed meteoric growth. By the end of 2024, the total size of the U.S. leveraged loan market was nearly $1.6 trillion, while the high-yield bond market was roughly $1.5 trillion.[11] Creditors have reaped the benefits. In 2024, the average annual return for high-yield corporate bonds was 8.7%, outperforming the average 4.1% return on investment-grade corporate bonds.[12] Over a longer time horizon, high-yield corporate bond returns beat investment-grade bonds on 5, 10, and 15-year bases.[13]

53. While more investors today are willing to extend debt to leveraged borrowers, the Leveraged-Finance Market remains limited to large, sophisticated financial institutions. Hedge funds, mutual funds, brokerage firms, and specialized debt funds are the key players in the market. Retail investors, by contrast, generally do not participate directly in this market. And some institutional investors (like some pension funds) have bylaws that bar investing in bonds with ratings below a particular level, further restricting the number of creditors that participate in the market. Still other institutional investors (like insurance companies and pension funds) often participate only in the "upper" (that is, safer) tiers of the Leveraged-Finance Market, investing in loans or bonds with credit ratings just below investment-grade but not those issued by more-leveraged companies that constitute the majority of borrowers in the market.

---

[11] *See* J.P. Morgan, *2024 Leveraged Loan Annual Review* (Jan. 21, 2025).

[12] Collin Martin, *2025 Corporate Bond Outlook*, VettaFi Advisor Perspectives (Dec. 10, 2024), https://bit.ly/4a5ElRw.

[13] J.P. Morgan, *2024 High-Yield Review* 131 (Jan. 6, 2025).

54.     Borrowers in the Leveraged-Finance Market are limited to an investor base far narrower than what investment-grade borrowers can access.  This is true both for leveraged loans and high-yield bonds.  Today, CLOs represent about 68% of the market for leveraged loans, while hedge funds account for about 15%, mutual funds account for 13%, and banks and insurance companies account for 5%.[14]  Similarly, high-yield mutual funds account for 30% of the high-yield bond market, with hedge funds, other mutual funds, and specialized investors making up another 20%.[15]  Pension funds (27%) and insurance companies (23%) account for the remaining 50% of the high-yield bond market – though as noted above, many of these institutions invest only in instruments at the safest end of the market.[16]

55.     Because they draw mostly from the same investor base, the markets for leveraged loans and high-yield bonds substantially overlap.  Most of the large financial conglomerates that dominate the markets for high-interest debt participate in both the bond and loan markets, often extending credit to the same borrower through both loans and bonds.  Even high-yield funds that primarily invest in either leveraged loans or high-yield bonds often hold both investment types.  For example, approximately two-thirds of the CLO managers that have extended loans to Optimum also hold Optimum's bonds.  And because there are a limited number of these institutional lenders willing to extend capital to leveraged borrowers, a single large borrower often transacts with a substantial majority of the market participants.

56.     Outside the Leveraged-Finance Market, lenders sometimes offer capital to companies in so-called "private credit" transactions.  Transactions in the private-credit market

---

[14] Chris Jorel, *Why today's leveraged loan market has grown more resilient*, Columbia Threadneedle Invs. (June 13, 2024).

[15] J.P. Morgan, *2024 High-Yield Review* 280 (Jan. 6, 2025).

[16] *Id.*

occur in narrow circumstances and on substantially different terms. These transactions resemble the old one-bank-one-loan system that predated the syndication and securitization era. In a typical private-lending transaction, a nonbank entity lends capital to the borrower, either directly or through a private-credit fund. Single-name credit risk in private lending transactions is significantly higher, and such private loans are illiquid – not listed on an exchange or generally traded on secondary markets. For these reasons, direct lenders charge materially higher interest rates and demand significantly more onerous terms than do bank lenders and investor syndicates in the leveraged loan and high-yield bond markets.

57.     Relatedly, the Committee of Uniform Security Identification Procedures ("CUSIP") historically has not assigned private loans CUSIP numbers, which are unique identification numbers that facilitate secondary-market trading and that distinguish loans, bonds, and other freely traded securities. Private loans are thus difficult to trade in any secondary transaction, because a prospective buyer cannot easily identify the loan by its CUSIP number. Private loans also tend to involve borrowers that present especially high credit risks and typically contain especially stringent covenants restricting the borrower's activities.[17]

58.     In addition to direct lending, the modern private-credit landscape also includes "asset-backed" transactions, where a debtor secures a loan by pledging a specific pool of assets and promising to pay lenders from the cash flow those assets generate. To execute this sort of transaction, the borrower first transfers a discrete pool of assets (typically cash-generating contracts) to a new, bankruptcy-remote entity that pledges them as collateral. Transferring assets in this way limits the borrower-company's ability to redeploy those assets or use them to raise

---

[17] *See Private credit – a rising asset class explained*, Flow: Deutsche Bank (Oct. 9, 2024), https://bit.ly/4asTElB.

other capital or repay other lenders.  It also permits an otherwise-leveraged borrower to obtain a better rating on the asset-backed debt than on its corporate debt, because the bankruptcy-remote entity reduces the transaction's credit risk.  This can allow a distressed borrower to raise capital on terms that are more attractive than what traditional corporate debt offers.  But it comes at a heavy price:  assets typically can only be pledged once, and the complex (and expensive) structuring required to execute an asset-backed loan constrains the pool of potential lenders.

59.     Like other forms of private credit, asset-based private loans and bonds do not trade on public markets.  Asset-based transactions also typically require specialized expertise and extensive diligence to value the collateral.  They also have different pricing conventions and repayment structures than traditional corporate debt, and thus typically involve a different set of financial professionals from those who underwrite and trade corporate debt on the whole.

60.     Like the Leveraged-Finance Market, the private-credit market spans a limited number of investors.  In the five years through year-end 2024, roughly 100 private-credit funds raised at least $1.5 billion, with roughly 20 of those raising at least $5 billion during the period.

61.     Though private-credit deals differ from publicly traded leveraged loans and high-yield bonds, the investors in all three overlap.  For example, BlackRock manages a High-Yield Fund (high-yield bonds), Corporate High-Yield Fund (high-yield bonds and non-investment grade corporate loans), and Private Credit Fund (private corporate loans).  BlackRock also recently acquired HPS Investment Partners, one of the largest private-credit investors in the United States.  Likewise, Oaktree manages several high-yield bond funds plus a Strategic Credit Fund, which invests in private loans.

### C.     Secondary Markets And Tools For Refinancing Debt

62.     Investors often buy and sell loans and bonds on secondary markets.  Borrowers themselves often participate in those secondary markets.  The "secondary market" is a common

industry term that refers to sales and purchases of loans, bonds, and other securities that occur after their initial offering. For example, a borrower may wish to repurchase its own loan or bond on the secondary market to retire the debt, especially when the debt is trading at a discount to its face value. Borrowers also commonly exchange new debt for existing debt on the secondary market. In a typical exchange, the borrower repurchases existing debt and replaces it with a new loan or bond on new terms acceptable to the creditor. The contracts that govern loans and bonds contemplate these post-issuance transactions and typically allow borrowers to engage in them.

63. Borrowers and creditors also often amend loan or bond terms. This can occur, for example, to provide relief from covenants that are impeding business operations, to create allowances for companies to sell certain assets or return capital to shareholders, or to adjust a loan's economics to compensate for one side's contract breach. In some cases, borrowers will persuade creditors to accept one amendment by offering to include additional amendments that give creditors better terms elsewhere, or vice versa. Refinancings and amendments are a common, well-accepted part of the ordinary course of business between lenders and borrowers.[18] They are also market-driven transactions: prevailing market conditions directly affect the terms that borrowers and lenders are willing to offer and accept in an amendment, and lenders compete to offer borrowers favorable amendment terms.

64. Borrowers and creditors often engage in post-issuance market transactions like refinancings, amendments, and secondary-market transactions to manage their debt obligations and free up capital for operations and growth. These transactions, which both reflect and depend on competition in the Leveraged-Finance Market, are sometimes called Liability Management

---

[18] *See What's in store for leveraged loans and CLOs in 2025*, Moody's (Nov. 21, 2024), (projecting that borrowers will continue to pursue refinancings in 2025, "which dominated deal activity in 2024"), https://bit.ly/4gZiP1C.

Exercises ("LMEs") and have surged in popularity in recent years.[19]  LMEs are a creature of contract.  Covenants in the credit documents control a borrower's flexibility to engage in LMEs; lenders decide up front (based on market conditions and other factors) what sort of covenants they require for debt priced at the level the borrower is offering.  In that way, the prospect of LMEs are central to the contractual bargain borrowers and lenders strike.  LMEs – and how strict the covenants are to restrict them (or not) – are baked into the debt's up-front price.

65.     LMEs can take many forms, depending on the nature of the transaction and the governing documents.  In many cases, borrowers undertake LMEs by negotiating with one or more creditors to support the LME – consistent with the terms of the governing credit documents – in exchange for improving the participating creditors' positions in the capital structure.  In other cases borrowers can capitalize on inter-creditor competition by negotiating with a majority of creditors to support the LME – again consistent with the terms of the governing credit documents – in exchange for improving the majority's position in the capital structure.

66.     An "exchange offer" is one common type of LME, in which a borrower offers a creditor (or group of creditors) the ability to trade its existing debt securities for new securities or equity.  A "dropdown" transaction is another popular type of LME, in which a borrower exercises its right to transfer assets to or invests in an unrestricted subsidiary and then issues new debt collateralized by the assets of that subsidiary.  An "uptier" is another type of LME, in which creditors negotiate to improve their payment priority or lien position with respect to the collateral for their loans.  Other types of LMEs can include restructurings, voluntary prepayments,

---

[19] *See* Sam Brodie et al., *Liability Management Exercises:  A Transatlantic Perspective*, Akin Gump Strauss Hauer & Feld LLP (June 1, 2023) (Cooperative's law firm acknowledging that LMEs are "tried and tested in the U.S." as a way for companies to "reduce or manage their overall debt burden," and "serve a useful purpose"), https://bit.ly/4gTrB12.

refinancings, rescheduling, or recapitalizations of a company's liabilities. All LMEs are subject to the bargained-for rights and restrictions set forth in the governing credit documents.

67. LMEs often create significant procompetitive benefits. Most importantly, they allow borrowers to manage their debt, freeing up capital for new investments while helping increase liquidity and support ongoing operations. Spurring investment benefits borrowers and creditors (and consumers) by allowing borrowers to offer new or improved products.

68. LMEs can also avoid or delay bankruptcy, which likewise benefits borrowers and creditors by avoiding or minimizing the massive costs and other damage a bankruptcy proceeding can cause a company and its brand, employees, and customers.[20] Avoiding bankruptcy also promotes competition more broadly by preserving the borrower's business and preventing further concentration, thus preserving consumer choice and welfare. And by reducing the risks of default and bankruptcy, LMEs can allow leveraged borrowers to obtain higher credit ratings, thereby giving them access to more risk-averse creditors, to the benefit of borrowers and creditors alike. For those reasons, LMEs are a critical tool for borrowers, who often bargain for the flexibility to engage in LMEs when negotiating the covenants in their debt instruments.[21]

---

[20] Rachelle Kakouris, *Out-of-court restructurings lift leveraged loan recovery rates*, PitchBook (May 31, 2024), https://bit.ly/4hnN5Db; Rachelle Kakouris, *Leveraged loan default rate falls as issuers avoid court via LMTs*, PitchBook (July 3, 2024), https://bit.ly/4g6MbKm; John Hintze, *Debt Restructurings Ramp Up in Out-of-Court 'LMEs'*, GARP (Nov. 15, 2024), https://bit.ly/40F26Lu; Steve H. Wilkinson, *Credit FAQ: Demystifying Loan Liability Management Transactions and Their Impact on First-Lien Lenders*, S&P Glob. (Oct. 30, 2024) (describing five borrowers (14 percent of those tracked) that "staved off a subsequent default or are rated higher than 'CCC+' "), https://bit.ly/3Whb0vJ.

[21] *Trends in Special Situations & Private Credit* 3, Akin Gump Strauss Hauer & Feld LLP (2024) (Cooperative's law firm stating that "borrowers facing upcoming maturity walls are increasingly engaging in [LMEs] to preserve and increase equity value and extend runway"), https://bit.ly/4jgBnfp.

69. Creditors likewise bargain for and then employ flexibility in credit documents. Indeed, a creditor that extends debt to a leveraged borrower often has a unilateral economic incentive to engage in refinancing and similar post-issuance transactions with that borrower. For example, a creditor may want to accept a tender offer or loan prepayment to reduce its credit risk, secure better debt covenants or coverage ratios, obtain payment on terms more favorable than those currently prevailing in the market, or redeploy capital. Accepting a borrower's repurchase offer can also provide a short-term cash infusion. Or creditors that lack an immediate need for liquidity may choose to extend the maturity date in exchange for more attractive terms or reprioritization of their debt relative to other creditors in the capital structure. In these ways, refinancings or LMEs can allow parties to allocate capital efficiently.

70. LMEs, like all debt transactions, depend on robust competition between creditors.[22] In an exchange offer, for example, creditors compete to offer the borrower the best terms for the exchange. If one creditor offers a lower interest rate than another creditor on the same debt, the borrower will naturally accept the offer with the lower rate. Likewise, in a dropdown transaction where the borrower issues new debt collateralized by the assets transferred to the new subsidiary, creditors similarly compete to offer better terms for that new debt. Borrowers have used that competition to their advantage in recent years. As the Cooperative's law firm observed publicly, leveraged companies before the advent of cooperatives "could still generate competition among lenders, so borrowers did not have to concede much on terms."[23]

---

[22] Sam Brodie et al., *Liability Management Exercises: A Transatlantic Perspective*, Akin Gump Strauss Hauer & Feld LLP (June 1, 2023) (Cooperative's law firm discussing the benefits to borrowers of having "creditors compet[e] to offer liquidity on competitive terms"), https://bit.ly/4gTrB12.

[23] *Trends in Special Situations & Private Credit* 5, Akin Gump Strauss Hauer & Feld LLP (2024), https://bit.ly/4jgBnfp.

And PJT itself has acknowledged the importance of such competition. In describing one LME it arranged, PJT stated that although "creditors are unhappy, if this type of flexibility exists in the [credit] documents[,] it's incumbent upon" borrowers "to play up the option value."[24]

71. Credit agreements often contemplate future refinancing transactions. For example, Optimum's existing credit documents include Dutch-auction provisions allowing Optimum to auction prepayments of its debt at escalating discounts to par.[25] The procedures require Optimum to extend discounted prepayment offers to all applicable term lenders, thus baking in the very type of inter-creditor competition the Cooperative now extinguishes. The credit documents also allow Optimum to make open-market purchases on a non-pro rata basis.[26] Through these and other mechanisms, the contracts permit creditors to transact with Optimum individually, eliciting competition between creditors to secure better terms. Such provisions match standard industry practice allowing leveraged borrowers to deploy refinancing strategies.

### D. The Advent Of Debt With Flexible Covenants

72. In the wake of the 2008 financial crisis, the Federal Reserve slashed the federal funds interest rate. That produced a low-interest-rate environment that continued for several years.[27] These historically low interest rates made it challenging for creditors to find profitable debt investments. That gave significant bargaining power to the few borrowers still willing to offer higher-interest debt. And that bargaining power, in turn, allowed those borrowers to

---

[24] Christopher Spink & Philip Scipio, *Restructuring Adviser: PJT Partners*, Int'l Fin. Rev. (Dec. 15, 2022), https://perma.cc/5VKC-ZE38.

[25] *See, e.g.*, Credit Agreement § 2.12(c)(ii)-(iv) (describing procedures for Optimum to offer or solicit discounted term loan prepayments through the auction manager).

[26] *See, e.g.*, Thirteenth Amendment to Credit Agreement § 8.04(j).

[27] Eliza Ronalds-Hannon & Rachel Butt, *Credit-Market Clashes Are Getting Uglier, Dirtier, More Common*, Bloomberg (May 10, 2022) (attributing LMEs to "over a decade of near rock-bottom interest-rates and quantitative easing that spurred a surge in demand for higher-yielding assets").

negotiate for flexibility in credit agreements and indentures.[28]  In particular, creditors agreed to extend loans and buy bonds with fewer restrictive covenants, affording borrowers greater flexibility to make new investments, refinance debt, issue new debt, or amend debt contracts. Such negotiations were driven by economic self-interest:  creditors, in pursuit of higher yields through high-interest investment vehicles, willingly agreed to looser covenants in exchange.[29] Since 2008, loans with looser covenants exploded in popularity, rising from less than 20% of the S&P leveraged loan index in 2008 to more than 80% of the index in 2021.[30]

73.     Starting in the early 2020s, borrowers have increasingly deployed their bargained-for flexibility by employing LMEs to reduce or manage their debt.  These LMEs have proved generally successful in helping borrowers manage their capital structures while reducing risks to creditors.  One recent study of defaulting borrowers found that LMEs helped borrowers avoid bankruptcy while boosting creditor recovery rates.  The study found that, historically, only 28% of defaulting borrowers avoided resorting to bankruptcy.  In 2023, that percentage rose to 85% – the highest on record – due largely to LMEs.[31]  At the same time, average discounted recovery

---

[28] *Trends in Special Situations & Private Credit* 5, Akin Gump Strauss Hauer & Feld LLP (2024) (Cooperative's law firm explaining that "[d]uring years of low interest rates and competitive financing markets, borrowers and their sponsors enjoyed significant negotiating power when agreeing to terms with current and potential creditors"), https://bit.ly/4jgBnfp.

[29] John Hintze, *Debt Restructurings Ramp Up in Out-of-Court 'LMEs'*, GARP (Nov. 15, 2024), https://bit.ly/40F26Lu; Adam Trusley, *Looking Under the Hood at the Rise of Liability Management Exercises*, T. Rowe Price (Oct. 2024), http://bit.ly/4hxEsGp.

[30] *The Handbook of Loan Syndications and Trading* 57 (Lee M. Shaiman & Bridget K. Marsh eds., 2d ed. 2022); *see also U.S. Leveraged-Finance Annual Manual* 6, FitchRatings (Apr. 23, 2025) ("Demand for loans plays a large role in determining the specific terms of each transaction, which are often heavily negotiated and customized to fit each issuer's needs and prevailing market conditions.  It is generally true, with some exceptions, that issuers held the upper hand in recent years due to strong investor interest, and pushed for lower pricing with no floors and more flexibility in other areas of the credit agreement.").

[31] Rachelle Kakouris, *Out-of-court restructurings lift leveraged loan recovery rates*, PitchBook (May 31, 2024), https://bit.ly/4jSzsxT.

rates for creditors rose to 81.5%, one of the highest numbers on record and well above the

historical average of roughly 65%.[32]  Although this study focused on defaulting borrowers,

LMEs similarly benefit solvent, non-defaulting borrowers like Optimum by allowing such

borrowers to exercise their bargained-for rights and renegotiate their debt through consensual,

mutually beneficial transactions with individual creditors.

### E. Cooperation Agreements That Stifle Inter-Creditor Competition

74.     LMEs not only benefit borrowers and creditors who participate in them

(otherwise these mutually agreeable transactions would not occur), but also spur competition

among creditors and, like any free-market transaction, can create individual winners and losers.[33]

That is one hallmark of market competition:  even though it can produce individual losers, basic

economics recognizes that it results in higher total welfare.  Still, institutional creditors in recent

years have derided LMEs as "creditor-on-creditor violence" and have sought tactics to limit

borrowers' exercise of bargained-for rights in the Leveraged-Finance Market.[34]  "Creditor-on-

creditor violence" is a pejorative term for the process of free-market competition through which

one creditor competes for more favorable terms than what other creditors can obtain.

75.     Some creditors have sought to address the "problem" of inter-creditor competition

by signing cooperation agreements.  A cooperation agreement is a written contract between two

or more of a borrower's creditors restricting those creditors' ability to deal with the borrower.

---

[32] *Id.*

[33] *Trends in Special Situations & Private Credit* 10, Akin Gump Strauss Hauer & Feld LLP
(2024) (Cooperative's law firm asserting that LMEs with an individual lender often "results in
value leakage for the rest of the lenders"), https://bit.ly/4jgBnfp.

[34] Giulia Morpurgo, *Europe Too 'Polite' for Firms to Stir Creditor-on-Creditor Chaos*,
Bloomberg Law (May 9, 2023) (quoting a partner from the Cooperative's law firm stating that
"[i]nter-creditor violence is a hot topic," and then identifying cooperation agreements as "tools"
for creditors "looking at ways to protect themselves").

As the Cooperative's law firm explained, in a cooperation agreement, "a group of lenders agree that *none* of them will support an LME" without their rivals' consent.[35]  Cooperation agreements also bar individual creditors from negotiating or transacting with the borrower (or sometimes other creditors) without the other signatories' approval.  Typically, cooperation agreements "restrict[ ] engaging, entering, participating, supporting, voting in, or consenting to any liability management transaction, restructuring or the like, or even entering confidentiality agreements to speak with the [borrower], unless the requisite majority, as defined in the cooperation agreement *not* the credit agreement, gets on board."[36]  Such agreements can outright bar creditors from individually dealing with the borrower at all.  They also often prohibit cooperative members from selling to any investor that does not first agree to join the cooperative.

76.     Cooperation agreements have "surge[d]" in popularity in recent years, with the "dramatic increase" across the Leveraged-Finance Market arising "primarily as a reaction to . . . loose loan document provisions."[37]  In 2024 alone, for example, 45 creditor cooperatives formed in the United States, a sharp increase from the average of four per year from 2018 to 2023.[38]  These cooperatives involve many of the same institutional creditors, working with many of the same law firms and other advisors to apply onerous restrictions to various borrowers.  In the Leveraged-Finance Market especially, large institutional creditors frequently join multiple

[35] *Trends in Special Situations & Private Credit* 10, Akin Gump Strauss Hauer & Feld LLP (2024) (emphasis added), https://bit.ly/4jgBnfp.

[36] Max Frumes & Jane Komsky, *Co-op Challenges are Coming – Will They Work?*, 9fin (Sept. 12, 2024), https://bit.ly/3WoUkm5.

[37] Kenneth Rothenberg, *Cooperation Agreements 101:  A Quick Primer on Material Terms & Trends*, ABA Bus. Law Today (June 12, 2025), https://bit.ly/4p8WsKM.

[38] Sean Czarnecki, *Deep Dive:  Co-ops offer 'false sense of security' against LMEs*, PitchBook (Apr. 15, 2025), https://bit.ly/3K7amy6; *see* Shan Qureshi & Julian Bulaon, *Testing the Limits:  Cooperation Agreements as a Shield Against Liability Management in 2024*, at 1, Octus (June 24, 2024); Ayse Kelce et al., *LME threat pushes creditors to 'join or die' ad hoc groups, co-ops*, ION Analytics (Oct. 18, 2024), https://bit.ly/40l9xG5.

cooperatives across multiple borrowers. Cooperatives also "tend[] to cluster around the same pool of legal and financial advisers and have formed at various stages of the LME lifecycle."[39]

77. Because cooperation agreements often involve the same repeat players, different cooperation agreements tend to share many of the same provisions. On information and belief, the Cooperation Agreement between Optimum's creditors contains these typical features:

- *First*, cooperation agreements typically bar the cooperative's members and their affiliates from negotiating unilaterally with the borrower. By the same token, cooperation agreements forbid their members from entering any side agreements with the borrower.

- *Second*, cooperation agreements typically block creditors from selling, transferring, pledging, or otherwise disposing of their loans or bonds unless they force the transferee to join the cooperative and similarly encumber existing company debt it holds.

- *Third*, cooperation agreements typically dictate the terms on which members may extend new credit to the borrower. Specifically, they provide that any debt that a member later acquires – whether from the company directly or on the secondary market – becomes subject to the agreement automatically. In that way, as the law firm advising the Optimum Cooperative has stated, when a creditor joins a cooperative, "their debt will essentially come under the control of the majority [or supermajority] going forward."[40]

- *Fourth*, cooperatives typically require a supermajority vote before any one creditor can transact with the borrower. Additionally, cooperative members are contractually bound by the cooperative's decisions – dissenters may not opt out. The supermajority-vote and no-dissent rules combine to ensure that the cooperative members act in unison. According to the Optimum Cooperative's law firm, this "allow[s] the aligned group of lenders to take a blocking position and shift the dynamics of negotiations."[41]

- *Fifth*, cooperation agreements broadly bar any member from acting in any way that is inconsistent with the agreement or its objectives. The breadth of that vague prohibition further chills creditors from exploring ways to escape the cooperative's other restrictions.

- *Sixth*, cooperation agreements typically contain vigorous enforcement provisions whereby lenders cede the ability to defect from the agreement, and any non-compliant

---

[39] Shan Qureshi & Julian Bulaon, *Testing the Limits: Cooperation Agreements as a Shield Against Liability Management in 2024*, at 1, Octus (June 24, 2024).

[40] *Trends in Special Situations & Private Credit* 11, Akin Gump Strauss Hauer & Feld LLP (2024), https://bit.ly/4jgBnfp.

[41] *Id*.

debt transfers or acquisitions are deemed void – with other creditors able to seek both monetary damages and specific performance to undo any breaches.

78.     Cooperation agreements subject a borrower to these draconian restrictions even though the borrower never agreed to them.  In this way, cooperation agreements functionally amend a borrower's existing debt instruments after the fact to achieve what creditors could not obtain at the negotiating table.  For borrowers and creditors who bargained for the flexibility to employ LMEs, cooperation agreements take away that flexibility on the back end by blocking any creditor from agreeing to participate in one.  Indeed, cooperatives render largely irrelevant many of the negotiated terms of a loan or bond – despite the time and expense both sides typically invest in reaching them – by allowing creditors to later collude among themselves to impose extracontractual restrictions.  Cooperation agreements also undermine the expectations of borrowers and other secondary-market participants who rely on these negotiated terms.

79.     Cooperatives function as classic cartels.  They harness their members' collective market power by forcing them to negotiate collectively:  when cooperatives choose to deal with borrowers, acting in unison allows the creditors to extract harsher terms than any individual creditor could obtain on its own.  Consider, for example, BlackRock, which is the largest holder of Optimum Notes, holding roughly 8% of those outstanding.  By itself, BlackRock is constrained in the terms it could impose in a refinancing or exchange transaction, because if BlackRock demanded terms that were too onerous, Optimum could simply negotiate with a different creditor instead.  But as part of the Cooperative, BlackRock has exponentially greater market power because Optimum has no alternative but to deal with BlackRock together with the other members of the Cooperative in virtually any LME.  This discrepancy is even more pronounced for every other bondholder, each of which controls fewer bonds than BlackRock, and whose increased leverage as a member of the Cooperative is correspondingly greater.

80.     Cooperation agreements also magnify their members' veto rights.  Debt instruments typically require a majority of creditors of that instrument to consent to certain actions – like amending the instrument.  But a cooperation agreement's supermajority requirement uses collusion to raise the consent threshold, typically to two-thirds.  This makes it easier for creditors to block actions they dislike by lowering the number of other creditors required to form a blocking coalition, thus increasing the relative veto power of each creditor.

81.     Again, take BlackRock as an example.  BlackRock holds roughly 8% of Optimum's bonds, which means that BlackRock alone constitutes roughly 16% of a creditor bloc ordinarily required to block an amendment to the Indenture (i.e., 8% divided by 50%).  Under a cooperation agreement that allows one-third (plus one) of creditors to block a transaction, however, BlackRock's 8% share of Optimum's notes would constitute 24% of the creditor bloc required to block an amendment (i.e., 8% divided by 33.33%) – a 50% increase in BlackRock's veto power.  In other words, in a competitive market, BlackRock would need to persuade noteholders holding 42% of Optimum's notes to join BlackRock's 8% share to create a coalition large enough to block a transaction.  Under a cooperation agreement's two-thirds majority requirement, however, BlackRock need persuade only 25% of the other noteholders to reach the threshold required to block a transaction.  Or, still worse, it could stop a transaction by recruiting creditors from other debt classes (like lenders) to vote in a blocking coalition.

82.     The Cooperation Agreement magnifies each creditor's veto rights still further by allowing them to block transactions involving *separate* debt class types (here, Loans, Guaranteed Notes, and Non-Guaranteed Notes).  So, for example, a minority coalition of Loan holders could block a deal between Optimum and its holders of Guaranteed Notes, even if that deal did not affect the Loans themselves.  The resulting market distortion is substantial.  A lender that is party

to the Credit Agreement, but not any Indenture, now has veto power over Optimum's ability to enter transactions with bondholders about the Indentures.

83. The mere formation of a cooperative often pressures creditors to join for fear of exclusion from deals the group later strikes – which, because of the cooperative's collective power, are often less favorable to the borrower than any deal the individual creditor could negotiate on its own. As a result, cooperatives often enjoy high creditor participation rates.[42]

84. Cooperatives and their steering committees use coercive tactics to boost recruitment. Cooperatives often set artificial deadlines to join; wait too long and the cooperative will close its doors, leaving the creditor to fend for itself. Many creditors' status as repeat players in leveraged capital structures amplifies the pressure. Creditors have powerful financial incentives to maintain goodwill with their rivals and not break rank, for fear of being excluded from the next cooperative to form.[43] That concern is especially salient in a capital structure like Optimum's, in which most of the major institutional debt investors have banded together. To be clear, these features are not necessary to Optimum's claims; cooperatives would remain per se unlawful even absent the use of such coercive recruitment tactics. But they do explain why cooperatives have become so prevalent and so restrictive in restraining trade across the market.

85. Cooperation agreements like the one here differ from traditional creditor coordination in bankruptcy. Traditionally, creditors of an insolvent or defaulting borrower often agree among themselves (and with the borrower) to forbear from enforcing their repayment

---

[42] Kennedy Rose, *'Dogs and Cats and Snakes Living Together': Liability Management Professionals Debate Ledner Co-ops, Talk 'LME 2.0' as Out-of-Court Restructurings Gain Steam*, ION Analytics (Dec. 11, 2024), https://bit.ly/40Aaj3c.

[43] *Cooperation Agreements, Overview and Effectiveness in Restructuring Situations*, Restructuring Newsletter: Pari Passu (Oct. 25, 2024) (Cooperatives allow members to "join[] future alliances with other repeat lenders in the . . . market"), https://bit.ly/4gYMUOQ.

rights – to avoid spurring a run on the borrower's assets and thus preserving its solvency. Indeed, with an insolvent or defaulting borrower, creditors whose debt has come due often face a collective-action problem: each creditor has the incentive to demand immediate payment to ensure it can recover before the borrower runs out of money. But if each creditor demands immediate payment, bankruptcy can ensue. Creditors can alleviate that dilemma by agreeing to forbear from demanding immediate payment, thus allowing the borrower to continue operations and raise enough money to make each of the creditors whole. In that way, when a creditor has already defaulted or become insolvent, a coordinated decision by creditors to forgo immediate action to recover their own investment may benefit both the creditors and the insolvent borrower.

86. Cooperation agreements serve no such purpose. They often form in circumstances where there is no near-term risk of bankruptcy or default, and thus no need for the mutual forbearance needed to forestall imminent insolvency. In fact, cooperation agreements, like the one among Optimum's creditors, forge new creditor powers to a borrower's detriment and increase the odds the borrower will slide into bankruptcy. So while other inter-creditor agreements can make things easier for insolvent borrowers, cooperation agreements like the one here make things harder on borrowers and increase the odds of bankruptcy.

87. Cooperation agreements also bear no rational relationship to the goal of mutual forbearance traditionally shared by creditors of a borrower facing insolvency or default. Cooperation agreements do not merely enforce existing obligations or provide a way to coordinate on a common transaction; they prevent individual creditors from dealing or negotiating with the borrower at all. Indeed, cooperatives are typically designed to prevent borrowers and creditors from negotiating LMEs, which can help companies deleverage, maintain solvency, and avoid bankruptcy. And here, as with many cooperation agreements, the

Cooperative effectively shuts the borrower out of the relevant credit market altogether, heightening the risk of bankruptcy and undermining the odds of a successful workout.

## II. DEFENDANTS FORMED AN INTER-CREDITOR COOPERATIVE TO LOCK OPTIMUM OUT OF THE U.S. LEVERAGED-FINANCE MARKET

### A. Optimum's Capital Structure And The Cooperative's Formation

88. Optimum is a broadband telecommunications company that employs roughly 10,000 American workers. It provides broadband, video, telephone, and mobile and related services to about 4.4 million residential and business customers in the United States. Its coverage extends across 21 states, mainly in the New York metropolitan area and in the south-central United States. Millions of people rely on Optimum to stay connected to their jobs, education, healthcare, government services, and more. Optimum also operates a news and advertising business via traditional and digital platforms.

89. Like virtually all large companies, Optimum has funded its operations by borrowing loans and issuing bonds. Relevant here, Optimum has three main categories of debt:

90. **Loans.** Optimum has more than $6.5 billion in loans outstanding (the "Loans"), consisting of a $1.7 billion revolving credit loan due July 13, 2027 (the "Revolver") and approximately $4.8 billion in term loans due in 2027 and 2028.

91. An October 9, 2015 Credit Agreement governs Optimum's loans, with JPMorgan Securities LLC serving as administrative agent and lead arranger.[44]

---

[44] The other lead arrangers are Barclays Bank PLC, BNP Paribas Securities Corp, Crédit Agricole Corporate and Investment Bank, Deutsche Bank Securities Inc., Royal Bank of Canada, Société Générale, TD Securities (USA) LLC, and the Bank of Nova Scotia. *See* Credit Agreement § 1.01.

92.     **Guaranteed Notes.**  Optimum also issued eight series of senior guaranteed notes (the "Guaranteed Notes") with varying maturities and interest rates.[45]  The Guaranteed Notes collectively account for $10.71 billion in outstanding debt and are guaranteed by certain Optimum subsidiaries.

93.     **Non-Guaranteed Notes.**  Optimum has issued four series of senior non-guaranteed notes with varying maturities and interest rates (the "Non-Guaranteed Notes," and together with the Guaranteed Notes, the "Notes").[46]  The Non-Guaranteed Notes collectively account for $6.125 billion in outstanding debt.  The Non-Guaranteed Notes have no guarantees and are junior to the Loans and Guaranteed Notes.

94.     An Indenture governs each series of Notes.  Those Indentures are substantially similar, with the Indentures governing the eight series of Guaranteed Notes including terms

---

[45] The Guaranteed Notes comprise eight series:  (1) $1.31 billion aggregate principal amount of 5.5% Senior Guaranteed Notes due 2027, governed by that certain indenture, dated September 23, 2016; (2) $1 billion aggregate principal amount of 5.375% Senior Guaranteed Notes due 2028, governed by that certain indenture, dated January 29, 2018; (3) $1 billion aggregate principal amount of 11.25% Senior Guaranteed Notes due 2028, governed by that certain indenture, dated April 25, 2023; (4) $2.05 billion aggregate principal amount of 11.75% Senior Guaranteed Notes due 2029, governed by that certain indenture, dated January 25, 2024; (5) $1.75 billion aggregate principal amount of 6.5% Senior Guaranteed Notes due 2029, governed by that certain indenture, dated January 31, 2019; (6) $1.1 billion aggregate principal amount of 4.125% Senior Guaranteed Notes due 2030, governed by that certain indenture, dated June 16, 2020; (7) $1 billion aggregate principal amount of 3.375% Senior Guaranteed Notes due 2031, governed by that certain indenture, dated August 17, 2020; and (8) $1.5 billion aggregate principal amount of 4.5% Senior Guaranteed Notes due 2031, governed by that certain indenture, dated May 13, 2021.

[46] The four series of Non-Guaranteed Notes include the following:  (1) $1.05 billion aggregate principal amount of 7.500% Senior Notes due 2028, governed by that certain indenture, dated April 5, 2018; (2) $2.25 billion aggregate principal amount of 5.75% Senior Notes due 2030, governed by that certain indenture, dated July 10, 2019; (3) $2.325 billion aggregate principal amount of 4.625% Senior Notes due 2030, governed by that certain indenture, dated June 16, 2020; and (4) $500 million aggregate principal amount of 5% Senior Notes due 2031, governed by that certain indenture, dated May 13, 2021.

related to guarantees not applicable to the four series of Non-Guaranteed Notes.  Deutsche Bank serves as Trustee, Paying Agent, Transfer Agent, and Registrar under each of the Indentures.

95.     Like many borrowers that issued debt after the 2008 financial crisis, Optimum negotiated the Credit Agreement and Indentures when there was significant market demand for high-interest debt.  High demand – with investors clamoring to buy higher yielding debt – gave Optimum the bargaining power to obtain flexibility in the covenants and other terms of those agreements, which Optimum's creditors willingly accepted but are now colluding to undo.

96.     The Credit Agreement and Indentures allow Optimum to take certain actions with the approval of a majority of creditors.  For example, Optimum may amend the Credit Agreement with the approval of the lenders holding a majority of Optimum's loans.[47]  The Credit Agreement also permits a majority of lenders to waive the requirements of any covenant in the Credit Agreement.[48]  Likewise, the Indentures allow certain amendments and supplements if holders of a majority of the principal amount of Notes consent.[49]

97.     The Credit Agreement and Indentures conversely allow Optimum to take many other actions without majority approval (or any approval at all) from creditors.  For example, the Credit Agreement provides that Optimum "shall have the right at any time and from time to time to prepay any Borrowing, in whole or in part . . . without premium," and such prepayments "shall be applied to such Classes of Loans as the Borrower may direct."[50]  The Credit Agreement also gives Optimum "the right to make a voluntary prepayment of Term Loans at a discount to par"

---

[47] Credit Agreement § 9.08(b).

[48] *Id.* art. V preamble.

[49] *See, e.g.*, 11.250% Senior Guaranteed Notes Indenture, dated April 25, 2023, § 9.02(a).

[50] Credit Agreement § 2.12(a)-(b).

under a specified auction procedure.[51] It similarly allows "any Lender" to "exchange, continue or rollover all or a portion of its Loans in connection with any refinancing, extension, loan modification or similar transaction permitted by the terms of this Agreement."[52] Likewise, Optimum may contractually engage in dropdown transactions without creditor consent.

98. The Indentures provide Optimum similar flexibility to engage in refinancing transactions, allowing Optimum to redeem bonds, make tender offers, and engage in other refinancing transactions without majority creditor approval.[53] And the credit documents generally contemplate refinancing transactions without majority consent.[54]

99. In April 2024, Optimum began receiving overtures from creditors about potential LMEs. At first, these inbound communications suggested Optimum would be able to work with its creditors to manage its debt. One creditor even made an unsolicited proposal for Optimum to engage in a dropdown transaction and outlined the mechanics of such a potential transaction. Other lenders expressed interest in unsecured exchanges, exchange discounts to equity, and maturity extensions. These invitations to deal were relatively frequent and showed interest among creditors in conducting individual negotiations with Optimum. All these transactions would have improved Optimum's liquidity and solidified its financial position.

100. But the Cooperative halted Optimum's discussions with individual creditors. Defendants formed the Cooperative on July 3, 2024, which they memorialized in a signed Cooperation Agreement executed that day. PJT is the Cooperative's lead financial advisor and

---

[51] *Id.* § 2.12(c).

[52] *Id.* § 1.04.

[53] *See* 11.250% Senior Guaranteed Notes Indenture, dated April 25, 2023, art. 3 (describing redemption procedures and optional redemptions); *id.* § 9.01 (enumerating amendments where lender approval is not needed).

[54] Credit Agreement § 2.24.

represents the Steering Committee in negotiations. Akin Gump Strauss Hauer & Feld LLP ("Akin") is the Cooperative's lead law firm and likewise represents it in negotiations. According to PJT, as of January 2025, the Cooperative controlled 99% of Optimum's debt. *See* Ex. A. As one financial advisor thus told Optimum, this is now the "[l]argest co-op ever along with extremely high participation rates."

101.    The Cooperative has snuffed out Optimum's negotiations with creditors. Despite repeated efforts, Optimum has been unable to conduct any substantive negotiations with any Cooperative member since the Cooperative formed. Although some members have privately expressed an interest in exploring a deleveraging deal, they have told Optimum that the Cooperative blocks them from even discussing it. Thus, since July 2024, Optimum's substantive negotiations with its creditors have occurred exclusively through the Cooperative.

102.    Optimum has repeatedly asked to view the Cooperation Agreement, but Defendants have refused to share it. Still, PJT has represented to Optimum, and public reporting corroborates, that the Cooperative had an initial term of 18 months – through January 3, 2026 – with an option to extend for another 18 months.[55] One Defendant boasted this year that the creditors "will have no problem extending the coop" again. And as recently reported by a large investor's trading desk, Defendants now have extended the Cooperative through January 2027.

103.    A Steering Committee of large institutional holders leads the Cooperative. Defendants are the Steering Committee's eight members, which serves as the liaison between Optimum and the Cooperative, controls the Cooperative's decision-making process, and exerts significant influence over other Cooperative members to keep the cartel intact.

---

[55] Ayse Kelce & Nicholas Morgan, *Altice USA creditors lock arms under B-6 shield*, Debtwire (July 12, 2024), https://perma.cc/5L8R-L2NN.

104.     On information and belief, the Cooperation Agreement contains terms that resemble those in the other cooperation agreements that have become commonplace in the Leveraged-Finance Market. *Supra* ¶ 77. Among other things, it:

- Bars signatories or their affiliates from negotiating individually with Optimum, including by extending new credit, refinancing the terms of existing loans or bonds, or otherwise transacting with Optimum or its affiliates, including on the open market;

- Bars signatories or their affiliates from transferring Optimum's debt to anyone else unless the buyer joins the Cooperative and places all the buyer's existing and future Optimum debt under the Cooperative's control;

- Provides that any additional Optimum debt bought by a Cooperative member on the secondary market will automatically become subject to the Cooperation Agreement;

- Imposes supermajority-consent requirements across classes of debt, meaning that a minority of holders of one debt class can block transactions in unrelated debt classes;

- Bars any member from acting in a way that the Steering Committee believes undermines the Cooperation Agreement's purpose; and

- Imposes onerous indemnification and other remedies on signatories that violate its terms.

105.     PJT admitted to Optimum that the Cooperation Agreement contains many of these restrictions. On January 24, 2025, PJT sent a PowerPoint presentation stating that the Cooperative bars "transfers to the Company or its affiliates, including through open market purchases." Ex. A. It also boasted that "Co-Op debt transferred remains Co-Op debt," because any new "transferee must sign a joinder." *Id*. The same presentation laid bare the Cooperative's goal of blocking Optimum from obtaining market-standard discounts. As PJT summarized the aim: "The Co-Op prohibits transfers to the Company and any of its affiliates, so the Company will not be able to repurchase Co-Op debt at a discount through open market purchases." *Id*. That description refers to a market-standard process through which borrowers buy back their own debt at (or even above) the current trading price but below par – thus "capturing discount" and permitting the borrower to retire debt and reduce its leverage. Optimum's debt is currently

trading (and has long traded) at prices that are well below par. So the Cooperative is intentionally blocking Optimum from transacting at the prevailing market price.

106.     The Cooperation Agreement's prohibitions sweep broadly. On information and belief, it binds not just its existing members – that is, the entities that currently hold Optimum debt – but also their affiliates. Many of the Cooperative members' affiliates participate as lenders in the Leveraged-Finance Market alongside their affiliated Cooperative member. The Cooperation Agreement blocks Optimum from accessing credit from those affiliates, too.

107.     The Cooperative permits only a handful of limited exceptions to this affiliate-lockup provision. A small number of investors with investment-banking affiliates – like Defendant JPM IM – have negotiated carveouts for their investment-banking affiliates, which permits an affiliated bank to make a market in debt securities traded by Optimum. Those carve-outs are narrow and exist only because of the distinction between an asset manager like JPM IM and a market-making investment bank like JPMorgan Chase. Despite the carve-out, on information and belief, the Cooperation Agreement freezes all trading with Optimum by members' asset-management affiliates. And on information and belief, virtually no other Optimum creditors (besides JPM IM and Goldman Sachs Asset Management) have negotiated similar exclusions. In the main, therefore, the Cooperative locks up all its members' affiliates.

108.     Similarly, the Cooperation Agreement blocks members (and their affiliates) from dealing not just with Optimum itself, but also Optimum's own affiliates and subsidiaries.

109.     This Cooperative is also unique in at least two respects – its size and its breadth. Unlike some cooperatives, this one binds creditors across all of Optimum's debt classes, including Optimum's Loans, Guaranteed Notes, and Non-Guaranteed Notes. As one creditor

told Optimum in 2024, the Cooperation Agreement forbids any member from transacting with Optimum without two-thirds approval from the members representing *each* debt class.

110.     This cross-class consent requirement is highly restrictive, suppressing competition not only within creditor class types, but also across different class types.  It means that Optimum creditors that hold one class type of debt (like Loans) cannot transact with Optimum without the two-thirds approval of creditors that hold a different class type of debt (like Non-Guaranteed Notes).  And it means that even if Optimum negotiated an LME affecting only one class type, a minority of creditors holding a separate, unaffected class type could veto the transaction.

111.     This Cooperative is also unusually large – perhaps the largest ever formed.  It has controlled a staggering 99% of Optimum's outstanding debt, which combines with the affiliate-lockup provision to envelop essentially the entire U.S. Leveraged-Finance Market.  Defendants have constructed, as one of their affiliates summarized earlier this year, "a 100% coop."

112.     The Cooperative's size is intentional.  Once a cooperative amasses market power, it becomes nearly impossible for creditors to stay outside it.  Although many creditors would be better off without cooperatives (which is true of this one), once one obtains bargaining power, the remaining creditors face an unpalatable choice:  join or risk exclusion from a future deal.  That is what happened here.  Defendants and PJT weaponized fear of exclusion, combined with artificial deadlines, to grow their cartel across Optimum's entire capital structure.  One reluctant creditor told Optimum privately in August 2024 that it felt it had no choice but to join the Cooperative – and did so on the last day of the deadline Defendants imposed.

### B.     The Cooperative's Anticompetitive Constraints

113.     The Cooperation Agreement has squelched competition among Optimum's creditors.  Before the Cooperative, several creditors had expressed interest in collaborating with Optimum on LMEs.  But once the Cooperative formed, those overtures ground to a halt.  Now all

substantive communications must occur through the Steering Committee, represented by PJT and Akin. The resulting market interference has manifested in several ways.

114. *First*, the Cooperative blocks Optimum from exchanging, repurchasing, or refinancing its outstanding debt through mutually beneficial transactions with individual creditors. It forecloses, in the Cooperative's own words, "open market" transactions between Optimum and otherwise-willing creditors. The Cooperation Agreement even prevents Optimum from negotiating with these creditors on an individual basis. Without the Cooperative, Optimum would deploy typical industry strategies to seek capital on more favorable terms as market conditions and the contracts allow. But the Cooperative has stopped those efforts in their tracks. As one of Optimum's third-party advisors explained, the Cooperative means that "the probability of creditor on creditor violence" – that is, competition among rival creditors – is "now nil."

115. The Cooperative's no-dealing provision aims to choke off Optimum's ability to deploy these free-market mechanisms to manage its debt. It is designed, according to PJT's January 24 email, to block Optimum from capturing "market discount" on any debt exchange. Ex. A. And it is working. As one of Optimum's financial advisors explained, if the "co-op group stands firm with not taking a meaningful haircut," it is "not hard to imagine the company being cornered." That is just what has happened, which is why Optimum had to file this suit.

116. *Second*, the Cooperation Agreement blocks Optimum from issuing new bonds to or borrowing new loans from Cooperative members. The Cooperation Agreement's restrictions envelop any transactions between Cooperative members and Optimum (and their respective affiliates), not just transactions in the debt those members already hold. And the new-buyer clause forces any new investor in Optimum's debt to join the Cooperative, too. These prohibitions curtail Optimum's ability to raise new capital on the open market.

117.    The same restrictions obstruct Optimum from raising new capital using alternative, private-financing strategies.  A substantial majority of the investors Optimum would approach for private financing are Cooperative members (or their affiliates) and are thus part of the group boycott.  Although public information on the private-credit market is limited, 2023 Prequin data shows that the Cooperative locks up roughly 61% of that market.  Of the top 100 private credit funds that raised capital between 2023 and 2018, Cooperative members (or their affiliates) operate funds that together control 61% of the private-credit market.

118.    The Cooperative has also ballooned the cost of the limited private financing that remains available.  In July 2025, Optimum engaged in an asset-backed private financing by moving network assets and customer contracts from the Bronx and Brooklyn to a separate, bankruptcy-remote entity to support a $1 billion loan.  Because the Cooperative decimated the pool of potential lenders, Optimum had to pay an interest rate that far exceeds the rate on similarly rated loans issued in comparable circumstances.  According to a contemporaneous estimate from a third-party advisor, Optimum had to pay the lender roughly 200 basis points more than ordinary market rates for similarly rated loans.  Further, Optimum had to agree to atypical non-economic terms that limited its flexibility to borrow additional amounts against those assets, even though they were rated for significant additional capacity.

119.    Pricing aside, the nature of asset-backed financing also limits the pool of capital Optimum can obtain through such transactions.  The cash generated by a discrete pool of assets, like those in Optimum's Bronx and Brooklyn perimeter, cannot support financing large enough to enable Optimum to manage its debt.  For this and other reasons, asset-backed private loans are not a practical substitute for the traditional corporate loans the Cooperative has blocked Optimum from obtaining.  Indeed, as explained above (¶¶ 58-59), asset-backed private loans

occupy a different market than traditional corporate loans because they have different structures and pricing conventions and do not trade on public markets, among other things. In a competitive market, Optimum would not pledge these prized assets to support a private, asset-backed transaction that was so expensive. But the Cooperative's market power forced Optimum to abandon the Leveraged-Finance Market and use a pricey, inferior option for acquiring capital.

120. *Third*, the Cooperation Agreement distorts the secondary-market price of Optimum's debt. Like most cooperation agreements, this one effectively cleaves Optimum's debt in two – into debt held by members of the cooperative, versus debt held by non-members – that trade at different prices. As one recent Barclays research publication explains, "When a co-op becomes effective, the bonds and loans that are subject to the co-op essentially become two distinct classes: co-op and non co-op," and "[i]n secondary markets, there is differentiation between how co-op and non co-op classes trade for the same bond or loan."[56] Industry publications have likewise noted that co-ops "hav[e] an impact on the actual trading prices of the securities" involved, creating artificial price disparities that would not exist in an efficient market.[57] These price distortions harm the interests of potential new market entrants.

121. That distortion has played out here by shrinking the number of trading partners available to transact in Optimum's debt in the secondary markets. As a third-party financial advisor explained to Optimum in the lead-up to the asset-backed private financing, "the world of investors that can buy [Optimum's] paper [] under the current Co-op agreement [is] very limited . . . so [creditors] will have some pricing power." In Optimum's case, the Cooperative is so large

[56] *LME: Trading Through Prisoner's Dilemmas* 5, Barclays FICC Rsch. (July 29, 2024) (using "co-op" as shorthand for "cooperative"), https://bit.ly/4oH3JBz.

[57] *The Default Notice — Not all co-op paper is created equal*, 9fin (July 19, 2024), https://bit.ly/4ijDcYL.

– and the market for leveraged debt outside the Cooperative so small – that Optimum has been unable even to obtain competitive price quotes for its debt. The Cooperative has thus effectively destroyed the market for Optimum's debt by undermining its price-discovery function.

122. *Fourth*, the Cooperation Agreement inflates the Cooperative's leverage and allows it to dictate terms to Optimum much like a monopolist would. At a January 2025 meeting, the Cooperative's representatives insisted that they would deal with Optimum only if Optimum amended the contracts to forfeit its right to deploy dropdown transactions. At least two Defendants also threatened that if Optimum took any action adverse to them, the Cooperative would "not engage" with Optimum further. As one Defendant further stressed to an Optimum financial advisor, the Steering Committee will "mirror" Optimum's negotiating position. If Optimum negotiated too aggressively, the Steering Committee warned, "the coop is strong" and the "group will not engage on discount or be constructive on M&A." The Cooperative's law firm then told Optimum flat-out that any further negotiations were pointless unless Optimum gave up the flexibility its credit documents now confer.

123. Similar statements abound. As one Defendant's affiliate emailed Optimum in January 2025, "the coop, through its collusion, removes any other debt refi[nance] flexibility the company has" unless Optimum agrees to new covenants that eliminate that very flexibility. Similarly, PJT told Optimum that stripping its existing flexibility-conferring covenants is a clear red line without which no deal will occur. Those demands place the Cooperative's aim into stark relief. When Optimum first issued its debt, it bargained for a basic exchange: it offered high yields in exchange for looser covenants permitting liability-management flexibility. Years later, Defendants decided that they want the former without the latter. So they are using their

conspiracy to force Optimum into a Hobson's choice:  either amend the contracts to forfeit its hard-fought flexibility, or be starved of capital until it is forced into bankruptcy.

124.    The Cooperation Agreement's tendency to heighten the risk of bankruptcy matches Defendants' incentives.  Though Optimum and some of its creditors would prefer to avoid bankruptcy, the Steering Committee has perverse incentives.  The Steering Committee appears motivated to drive Optimum into bankruptcy, perceiving it as preferential for large creditors versus an out-of-court restructuring.[58]  Groups of large creditors often exploit bankruptcy proceedings "to squeeze out minority lenders" by providing post-petition loans on advantageous terms.[59]  Debtors in bankruptcy lack a "true market" for these loans, allowing "the debtor's dominant pre-bankruptcy lenders to augment their control of the case."[60]  Moreover, steering committee members often impose preferential terms in cooperation agreements, in the form of "premium carve-out[s]."[61]  These premium carve-outs can give large creditors like Defendants the option to issue more senior debt with higher interest rates in the capital structure, thus insulating them from a prospective bankruptcy at the expense of smaller lenders.[62]

125.    Further, Steering Committee members can benefit from taking these actions in bankruptcy.  A bankruptcy judge must bless any loan made during a bankruptcy.  The

---

[58] *See* Kenneth M. Ayotte & Edward R. Morrison, *Creditor Control and Conflict in Chapter 11*, 1 J. of Legal Analysis 511, 512 (2009) (noting that creditors have "come to dominate the Chapter 11 process," at the expense of the debtor).

[59] Josh Neifeld, *DIP Rollups:  The Final Frontier for Creditor-on-Creditor Violence?*, Octus (Oct. 29, 2025), https://perma.cc/BWN6-BSJ2.

[60] Frederick Tung, *Financing Failure:  Bankruptcy Lending, Credit Market Conditions, and the Financial Crisis*, 37 Yale J. on Reg. 651, 657 (2020).

[61] *See* Jon Yarker, *What lies ahead for co-op arrangements?*, Priv. Debt Inv. (Apr. 1, 2025) (describing increase in premium carve-outs), https://bit.ly/4oQtMXc.

[62] Brett Seaton, *The Carveout Co-Op:  A Truce in the Lender Wars*, Wharton Initiative on Fin. Pol'y & Regul. (May 16, 2025) (quoting an Oaktree managing director that premium carve-outs have become popular to "compensate large lenders"), https://perma.cc/M7PT-WTYM.

imprimatur of judicial approval can insulate large creditors from the litigation they might face if they engaged in similar activity outside of Chapter 11.  So by conspiring to leave a debtor no option but to seek bankruptcy protection, large creditors – the ones that organized the cartel – can enjoy more freedom to cram down a coercive transaction that harms smaller creditors.  That is one reason Defendants' invocation of "creditor-on-creditor violence" rings so hollow.  The Steering Committee is perfectly willing to tolerate and even support such "violence" – they just want to do so after driving Optimum into bankruptcy and securing a better deal for themselves.

126.    The Cooperative has also insisted that Optimum pay fees to subsidize Defendants' conspiracy.  According to PJT, the Cooperation Agreement requires that, in any deal the Cooperative reaches with Optimum, Optimum must pay PJT and Akin's fees.  And PJT has demanded that Optimum pay its monthly fees of $200,000, a $15 million transaction fee, and a $5 million discretionary fee as part of any hypothetical deal.  Akin's fees would likely add many millions more on top.  In a free-market negotiation, Optimum would never agree to pay its counterparties for the expenses they incurred in orchestrating a group boycott.

## III.    THE COOPERATIVE EXERCISES MARKET POWER IN TWO RELEVANT MARKETS

127.    Defendants' conspiracy impairs Optimum's access to at least two relevant antitrust markets:  (1) the Leveraged-Finance Market, and (2) the Market for Outstanding Optimum Debt, which is a subset of the Leveraged-Finance Market.

128.    For both, the relevant geographic market is the United States.  Industry participants and analysts typically differentiate between U.S. and foreign debt issuers.[63]  As that

---

[63] Juan Carlos Gozzi et al., *How Firms Use Domestic and International Corporate Bond Markets* 2-4 (Nat'l Bureau of Econ. Rsch., Working Paper No. 17763, 2012) ("[D]ebt issues in domestic and international bond markets have different characteristics.  In particular, international bond issues are larger, of shorter maturity, tend to be denominated in foreign

practical recognition illustrates, creditors do not view foreign debt as a substitute for debt borrowed by U.S. companies, including for the type of leveraged loans and high-yield bonds that make up the Leveraged-Finance Market.  Most obviously, foreign loans are typically denominated in the currency of the lender's country, which are generally less stable than the U.S. dollar.  As a result, foreign debt creates currency risk – the risk that rapid fluctuations in the foreign currency will affect the value of the loan or bond – plus geopolitical risks stemming from the lender country's monetary policies and trade relations with the United States.  For that reason, foreign debt tends to be bought by foreign debt investors – not by the U.S. debt investors that are the most realistic sources of capital for U.S. borrowers like Optimum.

129.    Many foreign lenders likewise face transaction costs associated with participating in U.S. markets they do not face when participating in their domestic markets, further limiting participation of foreign asset managers in the U.S. credit markets.  Foreign lenders also face regulatory hurdles and U.S. financial reporting requirements that dissuade many foreign lenders from participating in U.S. markets.  Tax requirements create an additional hurdle for foreign lenders.  The United States imposes a 30% withholding tax on interest paid by U.S. borrowers to foreign lenders, meaning that U.S. borrowers must withhold and report 30% of all interest on foreign debt unless a treaty exempts the lender.[64]  As a practical matter, then, U.S. borrowers like Optimum typically view U.S. debt investors as the only realistic sources of capital.

---

currency, and entail more fixed interest rate contracts."), https://perma.cc/R5D6-MGY2; Tracy Chan et al., *International finance through the lens of BIS statistics:  bond markets, domestic and international*, BIS Q. Rev. (Sept. 15, 2025) (similar for currency risk), http://bit.ly/4nGSvMk.
    [64] *Corporate - Withholding Taxes*, PricewaterhouseCoopers Int'l Ltd. (Aug. 15, 2025), https://perma.cc/8RAA-RY7E.

130.    For those reasons, the product markets defined below comprise U.S. borrowers (buyers) transacting with creditors (the sellers) investing in leveraged U.S. debt.  Due to the barriers identified above, those creditors are nearly all U.S. companies as well.

**A.    The U.S. Leveraged-Finance Market**

**1.    Market Definition**

131.    The first product market is the market for leveraged debt financing (the "Leveraged-Finance Market").  In this market, creditors provide money to borrowers in the form of leveraged loans and high-yield bonds in exchange for contractually promised interest.  The "goods" sold in this market consist of credit offered through leveraged loans and high-yield bonds, both of which are liquid credit instruments that provide borrowers with capital to fund investments and operations.  Optimum is a borrower (or, in the case of bonds, an issuer) in this market, while Defendants and other Cooperative members are creditors in the market.  Or in standard antitrust terms, Optimum is the *buyer* of credit, while creditors are the *sellers*.  The Leveraged-Finance Market describes both the "primary" market, where borrowers like Optimum issue new debt, and the "secondary" market, where that debt trades after issuance.  Transactions in this market include the issuance of new debt, the post-issuance sale and purchase of debt on (including by borrowers), and transactions refinancing or exchanging already-issued debt.

132.    As its name suggests, the Leveraged-Finance Market is generally defined by how *leveraged* a borrower is.  Leverage typically refers to a borrower's debt-to-EBITDA ratio.  Borrowers in the Leveraged-Finance Market have more-leveraged capital structures than investment-grade borrowers.  That means leveraged borrowers present greater credit risks for debt investors, but in exchange they typically pay higher interest rates than other borrowers.

133.    That distinction is evident in the credit ratings given by the three large ratings agencies.  Credit rating agencies typically define leveraged loans as loans extended to companies

rated Ba3 (by Moody's) or BB- (by S&P and Fitch) or lower, or loans extended to non-rated companies that have higher-than-usual interest rates, typically 200 points above the base rate.[65] By contrast, "investment-grade" loans are rated Ba2/BB and above. High-yield bonds are bonds rated Ba1 (by Moody's) or BB+ and below (by S&P and Fitch), while investment-grade bonds are rated Baa3/BBB- and above.[66]

134. The industry recognizes the Leveraged-Finance Market as a distinct market and tracks its performance separately from investment-grade debt.[67] The SEC also distinguishes leveraged loans and high-yield bonds from investment-grade debt.[68] Those distinctions recognize the economic reality that leveraged borrowers like Optimum cannot access investment-grade capital and so cannot substitute into the investment-grade credit market.

135. The supply of leveraged financing in the United States is limited, available only from the few institutional lenders capable of assuming and distributing (through syndication or securitization) the requisite level of risk. For leveraged borrowers with lower credit ratings, investment-grade credit is not a reasonable substitute for the credit provided in the Leveraged-Finance Market. Indeed, such borrowers cannot access investment-grade credit.

---

[65] *See* Gary L. Storck & Mark D. Sheely, *Leveraged Lending: Evolution, Growth and Heightened Risk*, Fed. Deposit Ins. Corp. (July 22, 2025), https://bit.ly/4jjjoF2; *Leveraged Loan Primer*, PitchBook (2022), http://bit.ly/42prWUS.

[66] *See Guide to Credit Rating Essentials*, S&P Glob. Ratings (2024), https://bit.ly/3LSJrGR.

[67] *See, e.g.*, *Morningstar LSTA US Leveraged Loan Index*, Morningstar (Jan. 13, 2025), (tracking metrics in leveraged loan market), https://perma.cc/43NK-CNDS; *Bloomberg US Leveraged Loan Index Methodology*, Bloomberg (Mar. 2025) (describing methodology for indexing leveraged loan performance), https://bit.ly/4jlQc0k; *MSCI USD High Yield Corporate Bond Index*, Morgan Stanley Cap. Int'l (2025) (tracking metrics in high-yield bond market), https://bit.ly/40AfMae; Jack Hersch, *Tally of Distressed Bonds in Morningstar US High-Yield Bond Index Falling in Q3*, S&P Glob. (Aug. 22, 2022) (same), https://bit.ly/4ha04bG.

[68] *See* Off. of Inv. Educ. & Advoc., U.S. Sec. & Exch. Comm'n, *What Are High-Yield Corporate Bonds?* (June 2013), https://bit.ly/3Wli3DT; Gary L. Storck & Mark D. Sheely, *Leveraged Lending: Evolution, Growth and Heightened Risk*, Fed. Deposit Ins. Corp. (July 22, 2025), https://bit.ly/4jjjoF2.

136.    Private lending likewise does not provide a reasonable substitute for leveraged financing.  Private lending imposes higher costs and more onerous contract terms than traditional leveraged-financing deals, and private loans do not trade on secondary markets like syndicated loans and bonds.  *Supra* ¶¶ 56-57.  The significant price disparities place the cost of typical private-credit deals more than a significant non-transitory price increase above the cost of leveraged-finance capital.  And because private lenders do not syndicate or securitize loans (and thus cannot effectively spread the credit risk of a leveraged borrower), they generally do not have the capacity to provide capital at the scale needed by large leveraged borrowers like Optimum.

137.    Nor does equity financing provide a reasonable substitute for leveraged debt financing.  In contrast to a debt investor that provides capital in exchange for a promise of repayment, an equity investor buys partial ownership of the company.  For business owners that wish to maintain control over their companies' direction and operations, equity financing is not an option.  Moreover, for leveraged borrowers like Optimum, issuing equity is often prohibitively expensive, since equity holders are subordinate to debtholders and thus demand significant ownership interests or other concessions in return for their investments.  The Cooperative exacerbates this problem and depresses demand for Optimum equity:  few large equity investors are willing to invest in a company at the mercy of a creditor cartel.

138.    Accordingly, a hypothetical monopolist in the Leveraged-Finance Market could profitably impose a significant non-transitory price increase or quality reduction for the goods (leveraged loans and high-yield bonds) traded in that market.  Leveraged borrowers with low credit ratings face inadequate options for raising capital outside the Leveraged-Finance Market.  Neither private lending nor equity investing are adequate substitutes for leveraged-finance credit, which is why borrowers (including Optimum) cannot profitably switch to those sources of

capital in response to traditional debt price increases.  And leveraged borrowers cannot access investment-grade credit at all.  As a result, a monopolist creditor – one with no need to compete for debt by offering more attractive terms or interest rates – could raise rates and impose stricter covenants on borrowers without losing business.  That is what the Cooperative has done, dictating terms while knowing that Optimum cannot meaningfully turn elsewhere for capital.

## 2.  Market Power

139.  The Cooperative exercises market power in the Leveraged-Finance Market.  "Market power" refers to the ability to raise a product's quality-adjusted price above competitive levels.  Ample evidence confirms the Cooperative's ability to do so.

### a)  Price-effects evidence

140.  Direct price effects show the Cooperative's market power.  Most directly, the Cooperative has inflated the price for refinancing Optimum's debt.  Were Optimum operating in a free market, it could capture discount by buying back its existing debt at a price below par.  *Supra* ¶ 105.  Indeed, PJT admitted (in a self-serving underestimate) that similar borrowers have used LMEs to capture an average 30% discount.  *See* Ex. A.  Yet the Cooperative has wiped away that market discount, by colluding to block the mechanism through which Optimum could otherwise negotiate one.  In practice, then, the Cooperative has extinguished the discount implied by the looser covenants in Optimum's credit documents.  That is a massive price premium – 30% in PJT's telling, higher in reality – attributable to the Cooperative's market power.

141.  The Cooperative's statements reinforce that conclusion.  As the Steering Committee made clear, it believes it has enough market power to drive a price increase for any refinancing transaction.  PGIM laid bare that view at a February 2025 meeting in which it explained to Optimum why it could not execute any deleveraging transaction without the

Cooperative's consent. To make that threat credible, PGIM correctly described the Cooperative as synonymous with the relevant market, telling Optimum that "we *are* the high-yield market." That statement has proved accurate. Due to the Cooperative's no-dealing and affiliate-lockup provisions, Optimum has been unable to raise enough capital to refinance its debt.

142. The Cooperative exerted similar pricing pressure on the recent loan Optimum borrowed from non-Cooperative members. As alleged above (¶¶ 118-119) Optimum recently pledged its New York City assets to borrow $1 billion. The Cooperative forced Optimum to overpay for that loan. It raised the price in two ways: by constricting the supply of available capital and by causing the lenders to demand a premium for extending a loan they knew they could neither sell nor syndicate. According to third-party estimates and market benchmarks, the premium reached 200 to 300 basis points above ordinary price for such a loan.

143. Contemporaneous ratings estimates confirm the point. In May, when Optimum was looking to price its Brooklyn and Bronx assets, KBRA – a leading ratings agency – gave them an investment-grade rating and estimated that Optimum's asset-backed security would obtain a blended yield of roughly 7% based on market convention for similar securities. The actual yield Optimum obtained on its $1 billion loan backed by those assets, however, was roughly 10.3%. That yield calculation, moreover, is conservative because it accounts for only the coupon rate and the original issue discount on the loan – but does not factor in the above-market structuring fee Optimum had to pay or the unusually restrictive covenants Optimum swallowed. The Cooperative was responsible for all these differences, as the lenders made clear. They communicated to Optimum and its advisors during the negotiation that the Cooperative-driven liquidity constraints were driving up the price of the loan by several hundred basis points.

144.     The Cooperative itself admitted the point.  During a phone call on or about July 22, 2025, PJT told Optimum (on behalf of the Cooperative) that Optimum had overpaid on the asset-backed loan by at least "200 basis points."  Optimum said it knew it had overpaid, but that it had no other realistic choice given the one-sided dialogue with the Cooperative to date.  Because the Cooperative had locked up the Leveraged-Finance Market, Optimum conveyed that its only realistic option had been to resort to the thinner asset-backed market and overpay a lender.  As the phone call made clear, both sides knew full well that the Cooperative had moved the market price and compelled Optimum to pay a substantial premium.

145.     Optimum's experience marketing its asset-backed debt further supports that conclusion.  When Optimum's financial advisors started exploring the market for an asset-backed deal, they surveyed the top-30 investors that had bought into recent similar asset-backed-security issuances and determined that at least 22 of the 30 (73%) likely belonged to the Cooperative.  As a result, the advisor warned, any marketing effort would require "extensive outreach to investors not historically involved in broadband ABS."  Subsequent conversations with both Optimum's advisors and potential lenders demonstrated why that mattered.  Faced with an impaired market supply of asset-backed loans, Optimum was forced to negotiate with less competition for its debt and therefore with less bargaining power to command a market rate.

146.     An empirical analysis of market benchmarks reinforces that conclusion.  Recent experience with broadband asset-backed financings indicates that a leveraged issuer's asset-backed bonds typically trade tighter than its senior secured corporate bonds, which makes sense: asset-backed financings typically obtain investment-grade ratings and alleviate much of the credit risk that applies to leveraged corporate debt.  Indeed, looking at four similar broadband

benchmarks compiled by Octus Research[69] – Consolidated, Frontier, Uniti, and Zayo – those leveraged companies issued asset-backed bonds with yields roughly 160 basis points *tighter* than their most comparable senior secured obligations.  Applying that principle here, Optimum's asset-backed facility should have commanded a roughly 7% yield – about 160 basis points tighter than its comparable senior secured debt at the time of issuance.  But the Cooperative's market power inverted the typical relationship:  the asset-backed yield was *wider* than its senior-loan average yields by about 140 basis points.  Evaluating the price effect through that framework, the Cooperative's boycott again moved the market price by roughly 300 points.

147.    Optimum's financial advisor emphasized the same point when trying and failing to market asset-backed bonds secured by the same collateral.  When Optimum first turned to the asset-backed credit market, its goal was to raise up to $2.8 billion in capital by pledging its Bronx and Brooklyn assets.  Part of the strategy contemplated a private term loan; the other a bond offering secured by the same assets.  When building a book of demand for the bonds, however, the financial advisor stated that it had to price Optimum's bonds at a significantly wider spread than the price of the similar broadband asset-backed facility recently raised by Zayo.[70]  At least 100 to 150 basis points of that spread, the advisor explained, stemmed from the thin investor base and liquidity constraints imposed by "co-op restrictions."  And in absolute terms, the effect was even larger.  Based on the Zayo pricing, the 10.3% yield Optimum had to pay on its loan represents roughly an extra 400 basis points on top of the effective Zayo yield.

---

[69] *See* Ed Cerullo, *Consolidated Communications Inaugural Fiber Securitization Appears to Offer Deleveraging, Attractive Blended Rate*, Octus (May 28, 2025).

[70] *See* Press Release, Zayo Corp. Commc'ns, *Zayo Announces Pricing of Inaugural $1.42 Billion of Asset-Backed Term Notes* (Feb. 3, 2025), https://perma.cc/A6NL-UTSU.

148.    Yet even this elevated pricing failed to overcome the Cooperative's stranglehold on the market.  The Cooperative did not just drive up the price of Optimum's offering; it eventually blocked Optimum from selling the bonds at all.  Even at the steep interest rates Optimum was offering, there was not enough non-Cooperative capital available to lend money against those assets.  That is because the Cooperation Agreement's no-dealing and affiliate-lockup provisions eliminated most large investors – including those with expertise in asset-backed financings – from the pool of potential lenders.  Indeed, at least two investors told Optimum they were interested in the bonds but that the Cooperative blocked them from participating.  And more broadly, the Cooperative's boycott stoked uncertainty and shrank the pool of secondary buyers available to any investor that received the bonds, further weakening incentives to participate.  As a result, Optimum could not secure enough interest to make the offering feasible.  In late October, after months of trying, it abandoned the offering altogether.

**b)    Market-share evidence**

149.    Cooperative members also account for a dominant share of the Leveraged-Finance Market, which provides further evidence of its market power.  The Steering Committee alone controls more than $16 trillion in assets.  And the other Cooperative members account for most of the large institutions that dominate the Leveraged-Finance Market.  Creditors in the Leveraged-Finance Market provide capital through leveraged loans and high-yield bonds.  The Cooperative controls an outsized share of each:

150.    **The Cooperative's share of leveraged loans.**  While public data on lenders that invest in leveraged loans is limited, public sourcing makes clear that the Cooperative represents a significant share of those lenders – roughly 85% of the market – with substantial market power.

151.     Several types of financial institutions invest in leveraged loans, including CLO managers (which hold roughly 68% of leveraged loans), mutual funds (roughly 13%), hedge funds (roughly 15%), and banks and insurance companies (roughly 4%).  The Cooperative has penetrated each of these investor classes.  Summing the Cooperative's control of each class shows that it controls at least 85% of the overall leveraged-loan market.  These calculations rely on three primary data points:  (1) the percentage of the leveraged loans held by a specific investor class, (2) the percentage of assets managed by investors within that class that hold Optimum debt; and (3) the percentage of Optimum debt holders in that class that belong to the Cooperative.  Multiplying these percentages yields a percentage of investors within a specific class that the Cooperative controls.  And summing those class-specific percentages yields an approximate total percentage of leveraged loans the Cooperative controls across those classes.

152.     CLO managers represent approximately 68% of the leveraged-loan market.[71] Public data on CLO managers published by Morgan Stanley indicates that approximately 83% of assets managed by actively investing CLO managers are held by Optimum debt holders.[72]  And approximately 99% of those CLO managers are members of the Cooperative.[73]  Accordingly,

---

[71] Chris Jorel, *Why today's leveraged loan market has grown more resilient*, Columbia Threadneedle Invs. (June 13, 2024).

[72] According to December 2024 data from Morgan Stanley, the largest 110 actively investing CLO managers account for 99% of all debt managed by active CLO managers in the leveraged-loan market.  Of the 110 major CLO managers, at least 85 appear to hold Optimum debt.  These 85 creditors control 83% of all debt under CLO management.  Data about assets controlled by non-actively investing CLO managers it not publicly available.  But it is a reasonable inference that a similar percentage of non-actively investing CLO managers (83%) hold Optimum debt, and therefore 83% of all CLO managers hold Optimum debt.

[73] The 99% number was true as of December 31, 2024, shortly before PJT sent Optimum the slide deck attached as Exhibit A.  On information and belief, that extraordinary percentage remained the same until this week.  This week, Optimum executed a private-credit transaction with a non-Cooperative lender that permitted it to repay the Term Loan B6 in full, which may have an effect on the Cooperative's share of Optimum's outstanding debt moving forward.

CLO managers that are members of the Cooperative represent at least 56% of the entire leveraged-loan market (68% * 83% * 99%).

153. Mutual funds represent approximately 13% of the leveraged-loan market. Public data on floating-rate loan mutual funds published by Morningstar indicates that approximately 96% of assets managed by these mutual funds are held by Optimum debt holders. About 99% of those holders are Cooperative members. Accordingly, mutual funds that are members of the Cooperative represent at least 12% of all leveraged-loan investors (13% * 96% * 99%).

154. Hedge funds represent about 15% of the leveraged-loan market. Because hedge funds rely on private investors, public data on hedge funds that invest in leveraged loans is not readily available. But because hedge funds generally allocate a higher percentage of their investments to below-investment-grade debt than mutual funds, it is a fair inference that the same proportion of hedge funds, as a class, hold Optimum debt as do mutual funds (96%). Again, roughly 99% of those holders are Cooperative members. Accordingly, Cooperative-member hedge funds represent at least 14% of all leveraged-loan investors (15% * 96% * 99%).

155. Therefore, considering only CLO managers, mutual funds, and hedge funds, the Cooperative accounts for at least 82% of the leveraged-loan market (56% + 12% + 14%).

156. These calculations are conservative and understate the total percentage of leveraged loan-investors that are members of the Cooperative. They account for the portion of the leveraged-loan market represented by CLO managers, mutual funds, and hedge funds, but

---

Further, as with Optimum's other private-credit transactions, *supra* ¶¶ 56, 58, 117-119, the financing cost more than it otherwise would have but for the Cooperative, and Optimum never would have had to turn to the private-credit market in this way without Defendants' conspiracy. For simplicity, this complaint uses the market-share numbers as they existed in December 2024, which was six months into Defendants' conspiracy and which provides a good framework for assessing the Cooperative's anticompetitive effect on Optimum up through the present.

not other investors in leveraged loans. So the calculations above assume, conservatively, that the percentage of other leveraged-loan investors that are Cooperative members is zero – in other words, that no leveraged-loan investors besides CLO managers, mutual funds, and hedge funds have joined the Cooperative. In reality, other types of leveraged-loan investors (like insurance companies) do hold Optimum debt, and PJT has told Optimum that 99% of Optimum's creditors are Cooperative members. So a more realistic calculation should account for the Cooperative's share of those investors too.

157.     The exact shares for these other investor classes are difficult to calculate without discovery, given that broader statistics breaking down the leveraged-loan shares of insurance companies or similar entities are not publicly reported. But it is reasonable to assume that the Cooperative controls a similar percentage of the leveraged-loan market represented by these investors as it does for the other investor types above. These remaining investors account for roughly 4% of the leveraged-loan market. On information and belief, considering only these remaining investors, the Cooperative controls an additional 3% of the leveraged-loan market.

158.     Summing all these figures together, the Cooperative accounts for at least 85% of the leveraged-loan market.

159.     **The Cooperative's share of high-yield bonds.**  While public data on investors in the high-yield bond market is limited, the available data makes clear that the Cooperative controls a major share of that market – likely 92% – and so possesses substantial market power. A similar series of calculations makes that clear.

160.     High-yield mutual funds make up the single largest class of investors in high-yield bonds, holding 30% of all high-yield bonds.[74]  Morningstar data suggests that about 93% of

---

[74] J.P. Morgan, *2024 High-Yield Review* 280 (Jan. 6, 2025).

assets managed by these mutual funds are held by Optimum debt holders. And roughly 99% of those holders are members of the Cooperative. Accordingly, mutual funds that are members of the Cooperative represent at least 28% of the entire high-yield bond market (30% * 93% * 99%).

161.    Hedge funds, other mutual funds, and other specialized investors hold another 20% of all high-yield bonds. While public data on these funds is not readily available, because hedge funds and specialized investors generally invest more heavily in below-investment-grade debt than do mutual funds, it is a fair inference that at the least the same proportion of these specialized investors, as a class, hold Optimum debt as do mutual funds (93%). Approximately 99% of these holders are Cooperative members. In total, hedge funds, other mutual funds, and other specialized investors that are Cooperative members represent at least 18% of all high-yield bond investors (i.e., 20% * 93% * 99%).

162.    Therefore, considering only mutual funds, hedge funds, and other specialized investors (which account for 50% of the high-yield bond market), the Cooperative controls at least 46% of the entire high-yield bond market (28% + 18%).

163.    The other half of high-yield bonds investors are held by pension funds (27%) and insurance companies (23%). Public sourcing does not readily identify those specific investors or allow a fine-grained analysis of their individual market shares without discovery. Once again, it is reasonable to assume the Cooperative controls a similar percentage of these remaining high-yield bond investors as it does for the other investor types above. Not all (or even most) pension funds or insurance companies participate in the market, but among the subset that do, the control percentages set forth above are reasonable and can be confirmed through discovery. Moreover, although this analysis treats all pension funds and insurance companies that traditionally invest in high-yield bonds as full participants in the market, many invest largely in bonds rated just

below investment-grade but not those issued by more-leveraged companies that constitute the majority of borrowers in the market.

164.    Pension funds and insurance companies account for roughly 50% of the high-yield bond market.  Assuming a similar share of the market represented by these investors as with hedge funds and mutual funds, on information and belief, the Cooperative through this group controls an additional 46% of the entire high-yield bond market.

165.    Summing these figures together, the Cooperative accounts for roughly 92% of the high-yield bond market.

166.    **The Cooperative's share of the Leveraged-Finance Market.**  As of year-end 2024, the volume of outstanding leveraged loans in the United States was roughly $1.6 trillion, while the total amount of outstanding high-yield bonds was roughly $1.5 trillion.[75]  The relative volumes of these assets within the Leveraged-Finance Market (52% leveraged loans; 48% high-yield bonds), multiplied by the percentage of investors in each instrument that the Cooperative controls, permits a calculation of the total share of the Leveraged-Finance Market the Cooperative controls.

167.    That calculation is straightforward.  Adding the Cooperative's leveraged-loan and high-yield-bond shares and weighting them for their overall proportion of the Leveraged-Finance Market yields a total market-share number.  Using this approach, and relying on the calculations above, the Cooperative controls 88% of the Leveraged-Finance Market.[76]

---

[75] *See* J.P. Morgan, *2024 Leveraged Loan Annual Review* (Jan. 21, 2025).

[76] Eighty-eight percent is calculated by adding together the percentage of Cooperative members in the leveraged-loan market and the percentage of Cooperative members in the high-yield bond market and weighting the two numbers according to the relative size of each market:
88% LF Market  =
      85% (Coop-participants in loan market)  *  52% (size of loan market relative to total)

168.     To be even more conservative, a market-share analysis could alternatively make the unfavorable assumption that the Cooperative controls zero percent of the market participants (like pension funds or insurance companies) for which public data is not readily available.  At worst, using those unfavorable assumptions but otherwise retaining the calculations set forth above (*supra* ¶¶ 150-167), the Cooperative controls roughly 65% of the market.

169.     An 88% market-share figure matches market participants' behavior.  After all, Defendants have made clear that they believe they control nearly the entire market.  That is why PGIM stressed to Optimum at a contentious January 2025 meeting that Cooperative members "***are*** the high-yield market."  And Optimum's financial advisors reinforced the point.  As one advisor stressed in an August 2024 deck sent to Optimum, any new debt Optimum tries to raise must overcome the fact that the Cooperative "includes nearly [the] entire credit market."

170.     As explained above (*supra* ¶¶ 56-57, 136), private lending is not a reasonable substitute for leveraged loans and high-yield bonds, so private lending is not part of the Leveraged-Finance Market.  But even if private lending were included the Cooperative's share would remain high.  As shown above (*supra* ¶ 117), the Cooperative's share of the private-credit market is roughly 61%.  The total size of that market is about $1.2 trillion.[77]  Averaging the Cooperative's share of the private-credit market with its shares of the leveraged-loans and high-yield bond markets yields a total market share of 81% across all three markets.[78]

---

+

92% (Coop-participants in bond market)  *  48% (size of bond market relative to total)

[77] Daniel Maddy-Weitzman, *NBFIs in Focus:  The Basics of Private Credit* (Oct. 17, 2025), Fed. Rsrv. Bank of New York, https://bit.ly/48nlJdE (showing market as of December 2024).

[78] Eighty-one percent reflects the sum of the percentage of Cooperative members in the leveraged-loan market, the percentage of Cooperative members in the high-yield bond market, and the percentage of Cooperative members in the private-credit market, weighting the three numbers according to the relative size of each market:

### 3. Barriers to Entry and Expansion

171. Significant barriers to entry and expansion protect the Cooperative's market power in the Leveraged-Finance Market. Participation is highly capital-intensive, so prospective new entrants must raise significant capital to even enter the market. For example, a typical CDO issuance is about $500 million,[79] and U.S. regulations typically require sponsors to retain 5% of the riskiest tranche of the securitization.[80] So in a typical CDO issuance, the sponsor must hold at least $25 million of non-diversified, high-risk debt on its own balance sheet. In practice, this number is usually far higher: CDO sponsors typically "warehouse" a substantial portion of a securitization after issuance – keeping hundreds of millions of high-risk debt on their books for several months until they sell tranches to other investors.[81] Large financial institutions with broad, diversified portfolios can absorb this single-name risk, but new entrants cannot.

172. Economies of scale also create structural barriers. Managing high-yield bond or loan portfolios requires substantial infrastructure, like credit research teams, trading operations, risk management systems, and relationships with dealers and issuers. Large, established firms benefit from economies of scale that lower their marginal costs and allow them to invest in superior technology and talent. These firms often run multiple funds (high-yield bonds, loans,

---

81% Market =

      85% (Coop-participants in loan market) * 37% (size of loan market relative to total)

                              +

      92% (Coop-participants in bond market) * 35% (size of bond market relative to total)

                              +

      61% (Coop-participants in private credit market) * 28% (size of private credit market relative to total)

[79] *Understanding CLOs in Today's Dynamic Financial Landscape* 3 (Sept. 2024), Invesco Senior Secured Mgmt., Inc., https://bit.ly/4oia5qn.

[80] *See* 15 U.S.C. § 78o-11; 12 C.F.R. § 244.1 *et seq*.

[81] *Id.*

and CLOs), spreading costs across a broad asset base. New entrants with small asset bases cannot easily replicate such capabilities, putting them at a competitive disadvantage.

173. Incumbents enjoy additional institutional advantages – track record, reputation, and established networks and relationships – that insulate them from competition from entrants. In the high-yield bond market, large investment banks prefer to allocate new issue bonds to their reliable, repeat buyers – typically the big high-yield funds and CLO managers. These large buyers have the clout to receive sizable allocations of new deals, whereas a newcomer might be allotted only a trivial amount or none at all. And in the leveraged-loan market, lead arrangers usually invite a known circle of established investors to participate in syndicates. A new fund with no relationships may be left out of attractive deals or included only on less favorable terms. This relationship-based market structure inherently favors established participants.

174. Regulators and ratings agencies create still more entry barriers in the Leveraged-Finance Market. As noted above, for example, U.S. regulations require CDO sponsors to retain the riskiest portions of securitizations on their balance sheets, which creates a significant barrier for would-be entrants. Ratings agencies and investors also require CDOs to include diverse groups of assets from different borrowers and industries.[82] Large investors that originate thousands of loans in different industries can readily create these diversified portfolios of debt assets for securitization, but most smaller lenders simply cannot originate enough loans to create such a portfolio without exceeding concentration limits or taking excessive risks.

175. As a result, a finite number of longstanding, sophisticated creditors participate in the Leveraged-Finance Market. Not only is it operationally difficult to invest in leveraged

---

[82] *See, e.g.*, *CLO Concentration a Potential Risk* (Sept. 10, 2018), FitchRatings, https://bit.ly/4pNMXBh.

companies, but new entrants lack the networks and track records needed to participate in syndications and issuances – as Defendants and their advisors often tout.[83] New entrants must have significant capital and must be stable enough to risk their capital on higher-risk investments. For that reason, smaller investors typically cannot afford to invest in the Leveraged-Finance Market directly, instead investing in mutual funds or other vehicles.

176. The highly concentrated nature of the Leveraged-Finance Market confirms the point. A few large and highly sophisticated investment financial institutions have long dominated the market. As one observer recently noted, the "market is currently operating in an oligopolistic structure with potential impacts on price formation, liquidity, and the active management industry as a whole."[84] Another academic paper recently found that "imperfect competition in the loan market is an important contributor to high loan spreads."[85]

177. The Cooperative itself compounds those entry barriers. It is no accident that the Cooperative's Steering Committee contains some of the largest financial institutions in the country. Large institutions magnify their existing market advantages by creating and leading cooperatives. In weaponizing smaller creditors' fear of exclusion from future deals, the Steering Committee members also protect themselves from nimbler competitors, who may wish to negotiate individually with Optimum. This protectionism is the point: the Cooperative is

---

[83] Defendants and their advisors market these networks and track records as a competitive advantage. *See*, *e.g.*, *Credit – Institutional*, BlackRock (BlackRock touting that its "scale, deep networks in liquid and illiquid markets, and track record of being a preferred capital provider for companies are core to [its] ability to generate alpha."), https://perma.cc/3V43-344G (last visited Nov. 24, 2025); Christopher Spink & Philip Scipio, *Restructuring Adviser: PJT Partners*, Int'l Fin. Rev. (Dec. 15, 2022) (describing PJT's record of using LMEs to "play up the option value" in credit documents), https://perma.cc/5VKC-ZE38.

[84] Axel Cabrol & Tatjana Puhan, *Concentration Risk on the Buy-Side of Credit Markets: The Causes*, CFA Inst. (Aug. 31, 2021), https://perma.cc/EY8G-QPZY.

[85] Franz J. Hinzen, *Nonbank Market Power in Leveraged Lending* 1 (Oct. 28, 2023), https://perma.cc/J7ZZ-F9QK.

designed to route all potential financings through the Steering Committee's chosen advisors and decision-making process. It is a way of entrenching the position of the largest existing creditors who, through collusion, are able to control not just Optimum's capital structure but others' too.

178.    The Cooperative also depresses liquidity in the debt it controls, forcing new entrants to join the Cooperation Agreement before buying Optimum's debt. *Supra* ¶ 105; *infra* ¶¶ 193-195. This too heightens entry barriers in the already-entrenched Leveraged-Finance Market, by making it harder for new investors to enter the secondary market. It also shrinks the amount of new debt on the market (by functionally blocking Optimum from issuing new debt), thereby decreasing demand for the capital that might otherwise be offered by new investors.

### B.    The Market For Outstanding Optimum Debt

#### 1.    Market definition

179.    The second market is the Market for Outstanding Optimum Debt, which is a subset of the Leveraged-Finance Market. In this market, Optimum engages in post-issuance transactions with creditors who hold Optimum's debt to repurchase, refinance, exchange, or amend that debt. Optimum is a borrower in this market; Optimum's creditors are competitors in this market. Or in standard antitrust terms, Optimum is again the *buyer* of credit, while creditors are the *sellers*. The "goods" are the same as the goods in the Leveraged-Finance Market – leveraged loans and bonds – but limited to one customer (Optimum) within that market. Thus, transactions in this market include the refinancing and exchange of Optimum's existing debt.

180.    As with borrowers in the Leveraged-Finance Market more broadly, Optimum has limited options for raising new capital. The most realistic option is to negotiate with its existing creditors to refinance, repurchase, or exchange existing debt. Indeed, Optimum cannot practicably substitute away: the capital required to retire or refinance the entire outstanding capital structure on comparable terms is unavailable at scale, and contractual and ratings

constraints make piecemeal priming or replacement capital unworkably costly. Nor do equity financing and private financing transactions provide reasonable substitutes for post-issuance transactions regarding outstanding Optimum debt, for the same reasons they do not provide reasonable substitutes in the Leveraged-Finance Market more generally. *Supra* ¶¶ 136-137.

181. Accordingly, a hypothetical monopolist of the Market for Outstanding Optimum Debt could profitably impose a small but significant non-transitory price increase or quality reduction (in the form of stricter covenants or more onerous contractual terms) in the Market for Outstanding Optimum Debt. Indeed, the Cooperative, which has monopoly power in the Market for Outstanding Optimum Debt, has already effectively imposed higher prices and more onerous contractual terms on Optimum by blocking it from executing market-standard transactions. The Cooperative thus exploits the fact that Optimum is locked in to its capital structure to charge Optimum supracompetitive prices for refinancing its debt. The Cooperative knows that Optimum has no other feasible refinancing sources, and it is leveraging its power accordingly.

### 2. Market power and entry barriers

182. The Cooperative has substantial market power in the Market for Outstanding Optimum Debt. As shown above (¶¶ 140-148), the Cooperative has distorted prices in this market by effectively rewriting Optimum's contracts and foreclosing it from accessing the discount that competition ordinarily produces. It also has distorted the secondary prices of Optimum's existing debt and eliminated any liquidity in that debt. *Supra* ¶ 178. This power to move the trading terms for Optimum's debt alone establishes the Cooperative's market power. So does its demonstrated ability to lock Optimum out of the market altogether. Indeed, the Cooperative's market power is such that Optimum cannot even obtain price quotes for its debt.

183.    The Cooperative also controls a 99% share of Optimum's outstanding corporate debt.  PJT has boasted of the Cooperative's near-total control of that debt, and one Defendant's affiliate warned Optimum that it is facing what amounts to a "100% coop."  *Supra* ¶¶ 111, 141.  That sky-high share corroborates the Cooperative's market power in this market, too.

184.    Substantial entry barriers protect the Cooperative's market power in the Market for Outstanding Optimum Debt.  Because this market is a subset of the Leveraged-Finance Market, the same entry barriers outlined above apply equally here.  *Supra* ¶¶ 171-178.  Further, the Cooperative's role in strengthening those entry barriers is even more pronounced in this market.  The Cooperative prohibits new buyers from entering this market unless they first agree to join the conspiracy.  That cements the Cooperative's market power, discourages new buyers from entering the market, and depresses liquidity in Optimum's debt.

## IV.    DEFENDANTS' GROUP BOYCOTT HAS SUBSTANTIALLY HARMED COMPETITION IN THE RELEVANT MARKETS

185.    The Cooperation Agreement has harmed and continues to harm competition in the relevant markets.  It does so on its face:  the agreement's terms prohibit horizontal competition over Optimum's debt.  Under ordinary market conditions, Cooperative members would compete with each other by transacting with Optimum or with other debt investors of Optimum's outstanding debt.  The Cooperation Agreement intentionally bars them from doing so.  That prohibition impairs competition in the relevant markets in several ways.

186.    *First*, the Cooperative is a per se illegal group boycott.  The Cooperation Agreement dictates that none of Optimum's creditors may transact with Optimum (or its affiliates) without the entire group's approval.  Both in theory and in practice, that restraint substantially forecloses Optimum from the Leveraged-Finance Market (including both its "primary" and "secondary" components) and the Market for Outstanding Optimum Debt.  In

theory, the Cooperative controls roughly 88% of the Leveraged-Finance Market and 99% of the Market for Outstanding Optimum Debt. Optimum cannot realistically access either market so long as the cartel bans such a large share of participants from trading with it. And in practice, the Cooperative has essentially frozen Optimum out of both markets altogether. That ongoing freeze-out, the Steering Committee emphasized, will persist until Optimum rewrites its contracts and pays the conspirators' exorbitant advisor fees. This is a concerted refusal to deal.

187. *Second*, the Cooperative constitutes illegal price fixing. The Steering Committee has negotiated with Optimum on behalf of the entire Cooperative and purported to set prices for the entire group. Its goal, according to PJT, is to curtail the discount Optimum captures on any exchange with its creditors. That is why PJT stressed to Optimum in January 2025 that the Cooperative forecloses Optimum from "repurchas[ing] Co-Op debt at a discount through open market purchases." Ex. A. And it is why the Steering Committee insisted that Optimum rewrite its contracts to forfeit its bargained-for covenant flexibility. Due to the Cooperative's collusion, that leaves Optimum with only two options for transacting in the relevant markets: either (1) transact at par, with no discount; or (2) accept new restrictive covenants that are functionally the equivalent of raising the price of its debt. Either way, the Cooperative has used collusion to set the market price of Optimum's transactions. That too is destructive of competition per se.

188. *Third*, the Cooperative impairs the proper functioning of both antitrust markets. Well-functioning debt markets rely on competition among creditors, not collusion, to set efficient financing terms. LMEs play a key role in that free-market process. *Supra* ¶¶ 73-78. LMEs are an accepted market practice that, when deployed correctly, enable stressed debtors to deleverage

and present opportunities for creditors willing to negotiate competitively.[86]  Yet the Cooperation Agreement was designed to and does preclude Optimum from deploying LMEs to address its capital structure.  That prohibition deprives Optimum of a vital tool for managing its debt.

189.    The Cooperative's LME-blocking function upends the contractual bargain Optimum struck with its creditors.  Without the Cooperative, Optimum's deleveraging flexibility would stem from the Credit Agreement and Indentures, whose provisions Optimum crafted to give it the very flexibility the Cooperative now strips away.  And each creditor knowingly agreed to those provisions after extensive diligence from an army of advisors and lawyers.  They did so because they were chasing high yields during a period of low interest rates.  *Supra* ¶¶ 72, 123.  The credit documents thus reflected a simple exchange:  high yields for covenant flexibility.  The Cooperative is a way for the creditors now to renege on that exchange.  It allows Defendants to keep the yields while using collusion to strip away the flexibility.

190.    Backtracking on that contractual bargain strikes at the heart of both antitrust markets.  Markets depend, at their core, on up-front contractual bargains setting the terms of dealing.  Market integrity requires those contracts to function as intended, enabling both buyers and sellers to make business decisions in reliance on them.  The Cooperative's conduct – colluding to snatch away Optimum's key contractual benefit – is thus especially destructive to the market's functioning.  Not only does it harm borrowers like Optimum, but it also sets a dangerous precedent for other lenders going forward.  If lenders and borrowers doubt whether their contractual agreements will hold, the capital markets will break down entirely.

---

[86] *Decoding Liability Management Exercises (LMEs):  A game-changer for credit*, Octus (Feb. 13, 2025) ("Today, [LMEs] sit at the core of how companies and creditors maneuver through the complexities of the credit market."), https://perma.cc/J5AT-PFFJ.

191.    Defendants and their advisors like to dress their conspiracy in clever wordplay. For the cartel, debtors that deploy LMEs are merely provoking "creditor-on-creditor violence."[87] And because "violence" is bad, the argument goes, inter-creditor collusion is justified to stop it. But all the creditors have done through these formulations is recast competition in pejorative language. When creditors decry "creditor-on-creditor violence," all they really mean is that some creditors in a free market will act against the interests of competing creditors. Or, as Defendant Oaktree put it, "violence" describes any mechanism through which borrowers "pit creditors against each other, creating a prisoner's dilemma that allows the company to obtain concessions."[88] That well describes how competition often works. When creditors express a collective desire to solve those prisoner's dilemmas, they articulate the traditional logic of a cartel: the belief that collusion yields better outcomes for everyone in the cartel.[89]

192.    The "violence" justification well illustrates why Defendants' conspiracy is so corrosive to well-functioning capital markets. If Defendants believe LMEs are bad, they can and should negotiate language up front to stop them – as some creditors now often do. That is the ordinary market reaction when one counterparty wants to stop the other from doing something (here, provoking so-called "violence") in a give-or-take negotiation. But allowing a seller to

---

[87] Oaktree, *Oaktree Credit Q.* 2 (Jan. 30, 2025) (Defendant Oaktree asserting origin of "oft-used term 'creditor-on-creditor violence' "), https://perma.cc/CL46-AY6H; *see, e.g.*, *Special Situations: Addressing Post-LME Protections in 2025*, at 2, Akin Gump Strauss Hauer & Feld LLP (2025) (Cooperative's law firm referring to a "busy period of lender-on-lender violence"), https://perma.cc/9RAA-NL5H.

[88] Oaktree, *Oaktree Credit Q.* 2 (Jan. 30, 2025), https://perma.cc/CL46-AY6H.

[89] Fed. Trade Comm'n, *Overview of the Application of the US Antitrust Laws to Oligopoly Behavior* ¶¶ 3-4 (May 3, 1999) (describing how the prisoner's dilemma can defeat oligopolistic activity), https://bit.ly/439QKzO; Dennis W. Carlton & Jeffrey M. Perloff, *Modern Industrial Organization* 181-183 (4th ed. Boston: Pearson Education 2005) (noting that interfirm competition exemplifies the Prisoner's Dilemma and that cartels are attempts to avoid that dilemma); Peter Huber, *Competition, Conglomerates, and the Evolution of Cooperation*, 93 Yale L.J. 1147, 1150-52 (1984) ("Shared monopolies are another form of the Prisoner's Dilemma.").

obtain the same benefit through after-the-fact collusion weakens the incentives to engage in such negotiations or make any trade-offs up front.  The logic also has no stopping point.  Under Defendants' theory, nothing would stop Optimum from invoking "borrower-on-borrower violence" to enter a horizontal agreement with other leveraged borrowers.  Such borrowers could, for instance, agree that none will negotiate with Apollo unless Apollo first agrees to lower the interest rate in its credit agreements with them all.  Apollo would presumably claim that such an agreement was an illegal antitrust conspiracy.  Credit cooperatives are no different.

193.    *Fourth*, the Cooperative suppresses output and depresses liquidity in both antitrust markets.  As noted above (¶ 120), cooperation agreements spawn different prices for the target's debt held by members and non-members, distorting prices across the market.  In Optimum's case, the Cooperative has so restrained the market for non-Cooperative debt that Optimum cannot even obtain competitive price quotes for the latter.  In fact, the Cooperative has effectively destroyed the secondary market for Optimum's corporate debt, undercutting the market's price-discovery function.  And by restraining trading and forbidding Cooperative members from extending new loans (or buying new bonds) from Optimum, the Cooperative also suppresses output and reduces the amount of capital available in both markets.

194.    Historical data confirms the harm to liquidity.  According to FINRA's Trade Reporting and Compliance Engine fixed-income market trading data, transactions in Optimum's bonds[90] fell off a cliff once Defendants executed the Cooperation Agreement.  Comparing 2024's second quarter (immediately before the July 3, 2024 execution date) to the same quarter in 2025, bond transactions fell 44%.  The first quarter disparity was even more stark, with bond

---

[90] On information and belief, a similar effect occurred with respect to Optimum's loans.  But comparable public data on loan trading volumes is not readily available.

transactions falling by 71%. And the period just before and after the cartel's formation was equally glaring. In the 30 trading days before July 3, 2024, there were 1,501 trades in Optimum's bonds. In the 30 trading days after, there were only 513 (a 66% drop).

195. This liquidity-destroying effect is ongoing. The Cooperation Agreement bars its members from selling, transferring, pledging, or disposing of any of Optimum's debt unless the transferee binds itself to the Cooperation Agreement's terms. That locks some buyers out of the market altogether, as a creditor that does not wish to join an antitrust conspiracy (perhaps for legal reasons) has no realistic way to buy Optimum's corporate debt. It also discourages trading by Cooperative members by adding friction to any sale and weakening their incentives to sell at all. By halting those secondary-market transactions, the Cooperative does not stop at restricting trading among its own members; it also forestalls market entry by new potential competitors.

196. *Fifth*, the Cooperative inflicts anticompetitive effects beyond Optimum. By restraining transactions between Optimum and otherwise-willing creditors – such as open-market purchases of Optimum's outstanding debt – the Cooperative locks up creditors' capital and prevents them from redeploying it throughout the Leveraged-Finance Market. *Supra* ¶ 112 (explaining how reluctant creditors are locked into cartel). It also starves Optimum of capital and so prevents Optimum from investing in new ways, including potential mergers or acquisitions. This effect is not unusual. As the *Financial Times* has reported, "[c]ooperation agreements have irritated borrowers . . . , who increasingly allege they raise antitrust concerns by restraining free trade." These restraints have impeded borrowers from trading their debt in service of innovation and competition in the broader economy.[91]

---

[91] Sujeet Indap & Amelia Pollar, *Bondholder stand-off threatens $23bn bid to build satellite rival to Netflix*, Fin. Times (Oct. 22, 2024) (noting that a borrower's "bid to form a $23bn US

197.    The Cooperative also exemplifies a recent trend that harms myriad leveraged borrowers across the Leveraged-Finance Market.  While Defendants' group boycott here targets Optimum and its affiliates, many Defendants belong to other cooperatives targeting other leveraged borrowers, too.  On information and belief, the Cooperative's other members – the John Doe Entities – also belong to other cooperatives targeting other leveraged borrowers.  The Cooperative here thus represents an anticompetitive device that has spread across the Leveraged-Finance Market in recent years.  This Cooperative also encourages those others:  by providing a proven forum for creditor collusion, it provides a model for creditors of other borrowers – whether these Defendants or others – to follow suit.  In that way, the Cooperation Agreement paves the way for these Defendants and their cartel members to "join[ ] future alliances with other repeat lenders in the . . . market" to suppress competition for other borrowers' debt.[92]

198.    The spillover effects are particularly potent given this Cooperative's unique characteristics.  This Cooperative is (to Optimum's knowledge) the largest in existence, and its membership includes most institutional corporate creditors.  Its continued existence serves as a model for copycat efforts and, on information and belief, contributes to their propagation.  Left unabated, similar cooperation agreements will become standard operating procedure for creditors – spurred on by advisors like PJT and Akin who, in pursuit of lucrative business opportunities, organize and promote such agreements.  Additionally, the cartelization of rival commercial lenders creates both a platform and a financial incentive for Defendants to engage in further unlawful, cartel-like conduct.  Defendants have already disrupted the process of obtaining capital

satellite television group able to compete with Netflix is at risk of collapse" due to the borrower's "stand-off with creditors over a debt restructuring on which the deal depends"), https://on.ft.com/4ifyXxz.

[92] *Cooperation Agreements, Overview and Effectiveness in Restructuring Situations*, Restructuring Newsletter:  Pari Passu (Oct. 25, 2024), https://bit.ly/4gYMUOQ.

across the entire Leveraged-Finance Market and in the Market for Outstanding Optimum Debt, and they will continue to undermine the market until the cartel is broken.

199.     This hurts borrowers and lenders alike.  If borrowers do not believe their contracts are enforceable because a cooperative might form to renege on them, they will be less willing to enter the Leveraged-Finance Market at all – thereby depressing demand for lenders' capital. And by constricting otherwise-willing lenders from transacting with a borrower, cooperatives reduce lender flexibility and prevent them from redeploying capital elsewhere in the economy.

200.     Ultimately, all these restrictions harm U.S. consumers.  The Cooperative introduces inefficiencies in the Leveraged-Finance Market and the Market for Outstanding Optimum Debt, creating a deadweight loss that consumers bear when debt becomes more expensive and companies increasingly struggle to attract the capital they need to operate efficiently.  And by preventing Optimum, a large U.S. telecommunications company, from raising capital to support investments and operations, the Cooperative weakens a significant player in the telecommunications space, shrinks the size of the total economic pie in the United States, limits consumer choice, and diverts Optimum's resources from research and innovation.

201.     Procompetitive considerations do not justify the Cooperative's restraint on trade. As alleged above (¶¶ 85-87), this Cooperative serves no interest in facilitating mutual forbearance by creditors against a defaulting or insolvent creditor.  Quite the opposite:  this Cooperative (like many others) accelerates the risk of bankruptcy by choking off Optimum's liability-management options.  As Oaktree admitted earlier this year, "[e]xecuting an LME can

generate the runway required for a borrower to avoid or postpone a 'full' default."[93]  Closing off that option and precipitating a default appears to be the Cooperative's goal.

202.    The Cooperation Agreement's terms are untethered from any interest in fostering mutual forbearance or any other traditional justification for creditor coordination.  The Cooperative does not simply coordinate on a joint mechanism for enforcing Defendants' existing repayment rights; it also bars *future* loans to Optimum and likewise restrains trading with respect to Optimum's *unmatured* debt.  These interlocking prohibitions thus prevent creditors from participating in transactions that Optimum might execute to reduce its total debt load.  The Cooperative's multi-year term is also facially untailored to any insolvency period.  And it arose in July 2024, several years before any near-term maturity and before there might have been any need for the type of coordination sometimes seen in pre-packaged bankruptcy plans.

203.    Defendants' conspiracy also differs from the traditional case in which indenture trustees might work in concert to make a single offer to a defaulting borrower.  Some coordination in that context may serve the procompetitive aim of preventing an individual trustee from initiating premature litigation to remedy the default.  Crucial to that justification, however, is the background principle that indenture trustees traditionally lack the power to vary an indenture's terms or enter any compromise with a borrower.  Defendants are differently situated. They do have the right – one often exercised under ordinary market conditions – to compromise on deleveraging transactions.  The Cooperation Agreement upends those ordinary conditions.

---

[93] Oaktree, *Oaktree Credit Q.* (Jan. 30, 2025), https://perma.cc/CL46-AY6H; *see also* Oaktree, *The Roundup* 1 (Sept. 2024) (Robert O'Leary, Co-CEO & Portfolio Manager, Global Opportunities:  "As we note in *Value Opportunities:  Navigating the Docs*, this has paved the way for a record volume of liability management exercises, in which a borrower restructures its existing debt outside of court.  LMEs can help companies avoid formally defaulting, which often involves a long and expensive Chapter 11 bankruptcy process."), https://bit.ly/4nEPOej.

204.     Nor is Optimum a defaulting or insolvent creditor in all events.  It is a solvent company in full compliance with its contract obligations and covenants, and it continues to invest in its business.  There is no credible threat that one creditor or group of creditors in a free market would cause a run on Optimum's assets.  So there is no need for mutual forbearance by creditors, or for any coordination among creditors to facilitate such forbearance.

## V.     OPTIMUM HAS SUFFERED AND WILL SUFFER ANTITRUST INJURY

205.     The Cooperative has caused antitrust injury to Optimum by preventing it from engaging in contractually permitted transactions in the Leveraged-Finance Market and the Market for Outstanding Optimum Debt.  Those transactions, which the Cooperative stops in their tracks, would improve Optimum's financial health and free up capital for investment.  The Cooperative (1) prevents Optimum from transacting or even negotiating with individual Cooperative members, including over LMEs and other deleveraging transactions; (2) blocks Optimum from competing with Defendants to buy its own debt on secondary markets; (3) distorts the price of Cooperative and non-Cooperative debt alike; and (4) forces Optimum to pay elevated interest rates based on the Alternate Base Rate ("ABR") rather than Secured Overnight Financing Rate ("SOFR") benchmark.  Each injury stems directly from the anticompetitive harms the Cooperative inflicts in the relevant markets.

206.     *First*, the Cooperative harms Optimum by barring Cooperative members and their affiliates from individually transacting with Optimum.  Without this no-dealing clause, Optimum could negotiate with individual creditors to reorganize, repay, refinance, reschedule, or recapitalize some of its debt.  Optimum could also pursue LMEs with individual creditors or creditor groups, just as it did before the Cooperative formed.  These transactions would benefit Optimum by improving its capital structure and freeing up funds for operations and investments. The Cooperative obstructs that result by barring Optimum from reaching agreements with

individual creditors even when such agreements would benefit both parties. Indeed, the Cooperative has driven up the price Optimum paid for capital from non-Cooperative members and scuttled Optimum's efforts to raise money even in the adjacent asset-backed-finance market. *Supra* ¶¶ 142-148. Both effects reveal the Cooperative's market power and the antitrust injury that Defendants' group boycott has already inflicted on Optimum.

207. *Second*, the Cooperative prevents Optimum from competing with Defendants as a buyer of its own debt on the open market. The Cooperative bars its members from selling, transferring, pledging, or disposing of any of Optimum's debt unless the transferee also agrees to be bound by the Cooperative's terms. But for this unlawful constraint, secondary-debt buyers could compete with the Cooperative members over Optimum's unmatured debt. Optimum could itself participate in that open market by repurchasing its debt, and secondary-debt buyers could compete directly with Cooperative members over Optimum's unmatured debt.

208. *Third*, the Cooperative distorts the price of Optimum's debt across the relevant markets, making it more difficult for Optimum to purchase its debt even from the few creditors who are willing and able to transact with Optimum. In fact, the liquidity effects are so strong – and the potential universe of non-Cooperative buyers and sellers so limited – that Optimum has been unable to even obtain reliable price quotes for its debt. That destruction of the market's price-discovery function harms Optimum and independently constitutes antitrust injury.

209. *Fourth*, the Cooperative is inflicting ongoing harm by forcing Optimum to pay interest rates priced against a non-standard benchmark. It achieved this aim by scuttling Optimum's efforts to secure an uncontroversial, industry-accepted amendment to the Credit Agreement to replace the discontinued London Interbank Offered Rate ("LIBOR") benchmark interest rate. In the Credit Agreement, Optimum and its creditors selected LIBOR as the

benchmark rate, providing each creditor with interest calculated at LIBOR plus an agreed-upon spread.  The Credit Agreement also contemplated that if LIBOR were discontinued, Optimum could replace it with "a comparable successor or alternative interbank rate . . . broadly accepted as the prevailing market practice for syndicated leveraged loans of this type," which would take effect unless a majority of lenders object within five days.[94]  If Optimum and a majority of creditors could not agree on a replacement benchmark, the ABR would become the new benchmark rate.[95]  The ABR significantly exceeds LIBOR and is not a "comparable . . . alternative interbank rate."

210.    LIBOR was discontinued in 2022, and a subsequent "synthetic" version of LIBOR was discontinued in September 2024.  Since LIBOR's discontinuation, the vast majority of other borrowers and creditors with LIBOR-based debt instruments in the Leveraged-Finance Market have agreed to replace that benchmark with a comparable benchmark interest rate, the SOFR.  Amendments to debt instruments that replace LIBOR with SOFR are commonplace and uncontroversial, as SOFR is a well-accepted benchmark throughout U.S. financial markets.

211.    Indeed, such an amendment is so routine that Optimum's credit documents do not even require creditors to affirmatively approve it.  Rather, the amendment is adopted by default unless a majority of creditors object.  But the majority did object here, using the Cooperative's collusion to block this commonsense and almost universally accepted amendment.

212.    In 2024, Optimum and JPMorgan Chase Bank, as administrative agent for the lenders under the Credit Agreement, jointly determined that replacing LIBOR with SOFR as the benchmark interest rate for Optimum's approximately $2.865 billion Term Loan B-5 was

---

[94] *See* Credit Agreement § 1.07.
[95] *See id.* §§ 1.07, 2.08.

reasonable. In September 2024, Optimum formally proposed an amendment to the Credit Agreement that would have effectuated this replacement. Optimum expected the uncontroversial amendment to be adopted, as it has in scores of other credit agreements. But the Term Loan B-5 creditors (acting, on information and belief, through the Cooperative) affirmatively blocked the amendment in a coordinated manner without explanation. As a result, at the conclusion of the last interest period priced on synthetic LIBOR (March 31, 2025), Optimum's Term Loan B-5 became subject to the ABR instead – an interest rate that is materially higher than SOFR. The resulting cost to Optimum is immense. One Defendant's affiliate projected that the Cooperative's rejection of SOFR is costing Optimum between $60 and $90 million annually.

## CLAIMS FOR RELIEF

### COUNT ONE
### Unlawful Restraint of Trade in Violation of the Sherman and Clayton Acts, 15 U.S.C. §§ 1 and 15, respectively

213. Optimum incorporates the factual allegations above.

214. Defendants are corporations, limited liability companies, and limited partnerships engaged in interstate trade and commerce throughout the United States.

215. Optimum, Defendants, and other members of the Cooperative are participants in the Leveraged-Finance Market and the Market for Outstanding Optimum Debt. Defendants and other members of the Cooperative are creditors and direct competitors in these markets.

216. Optimum is a borrower in the Leveraged-Finance Market and Market for Outstanding Optimum Debt.

217. The Leveraged-Finance Market and Market for Outstanding Optimum Debt are concentrated, particularly with respect to those creditors that can finance multi-billion dollar capital structures such as Optimum's, and barriers to entry are high.

218.    In or around July 2024, Defendants executed the Cooperation Agreement, thereby forming the Cooperative, through which Defendants consolidated market power in the Leveraged-Finance Market and Market for Outstanding Optimum Debt.  Defendants conspired to act as a cartel, including by boycotting individual negotiations with Optimum and conspiring to set the price of Optimum's debt by rejecting Optimum's proposed SOFR amendment, among other things.  The Cooperative substantially affects interstate commerce, both with respect to Optimum's billions of dollars of outstanding debt, and in the broader Leveraged-Finance Market.

219.    Defendants and the Cooperative exert substantial market power in the Leveraged-Finance Market and the Market for Outstanding Optimum Debt.  The Cooperative, led by Defendants, controls at least 88% of the Leveraged-Finance Market and 99% of the Market for Outstanding Optimum Debt.  Defendants' market power is also illustrated by their power to affect the prices and terms on which Optimum and other borrowers transact in these markets.

220.    Defendants, as members of the Cooperative's Steering Committee, control negotiations with Optimum and represent a substantial percentage of both (1) Optimum's debt holders, and (2) the creditors in the Leveraged-Finance Market.

221.    The Cooperative and Cooperation Agreement constitute a concerted refusal to deal with Optimum and are per se unlawful.  The Cooperative and Cooperation Agreement also constitute a horizontal agreement to fix the prices of Optimum's debt in the Leveraged-Finance Market and Market for Outstanding Optimum Debt and are per se unlawful for that independent reason.

222.    Alternatively, Defendants' concerted refusal to deal with Optimum and horizontal agreement to fix prices unreasonably restrain trade under the rule of reason.  Among other things, the Cooperative harms competition in the Leveraged-Finance Market and Market for

Outstanding Optimum Debt by eliminating competition between Cooperative members, who represent the majority of participants in the Leveraged-Finance Market and Market for Outstanding Optimum Debt, by foreclosing Optimum from these markets, and by distorting prices in these markets. No procompetitive rationale justifies these anticompetitive harms.

223. Defendants' concerted refusal to deal and agreement to fix prices have injured Optimum. As a result of the Cooperative's refusal to engage in negotiations with Optimum, Optimum is unable to meaningfully participate in the Leveraged-Finance Market or Market for Outstanding Optimum Debt or otherwise manage its debt. The Cooperative's conduct also swells Optimum's cost to raise additional capital causing it (and ultimately other leveraged companies, too) to pay supracompetitive rates for new capital. This also harms U.S. consumers, millions of whom rely on Optimum for the telecommunications services that are critical to consumers' livelihood, health, and more.

## COUNT TWO
### Unreasonable Restraint of Trade in Violation of the Donnelly Act, N.Y. Gen. Bus. Law § 340

224. Optimum incorporates the factual allegations above.

225. The Cooperative and the conduct set forth in the Complaint's First Cause of Action violate New York's Donnelly Act for the same reasons it violates federal antitrust law, and application of New York law is proper because Optimum is headquartered in New York.

## COUNT THREE
### Breach of Contract

226. Optimum incorporates the factual allegations above.

227. Between 2015 and 2024, Optimum entered into written contracts governing its loans and bonds now held by Defendants and other creditors.

228. The Credit Agreement and Indentures are valid contracts that bind both Optimum and Defendants. As the creditors of Optimum's outstanding loans and notes, and through the Credit Agreement and Indentures, Optimum and Defendants are in privity of contract, or, at a minimum, the functional equivalent of privity sufficient to sustain a breach of contract action. For example, creditors have veto power over Optimum in certain instances, and creditors are also empowered to excuse certain of Optimum's contractual obligations. As to the Indentures, for example, they allow Optimum to take certain actions with the consent of Defendants and other noteholders. By, among other things, voluntarily becoming creditors and noteholders to Optimum's outstanding debt, Defendants have assumed the obligations of creditors and noteholders under the Credit Agreement and Indentures.

229. Optimum has performed all of its obligations under the Credit Agreement and Indentures. It is a going concern and has not defaulted on any of its obligations.

230. The Credit Agreement and Indentures permit Optimum to negotiate and transact with individual creditors who are parties to those contracts without the consent of other creditors. They permit Optimum to amend the contracts with the consent of creditors holding a simple majority of Optimum's debt governed by that contract.

231. After Optimum executed the Credit Agreement and Indentures, Defendants executed the Cooperation Agreement, thus forming the Cooperative which prevents any member from individually negotiating or transacting with Optimum, and requires transactions be approved by Cooperative members holding two-thirds of each of Optimum's debt class types.

232. As a result, Defendants have refused to individually negotiate or transact with Optimum – or to allow other creditors to negotiate or transact with Optimum or its affiliates – as permitted by the Credit Agreement and Indentures.

233. Defendants' refusals to individually negotiate or transact with Optimum – or to allow other creditors to do so – are a material breach of the Credit Agreement and Indentures.

234. In the alternative, Defendants' refusals constitute an anticipatory breach of the Credit Agreement and Indentures. By the terms of the Cooperation Agreement, Defendants have superseded the Credit Agreement's and Indentures' provisions with new, extracontractual terms that prohibit Optimum or its affiliates from individually negotiating with creditors, or from dealing with creditors or their affiliates without the two-thirds approval of each creditor class type. So the Credit Agreement and Indentures permit Optimum to amend its debt instruments or take those actions requiring creditor approval with approval of a bare majority of creditors (and many other actions with no consent at all). Due to the Cooperative, a small minority of creditors within a single creditor class type can prevent Optimum from managing its liabilities effectively (including liabilities unrelated to the objecting minority of creditors). By orchestrating the Cooperative to unilaterally amend the Credit Agreement and Indentures, Defendants have made clear that they have no intent to comply with those contracts.

235. Optimum has been harmed by Defendants' breaches of these agreements. As a result of the Cooperative's refusal to permit its members to engage in transactions with Optimum, Optimum cannot meaningfully participate in the Leveraged-Finance Market or Market for Outstanding Optimum Debt or otherwise manage its debt. The Cooperative's conduct also swells Optimum's cost to raise additional capital, if such capital can be raised at all, causing it (and other leveraged companies) to pay supracompetitive rates for new capital.

## COUNT FOUR
### Breach of the Implied Covenant of Good Faith and Fair Dealing

236. Optimum incorporates the factual allegations above.

237.     Optimum's Credit Agreement and Indentures are subject to an implied covenant of good faith and fair dealing, which incorporates into the contract any promises that a reasonable person would consider part of the bargain with respect to matters that the contracts do not address expressly by their terms.

238.     Defendants, by leading the Cooperative, acted in bad faith for their own benefit to intentionally deprive Optimum of the benefits it bargained for in its credit documents, which permit liability-management exercises and otherwise allow Optimum to pursue restructuring, reorganizing, repaying, refinancing, rescheduling, and recapitalizing opportunities.  Defendants deprived Optimum of the benefit of that contractual bargain by colluding with each other to change the consent requirements reflected in the contracts, thus requiring and withholding supermajority consent for transactions the contracts otherwise allow.

239.     Optimum has suffered and will continue to suffer harm as a result.  By boycotting negotiations and dealings with Optimum through the Cooperative, Defendants have deprived Optimum of the benefit of any liability-management exercise or other steps to manage its capital structure, in violation of the implied covenant of good faith and fair dealing.

## PRAYER FOR RELIEF

240.     Plaintiffs request that the Court:

a. Enter judgment against Defendants and declare that their conduct alleged here violates the Sherman Act, 15 U.S.C. § 1, the Donnelly Act, N.Y. Gen. Bus. Law § 340, and state common law;

b. Enjoin Defendants from enforcing the Cooperation Agreement;

c. Award Plaintiffs compensatory and punitive damages to the maximum extent permitted by law, and treble any compensatory damages awarded under the Sherman Act;

d. Award Plaintiffs their attorneys' fees and costs under §§ 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and the Donnelly Act, N.Y. Gen. Bus. Law § 340;

e. Award Plaintiffs prejudgment interest at the highest rate provided by law; and

f. Award Plaintiffs any such further relief the Court deems just and proper.

Dated:  November 25, 2025

Respectfully submitted,

/s/ Joshua D. Branson
Joshua D. Branson (*pro hac vice* pending)
David L. Schwarz (*pro hac vice* forthcoming)
Thomas G. Schultz (*pro hac vice* forthcoming)
Kyle B. Grigel (*pro hac vice* forthcoming)
Brenna L. Darling (*pro hac vice* forthcoming)
Jarrod A. Nagurka (*pro hac vice* forthcoming)
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
(202) 326-7999 (fax)
jbranson@kellogghansen.com
dschwarz@kellogghansen.com
tschultz@kellogghansen.com
kgrigel@kellogghansen.com
bdarling@kellogghansen.com
jnagurka@kellogghansen.com

*Counsel for Plaintiffs*