**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| OPTIMUM COMMUNICATIONS, INC.; CSC HOLDINGS, LLC, | |
| Plaintiffs, | Case No. 1:25-cv-9785 (JAV) |
| v. | |
| APOLLO CAPITAL MANAGEMENT, L.P.; ARES MANAGEMENT LLC; BLACKROCK FINANCIAL MANAGEMENT, INC.; GOLDENTREE ASSET MANAGEMENT LP; J.P. MORGAN INVESTMENT MANAGEMENT INC.; LOOMIS, SAYLES & COMPANY, L.P.; OAKTREE CAPITAL MANAGEMENT, L.P.; PGIM, INC.; Doe Entities #1-#1000, | ORAL ARGUMENT REQUESTED |
| Defendants. | |

**DEFENDANTS' MEMORANDUM OF LAW**
**IN SUPPORT OF THEIR MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................1

BACKGROUND AND ALLEGATIONS OF THE COMPLAINT.................................................4

    A.     The Parties and Optimum's Capital Structure ........................................ 4

    B.     Leveraged Finance ................................................................................. 6

    C.     Liability Management Exercises............................................................ 6

    D.     The Cooperation Agreement.................................................................. 7

    E.     Optimum's Recent Capital-Raising Efforts and Financial Health......................... 7

    F.     Plaintiffs' Claims ................................................................................. 8

LEGAL STANDARD...............................................................................................................9

ARGUMENT ..........................................................................................................................9

I.     PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE SHERMAN ACT..................9

    A.     Plaintiffs Lack Antitrust Standing Because the Alleged Conduct Does Not Implicate the Antitrust Laws.................................................. 10

    B.     Plaintiffs Do Not Allege a *Per Se* Antitrust Violation.......................... 18

    C.     Plaintiffs Fail to State a Claim Under the Rule of Reason. ................................ 21

II.    PLAINTIFFS FAIL TO STATE CONTRACT-RELATED CLAIMS ............................25

    A.     Plaintiffs Do Not Allege Failure to Perform.......................................... 25

    B.     Plaintiffs' Implied-Covenant Claim Is Deficient and Duplicative. ...................... 25

CONCLUSION.....................................................................................................................28

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### Cases

*19 Recordings Ltd.* v. *Sony Music Ent.*,
    165 F. Supp. 3d 156 (S.D.N.Y. 2016)..............................................................................25, 26

*Ace Arts, LLC* v. *Sony/ATV Music Publ'g, LLC*,
    56 F. Supp. 3d 436 (S.D.N.Y. 2014).......................................................................................18

*Akanthos Cap. Mgmt., LLC* v. *Atlanticus Holdings Corp.*,
    734 F.3d 1269 (11th Cir. 2013) ...................................................................................... *passim*

*ARI & Co.* v. *Regent Int'l Corp.*,
    273 F. Supp. 2d 518 (S.D.N.Y. 2003) ....................................................................................27

*Ashcroft* v. *Iqbal*,
    556 U.S. 662 (2009)....................................................................................................................9

*Atl. Richfield Co.* v. *USA Petroleum Co.*,
    495 U.S. 328 (1990)..................................................................................................................10

*Broad. Music, Inc.* v. *Columbia Broad. Sys., Inc.*,
    441 U.S. 1 (1979)........................................................................................................3, 19, 20

*Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977)..................................................................................................................10

*Cambridge Cap. LLC* v. *Ruby Has LLC*,
    675 F. Supp. 3d 363 (S.D.N.Y. 2023)....................................................................................27

*Cap. Imaging Assocs., P.C.* v. *Mohawk Valley Med. Assocs.*,
    996 F.2d 537 (2d Cir. 1993)...............................................................................................9, 19

*Cenedella* v. *Metro. Museum of Art*,
    348 F. Supp. 3d 346 (S.D.N.Y. 2018).......................................................................21, 22, 24

*CompuCredit Holdings Corp.* v. *Akanthos Cap. Mgmt., LLC*,
    916 F. Supp. 2d 1326 (N.D. Ga. 2011) ........................................................................... *passim*

*Dalton* v. *Educ. Testing Serv.*,
    87 N.Y.2d 384 (1995) ..............................................................................................................26

*DirecTV, LLC* v. *Nexstar Media Grp., Inc.*,
    162 F. 4th 295 (2d Cir. 2025) .................................................................................................10

## TABLE OF AUTHORITIES

*(continued)*

**Page(s)**

*Dixon* v. *von Blanckensee*,
    994 F.3d 95 (2d Cir. 2021)..................................................................................9

*Falstaff Brewing Corp.* v. *New York Life Ins. Co.*,
    513 F. Supp. 289 (N.D. Cal. 1978) .....................................................1, 12, 13, 16

*Gatt Commc'ns, Inc.* v. *PMC Assocs., L.L.C.*,
    711 F.3d 68 (2d Cir. 2013)........................................................... *passim*

*George Haug Co.* v. *Rolls Royce Motor Cars Inc.*,
    148 F.3d 136 (2d Cir. 1998)................................................................................15

*Global Disc. Travel Servs., LLC* v. *Trans World Airlines, Inc.*,
    960 F. Supp. 701 (S.D.N.Y. 1997).......................................................................23

*Global Tel*Link Corp.* v. *JACS Sols.*,
    708 F. Supp. 3d 784 (E.D. Va. 2023) .............................................................17, 18

*Hertz Corp.* v. *City of New York*,
    1 F.3d 121 (2d Cir. 1993) ...................................................................................19

*In re Int. Rate Swaps Antitrust Litig.*,
    2019 WL 1147149 (S.D.N.Y. Mar. 13, 2019) ......................................................21

*Integrated Sys. & Power, Inc.* v. *Honeywell Int'l, Inc.*,
    713 F. Supp. 2d 286 (S.D.N.Y. 2010).............................................................23, 24

*Leegin Creative Leather Prods., Inc.* v. *PSKS, Inc.*,
    551 U.S. 877 (2007)...........................................................................................19

*Lefkowitz* v. *McGraw-Hill Global Educ. Holdings, LLC*,
    23 F. Supp. 3d 344 (S.D.N.Y. 2014).....................................................................4

*Lipow* v. *Net 1 UEPS Techs.*,
    131 F. Supp. 3d 144 (S.D.N.Y. 2015)...................................................................4

*M/A-COM Sec. Corp.* v. *Galesi*,
    904 F.2d 134 (2d Cir. 1990)................................................................................27

*Madison 92nd St. Assocs., LLC* v. *Courtyard Mgmt. Corp.*,
    624 F. App'x 23 (2d Cir. 2015) ..........................................................................22

*Metro. Life Ins. Co.* v. *RJR Nabisco, Inc.*,
    716 F. Supp. 1504 (S.D.N.Y. 1989)....................................................................26

*Miller* v. *HSBC Bank U.S.A., N.A.*,
    2015 WL 585589 (S.D.N.Y. Feb. 11, 2015).........................................................25

## TABLE OF AUTHORITIES
(*continued*)

**Page(s)**

*Nat'l Collegiate Athletic Ass'n* v. *Bd. of Regents of Univ. of Okla.*,
    468 U.S. 85 (1984)....................................................................................................20

*Nat'l Union Fire Ins. Co.* v. *Xerox Corp.*,
    807 N.Y.S.2d 344 (App. Div. 2006) .......................................................................26

*NYNEX Corp.* v. *Discon, Inc.*,
    525 U.S. 128 (1998).................................................................................................9

*Piuggi* v. *Good for You Prods. LLC*,
    739 F. Supp. 3d 143 (S.D.N.Y. 2024)....................................................................25

*Planetarium Travel, Inc.* v. *Altour Int'l, Inc.*,
    97 F. Supp. 3d 424 (S.D.N.Y. 2015)......................................................................23

*Primetime 24 Joint Venture* v. *Nat'l Broad. Co.*,
    219 F.3d 92 (2d Cir. 2000)......................................................................................12

*Queen City Pizza, Inc.* v. *Domino's Pizza, Inc.*,
    124 F.3d 430 (3d Cir. 1997)....................................................................................23

*Relevent Sports, LLC* v. *Fédération Internationale De Football Ass'n*,
    551 F. Supp. 3d 120 (S.D.N.Y. 2021)....................................................................19

*Security Plans, Inc.* v. *CUNA Mut. Ins. Soc'y*,
    769 F.3d 807 (2d Cir. 2014)....................................................................................26

*SEI Global Servs., Inc.* v. *SS&C Advent*,
    496 F. Supp. 3d 883 (E.D. Pa. 2020) .....................................................................17

*Sharon Steel Corp.* v. *Chase Manhattan Bank, N.A.*,
    521 F. Supp. 104 (S.D.N.Y. 1981).........................................................................11

*Sharon Steel Corp.* v. *Chase Manhattan Bank, N.A.*,
    691 F.2d 1039 (2d Cir. 1982)......................................................................... *passim*

*State Farm Mut. Auto. Ins. Co.* v. *Metro Pain Specialists, P.C.*,
    2025 WL 1166982 (E.D.N.Y. Mar. 26, 2025).......................................................27

*Steves & Sons, Inc.* v. *JELD-WEN, Inc.*,
    988 F.3d 690 (4th Cir. 2021) .............................................................................16, 17

*Texaco Inc.* v. *Dagher*,
    547 U.S. 1 (2006).....................................................................................................19

*Tierney* v. *Davidson*,
    133 F.3d 189 (2d Cir. 1998)....................................................................................27

## TABLE OF AUTHORITIES
(*continued*)

**Page(s)**

*Tommy Lee Handbags Mfg. Ltd.* v. *1948 Corp.*,
   971 F. Supp. 2d 368 (S.D.N.Y. 2013)...............................................................................16, 18

*United Airlines, Inc.* v. *U.S. Bank N.A.*,
   406 F.3d 918 (7th Cir. 2005) .......................................................................... *passim*

*United States* v. *Booz Allen Hamilton Inc.*,
   2022 WL 9976035 (D. Md. Oct. 17, 2022) ...........................................................23

*Vill. On Canon* v. *Bankers Trust Co.*,
   920 F. Supp. 520 (S.D.N.Y. 1996).......................................................................26

*Watkins* v. *Smith*,
   2012 WL 5868395 (S.D.N.Y. Nov. 19, 2012)..................................................21, 24

*WCA Holdings III, LLC* v. *Panasonic Avionics Corp.*,
   704 F. Supp. 3d 473 (S.D.N.Y. 2023)...................................................................27

## Statutes and Rules

Donnelly Act, N.Y. Gen. Bus. Law § 340 ....................................................................24

Fed. R. Evid. 201 ........................................................................................................4

Sherman Act, 15 U.S.C. § 1.................................................................................. *passim*

## PRELIMINARY STATEMENT

This case is an effort to weaponize the antitrust laws to give plaintiff Optimum Communications, Inc. and its subsidiary co-plaintiff, CSC Holdings, LLC ("Optimum" or "Plaintiffs"), leverage to which they are not entitled by contract—so they can extract individual concessions on billions of dollars of pre-existing debt. Plaintiffs' complaint (ECF No. 1, "Complaint" or "Compl.") does not allege that the lending markets were rigged at the point that debt was issued, when competition actually occurred. Instead, it challenges creditors' subsequent decision—after the debt was issued—to coordinate their response to Optimum's restructuring overtures and proposed amendments, rather than agree to being pitted against one another through individual renegotiations.

But antitrust law protects competition—not a borrower's desire for leverage in renegotiating its liabilities in times of distress. That is why *every* court that has addressed antitrust challenges to creditor cooperation has held that the antitrust laws do not reach the challenged conduct. "[T]hin to the point of invisibility," *United Airlines, Inc.* v. *U.S. Bank N.A.*, 406 F.3d 918, 924 (7th Cir. 2005) (Easterbrook, J.), "border[ing] on the frivolous," *Sharon Steel Corp.* v. *Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1052 (2d Cir. 1982), "the very opposite of price-fixing." *Falstaff Brewing Corp.* v. *New York Life Ins. Co.*, 513 F. Supp. 289, 293 (N.D. Cal. 1978). That is how courts in the past 50 years have characterized such antitrust claims—and they are right.

Optimum received from its creditors billions of dollars in a freely competitive market. With its bargaining position improved now that it holds those assets and may threaten non-payment, Optimum wishes to prevent its creditors, Defendants here,[1] from coordinating to

---

[1]     "Defendants" refers to the eight financial institutions that are named defendants in this action:  Apollo Capital Management, L.P.; Ares Management LLC; BlackRock Financial

maximize their collective ability to receive the benefit of their bargain.  Thus, under the Complaint's theory, antitrust law requires Defendants to compete with one another in *re*negotiations with the debtor who holds their assets.  That theory is wrong.  As part of the same transactions that provided Optimum with billions in capital, Optimum's creditors are entitled to repayment.  Optimum and Defendants' relationships are defined by the underlying debt instruments, not antitrust law.  Defendants are not bound by the Sherman Act to indulge Optimum's preferred renegotiation strategy.

The Complaint itself explains why:  leveraged financing exists because risk is shared across many sophisticated lenders and bondholders, and the governing agreements hardwire collective action through voting thresholds, class votes, and consent rights.  Plaintiffs acknowledge that so-called "liability management exercises" ("LMEs") are "a creature of contract," often pitting creditors against one another to "create individual winners and losers."  The creditor cooperation alleged here is a permissible response to that dynamic.  It prevents opportunistic maneuvers that reward certain creditors at the expense of others; it reduces transaction costs and the destructiveness of brinkmanship; and it promotes the very mutual forbearance that can keep a borrower operating while preserving the contractual expectations that made the original financing possible.  In short, the cooperation Plaintiffs attack is not merely lawful—it is procompetitive, and it benefits borrowers and consumers alike.

Defendants are entitled to dismissal as a matter of law.  First, Plaintiffs lack antitrust standing because they do not plead an antitrust injury.  Long-settled precedent recognizes that coordinated creditor action to protect and collect on pre-existing debt is not the sort of conduct the

---

Management, Inc.; GoldenTree Asset Management LP; J.P. Morgan Investment Management Inc.; Loomis, Sayles & Company, L.P.; Oaktree Capital Management, L.P.; and PGIM, Inc.

antitrust laws police, because "[c]ompetition comes at the time loans are made," *United Airlines*, 406 F.3d at 921, not when a borrower later seeks to renegotiate a discount.

Second, Plaintiffs' attempt to dress this case in *per se* labels fails.  Courts reserve *per se* treatment for restraints that are "plainly" and "always or almost always" anticompetitive. *Broad. Music, Inc.* v. *Columbia Broad. Sys., Inc.*, 441 U.S. 1, 8, 19-20 (1979).  Creditor cooperation is the opposite:  courts repeatedly recognize that joint creditor action is commonly in the interests of all parties and serves the market by reducing the costs of disorderly workouts and bankruptcy.  Given that courts have uniformly held that the challenged conduct is not reached by the antitrust laws at all, *per se* treatment is particularly inapt.  At most, Plaintiffs' allegations could be tested under the rule of reason—even there, they fail.

Third, Plaintiffs' rule-of-reason claim collapses for several independent reasons. Both of their proposed antitrust markets—the market for only Optimum's outstanding debt and the leveraged-finance market in general—are implausible, not least because they are artificially narrow and ignore obvious alternative sources of capital, including the very third-party financings that Plaintiffs admit they have obtained.  And even if the Court accepted Plaintiffs' overly narrow leveraged-finance market, the Complaint still fails to plead substantial anticompetitive effect. What Plaintiffs describe is not reduced market output or harm to consumers; it is creditors declining to be divided and used to facilitate value-shifting LMEs.  The law does not treat that as an antitrust harm—and the procompetitive justifications for creditor cooperation outweigh Plaintiffs' speculative assertions to the contrary.

Finally, Plaintiffs' contract-based claims also fail.  The Complaint relies on the false premise that Defendants were obligated under the debt instruments to negotiate on Plaintiffs'

preferred terms, but that obligation does not appear in any of the governing agreements, and Plaintiffs cannot manufacture its existence through an implied-covenant theory.

In sum, Plaintiffs seek to use antitrust law to rewrite their credit contracts.  But the Sherman Act does not protect a debtor's preferred bargaining position against its own creditors or require creditors to help a debtor renegotiate on more favorable terms.  The Complaint should be dismissed with prejudice.

## BACKGROUND AND ALLEGATIONS OF THE COMPLAINT

### A.    The Parties and Optimum's Capital Structure

Optimum, together with its subsidiary, CSC Holdings, is a New York-based telecommunications company that provides internet and related services throughout the United States.  (Compl. ¶¶ 18, 88.)  Defendants are eight financial institutions that serve as asset managers or advisors to funds that hold portions of Optimum's debt.  (*See id.* ¶¶ 19-26 (alleging that each Defendant "owns or manages holdings in Optimum's Loans and Notes").)

Like many large U.S. companies, Optimum finances its operations by entering into loans and issuing bonds, primarily through CSC Holdings.  (*See id.* ¶¶ 18, 89; Ex. 1 at F-34-37.)[2] As of year-end 2024, Optimum and CSC Holdings together owed approximately $23 billion in

---

[2]    "Ex. [_]" refers to exhibits to the accompanying Declaration of Kyle W. Mach.  The Court should consider those exhibits because they are incorporated by reference in the Complaint and/or subject to judicial notice as their contents can be accurately and readily determined though public sources.  *See* Fed. R. Evid. 201; *Lefkowitz* v. *McGraw-Hill Global Educ. Holdings, LLC*, 23 F. Supp. 3d 344, 352 (S.D.N.Y. 2014) (in deciding a Rule 12(b)(6) motion, courts may consider the complaint and its exhibits, "any statements or documents incorporated in it by reference," "any document upon which the complaint heavily relies," and "any items of which judicial notice may be taken"); *Lipow* v. *Net 1 UEPS Techs.*, 131 F. Supp. 3d 144, 157-58 (S.D.N.Y. 2015) (taking judicial notice of press releases, SEC filings, and a research report).

outstanding debt.[3]  (Compl. ¶ 18.)  That debt consists of syndicated term loans and a revolving credit facility (the "Loans"), which are governed by an October 9, 2015 credit agreement, as amended (the "Credit Agreement"), as well as multiple series of notes (*i.e.*, bonds) (the "Notes").  (*Id.* ¶¶ 90-94 & nn.45-46.)  Each series of Notes is governed by an indenture (the "Indentures," together with the Credit Agreement, the "Debt Instruments"), which were executed between 2016 and 2024 and have substantially similar terms.  (*Id.*)  The Loans and Notes have varying interest rates and maturities as provided under their governing Debt Instruments.  (*Id.*)

The Debt Instruments were negotiated years ago under then-prevailing market conditions and contain detailed provisions governing the rights and obligations of Optimum and its creditors.  (*See id.* ¶¶ 90-98.)  These agreements specify when creditor consent is required for executing amendments or other post-issuance transactions and they establish creditor-voting thresholds for such transactions.  (*See id.* ¶¶ 64-65, 96-97 (Optimum must obtain "the approval of a majority of creditors" to take various actions).)  But Optimum alleges that it may take "other actions without majority approval (or any approval at all) from creditors."  (*Id.* ¶¶ 97-98.)[4] Optimum's creditors, however, are not obligated under the Debt Instruments to agree to any transactions proposed by Optimum.  (*Cf. id*. ¶¶ 96-98, 228, 230.)

---

[3]     Defendants, like the Complaint, rely on "market data as of December 31, 2024," and "exclude debt issued by Lightpath" when referring to Optimum's indebtedness.  (Compl. ¶ 18 n.2.)

[4]     Optimum continues to be able to engage in certain transactions irrespective of the Co-op. Under the April 25, 2023 Indenture, for example, Optimum may redeem all or part of the covered notes at the price fixed by schedule under that Indenture.  (Ex. 2 at A-2-6 (setting the redemption price for 2025 and 2026 at 105.625% and 102.813% of the principal amount, respectively).)  Given that Optimum's debt purportedly is trading "at prices that are well below par" (the face value of the note) (Compl. ¶ 105), it is unsurprising that Optimum does not want to repurchase the notes at the price to which it originally agreed.

### B.    Leveraged Finance

Optimum alleges that this action concerns the U.S. "Leveraged-Finance Market," in which below-investment-grade borrowers like Optimum raise capital through syndicated loans and high-yield bonds.  (*Id.* ¶¶ 12, 33, 45-61.)  A leveraged borrower relies heavily on "debt to fund its operations" and pays higher interest rates to compensate creditors for increased risk.  (*See id.* ¶¶ 33 n.4, 132.)  Leveraged finance is distinguished from traditional credit markets by two main concepts:  "syndication" and "securitization."  (*See id.* ¶¶ 45-49.)  In short, syndication and securitization make it possible for a single, leveraged borrower to access capital while mitigating the risk to creditors by "open[ing] the credit markets to more investors."  (*See id.* ¶¶ 46-48.)  A syndicated loan, for instance, involves an "arranger" that organizes a single credit facility funded by multiple creditors under a common credit agreement.  (*Id.* ¶ 46.)  "Securitization" manages risk by pooling loans or bonds and "sell[ing] interests in those securities to others."  (*Id.* ¶ 47.)  According to the Complaint, the U.S. "Leveraged-Finance Market" is valued at more than $3 trillion.  (*Id.* ¶ 52.)

### C.    Liability Management Exercises

The Complaint uses the term "LME" to refer to post-issuance transactions through which borrowers seek to manage already-issued debt outside of bankruptcy.  (*Id.* ¶¶ 62-66, 73.)  "LMEs can take many forms," including "restructurings, voluntary prepayments, refinancings, rescheduling, or recapitalizations."  (*Id.* ¶¶ 65-66.)  In any case, LMEs are not unilateral transactions but instead "are a creature of contract" and require "negotiating with one or more creditors."  (*Id.* ¶¶ 64-65.)  LMEs may result in different outcomes for different creditors depending on whether and how creditors participate in a proposed transaction.  (*See id.* ¶¶ 69-70, 74.)  The Complaint alleges that this dynamic creates incentives for creditors to compete with one

another to obtain favorable treatment, sometimes at the expense of other creditors in the capital structure.  (*Id.* ¶¶ 70-71, 74.)

In recent years, borrowers have increasingly pursued LMEs.  (*Id.* ¶¶ 72-73.)  In response to this surge in LMEs, Optimum alleges that creditors have sought ways to avoid borrowers' aggressive efforts to engage in these transactions.  (*Id.* ¶¶ 74-75.)  One common mechanism is "cooperation agreements," under which creditors agree on a collective framework for dealing with borrowers in post-issuance transactions.  (*Id.* ¶¶ 75-77.)

### D.  The Cooperation Agreement

Against this backdrop, Optimum alleges that certain holders of its debt formed a Cooperative on July 3, 2024 (the "Co-op"), memorialized in a Cooperation Agreement.  (*Id.* ¶ 100.)  Optimum alleges that the Cooperation Agreement contains terms similar to other such agreements formed in recent years, including a bar on individual negotiations between Optimum and Co-op members and their affiliates, a requirement that a supermajority of Co-op members consent to certain transactions, and a provision that debt transfers must bind transferees to the Agreement.  (*Id.* ¶¶ 77, 104.)  Optimum avers that the Co-op is the "largest ever formed" in that its members control "99% of Optimum's outstanding debt."  (*Id.* ¶¶ 9, 111.)  Since the Co-op's formation, Optimum alleges that it has been "unable to conduct any substantive negotiations with any Cooperative member."  (*Id.* ¶ 101.)

### E.  Optimum's Recent Capital-Raising Efforts and Financial Health

The Complaint acknowledges that Optimum has obtained financing from lenders outside the Co-op since it was formed.  In July 2025, Optimum obtained a $1 billion asset-backed loan from a non-Co-op lender secured by certain fiber assets.  (*Id.* ¶¶ 118, 142.)  And in the same week that Plaintiffs filed this action, Optimum entered into a $2 billion transaction under which an affiliate of Defendant J.P. Morgan Investment Management Inc. ("JPMIM") was a lender.  (*See*

*id.* ¶ 152 n.73; Ex. 3; Ex. 4 at Schedule 2.01.)  Most recently, Optimum refinanced the July 2025 asset-backed loan by entering a $1.1 billion term loan in January 2026 with the same JPMIM affiliate.  (Ex. 5; Ex. 6 at Schedule 2.01.)  Notably, Optimum's November 2025 and January 2026 transactions included sweeping restrictions on formal and informal creditor cooperation arrangements.  (*See* Ex. 4 at 132-33; Ex. 6 at 136.)

Although the Complaint asserts that Optimum is solvent and current on its debt obligations (Compl. ¶ 204), the company has become highly and increasingly leveraged in the years leading up to the Co-op's formation.  (*Compare* Ex. 7 at 4, *with* Ex. 8 at 3 (reflecting an approximate 35% increase in Optimum's consolidated net leverage from year-end 2021 to year-end 2024); Ex. 1 at 20, 26-27 (Optimum disclosing that it is "highly leveraged" and that its "substantial indebtedness" exposes it to heightened financial risk).)  Following Optimum's November 2025 debt transaction, Moody's reiterated its "negative" outlook rating for Optimum. (*See* Ex. 9.)

## F.    Plaintiffs' Claims

The Complaint asserts antitrust claims under federal and state law, as well as related contract claims, arising out of Defendants' participation in the Co-op.  (Compl. ¶¶ 213-39.)

Optimum alleges that the Co-op is *per se* unlawful under the Sherman Act, 15 U.S.C. § 1, as a "concerted refusal to deal with Optimum" and a "horizontal agreement to fix the prices of Optimum's Debt."  (*Id.* ¶ 221.)  In the alternative, Optimum alleges that the Co-op unreasonably restrains trade under the rule of reason.  (*Id.* ¶ 222.)  The Complaint alleges that the Co-op harms competition in two primary markets geographically limited to the U.S.  (*Id.* ¶¶ 127, 130.)  The first is the "Leveraged-Finance Market," defined as the market for "leveraged loans and high-yield bonds" available to below-investment-grade borrowers like Optimum.  (*Id.* ¶¶ 131-35.)  The second is the "Market for Outstanding Optimum Debt," which encompasses "post-issuance

transactions" involving only Optimum's "existing debt." (*Id.* ¶ 179.) Defendants allegedly "exert substantial market power" in both markets. (*Id.* ¶ 219.) Nowhere does the Complaint, however, contend that Defendants caused the cost of credit to increase within the "Leveraged-Finance Market" for anyone besides Optimum or that anyone was harmed by the alleged conduct other than Optimum.

Separately, the Complaint alleges that Defendants' refusal to individually renegotiate the Debt Instruments breaches the terms of those agreements and violates the implied covenant of good faith and fair dealing under New York law. (*Id.* ¶¶ 226-39.)

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009). Only "well-pleaded factual allegations" are entitled to the presumption of truth; the Court "need not consider 'conclusory allegations or legal conclusions couched as factual allegations.'" *Dixon* v. *von Blanckensee*, 994 F.3d 95, 101-02 (2d Cir. 2021).

## ARGUMENT

## I.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE SHERMAN ACT.

Section 1 of the Sherman Act "prohibits only agreements that *unreasonably* restrain trade." *NYNEX Corp.* v. *Discon, Inc.*, 525 U.S. 128, 133 (1998). To state a claim under Section 1, a private plaintiff must plausibly plead (i) that it has "antitrust standing," *Gatt Commc'ns, Inc.* v. *PMC Assocs., L.L.C.*, 711 F.3d 68, 75 (2d Cir. 2013), and (ii) that an alleged agreement "constitute[s] an unreasonable restraint of trade either *per se* or under the rule of reason." *Cap. Imaging Assocs., P.C.* v. *Mohawk Valley Med. Assocs.*, 996 F.2d 537, 542 (2d Cir. 1993). Plaintiffs' Sherman Act claim fails at each turn. As a threshold matter, Plaintiffs have not adequately pleaded antitrust standing because the harm that they allege does not give rise to injury

cognizable under the antitrust laws.  But even if Plaintiffs could plead antitrust standing, the Complaint fails to state a violation of the Sherman Act either *per se* or under the rule of reason. Count One must therefore be dismissed.

### A.    Plaintiffs Lack Antitrust Standing Because the Alleged Conduct Does Not Implicate the Antitrust Laws.

To survive dismissal, Plaintiffs must establish antitrust standing, irrespective of whether the *per se* rule or rule of reason applies.  *Atl. Richfield Co.* v. *USA Petroleum Co.*, 495 U.S. 328, 344 (1990); *Gatt*, 711 F.3d at 75 ("Antitrust standing is a threshold, pleading-stage inquiry.").  As part of this threshold analysis, Plaintiffs must plausibly allege an "antitrust injury." *Gatt*, 711 F.3d at 76.  They do not.  It is not enough that the alleged restraint harmed Optimum. *See id.*  Instead, Plaintiffs must plausibly allege an injury "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).

The Second Circuit "employ[s] a three-step process for determining whether a plaintiff has sufficiently alleged antitrust injury."  *Gatt*, 711 F.3d at 76; *DirecTV, LLC* v. *Nexstar Media Grp., Inc.*, 162 F.4th 295, 308 (2d Cir. 2025) (same).  Courts must (1) "identify the practice complained of and the reasons such a practice is or might be anticompetitive"; (2) "identify the actual injury the plaintiff alleges" and "look to the ways in which the plaintiff claims it is in a 'worse position' as a consequence of the defendant's conduct"; and (3) "compare the anticompetitive effect of the specific practice at issue to the actual injury the plaintiff alleges." *Gatt*, 711 F.3d at 76 (cleaned up).

Writ large, the Complaint alleges that the Co-op violates the antitrust laws because it supposedly was designed to prevent Optimum from "renegotiat[ing]" its *pre-existing* debt with creditors.  (Compl. ¶¶ 1, 205-12.)  But that allegation fails under *Gatt* because the Complaint does

not plausibly allege that cooperation among creditors to secure repayment of *existing* debt is anticompetitive and thus subject to the antitrust laws.  To the contrary, *every court* to consider claims like those presented here has agreed:  cooperation among creditors to secure pre-existing debt enhances competition and falls outside the Sherman Act.  But even if Defendants' conduct was anticompetitive (it is not), Plaintiffs still fail under *Gatt* because they cannot establish that their alleged harm—loss of leverage in renegotiating their own debt—flows from any harm to competition, as opposed to harm to Optimum alone as a counterparty to the Debt Instruments.

### 1. "Concerted Activity" Among Creditors to Secure Pre-Existing Debt Is Not Anticompetitive.

Binding precedent forecloses Plaintiffs' theory.  In *Sharon Steel*, the Second Circuit addressed whether "concerted activity" among indenture trustees violated the Sherman Act.  691 F.2d at 1052.  There, plaintiff alleged that indenture trustees "ha[d] jointly taken steps to raise the price of money loaned to [debtors] and make the terms and conditions of the loans more favorable to the trustees and the bondholders."  *Sharon Steel Corp.* v. *Chase Manhattan Bank, N.A.*, 521 F. Supp. 104, 114 (S.D.N.Y. 1981).  Affirming dismissal, the Second Circuit noted that the antitrust claim predicated on creditor cooperation "border[ed] on the frivolous" because "[j]oint activity by creditors facing a debtor is commonly in the interests of all parties" and therefore lacks "any anti-competitive purpose or effect injurious to consumer welfare."  691 F.2d at 1052.

Other courts unanimously agree.  In *CompuCredit Holdings Corp.* v. *Akanthos Capital Management, LLC*, for example, plaintiff offered to repurchase "its outstanding notes at prices purportedly equal to or above market value."  916 F. Supp. 2d 1326, 1328 (N.D. Ga. 2011).  Plaintiff's creditors, however, "agreed not to participate [in the tender offer] because they believed the price to be too low."  *Id.*  Dismissing plaintiff's antitrust claim on the pleadings, the court held "that the Sherman Act is not implicated by [the creditors'] conduct."  *Id.* at 1332.  The court

-11-

explained that cooperation among creditors to "collect as much as possible of the amounts due under competitively determined contracts" is "not the sort of activity with which the antitrust laws are concerned" because "competition comes at the time loans are made." *Id.* at 1330-31. Such antitrust claims, like those presented here, are "thin to the point of invisibility."[5] *United Airlines*, 406 F.3d at 924 (rejecting antitrust claims against creditors who "coordinat[ed] their efforts to preserve [the lenders'] collateral and collect [pre-existing] promised payments"); *Falstaff*, 513 F. Supp. at 293 (antitrust claims had "little substance" where lenders' collusion allegedly resulted in a higher interest rate because lenders "were not competing . . . to offer or to supply [plaintiff] with more credit, but were attempting to secure that credit which they had already extended, the terms of which had already been negotiated").

All these cases recognize that "[n]egotiations between a creditor and a debtor to refinance debt are different from negotiations between two parties not bound by an existing agreement." *Akanthos Cap. Mgmt., LLC* v. *Atlanticus Holdings Corp.*, 734 F.3d 1269, 1273-76 (11th Cir. 2013) (Pryor, J., concurring). Where "groups of creditors already owned the debt, and they worked collaboratively to secure the repayment of that debt," such "collective activity does not violate the Sherman Act." *Id.* at 1276.

Plaintiffs allege that in the Leveraged-Finance Market, "creditors compete for the opportunity to provide capital to borrowers by offering credit on terms favorable to borrowers,"

---

[5] More generally, the Second Circuit recognizes that the Sherman Act "has been read not to prohibit parties with common legal rights—for example, creditors—from engaging in coordinated efforts to enforce those rights," including "copyright owners from defending their individual copyrights against common infringers." *Primetime 24 Joint Venture* v. *Nat'l Broad. Co.*, 219 F.3d 92, 99 (2d Cir. 2000). Although copyright "decisions have usually relied upon a *Noerr-Pennington* rationale," the Second Circuit made clear that "traditional antitrust analysis leads to the same outcome." *Id.* The Sherman Act does not prohibit Defendants from coordinating to enforce their common legal rights with respect to pre-existing debt.

while "borrowers compete for capital by offering higher interest rates or more restrictive covenants." (Compl. ¶ 42.)  True.  Plaintiffs received the benefits of that competition at the time Optimum's debt was issued.  *CompuCredit*, 916 F. Supp. 2d at 1330; *United Airlines*, 406 F.3d at 921.  Plaintiffs admit this.  (Compl. ¶ 44 ("[D]ebt instruments in the Leveraged-Finance Market reflect intense negotiation.").)  But Plaintiffs go one step further when they allege that the Co-op "stifles inter-creditor competition" because it allegedly restricts Optimum from renegotiating its existing debt and entering LMEs with individual debtholders.  (*Id.* ¶¶ 74-84, 206 (cleaned up).)  Not so.

LMEs are allegedly "post-issuance market transactions" in which borrowers manage their *pre-existing* debt.  (*Id.* ¶¶ 64-66.)  As Plaintiffs concede, LMEs only "improv[e] the participating creditors' positions in the capital structure."  (*Id.* ¶ 65.)  Creditors participating in LMEs are "attempting to secure that credit which they had already extended, the terms of which had already been negotiated."  *Falstaff*, 513 F. Supp. at 293.  On the other hand, nonparticipating creditors are worse off because LMEs "often result in significant disparity of returns for lenders participating in the LME versus nonparticipating lenders."  (Ex. 10 at 2.)

The notion that antitrust law entitles Optimum to have its creditors "compete" over sweetening the terms of *outstanding* debt defies logic.  Defendants cannot be required to renegotiate debt that was already issued and subject to "intense negotiation" and competition.  (*See* Compl. ¶ 44.)  Defendants bargained for certain rights that they may enforce or preserve.  Creditor cooperatives are narrowly tailored to achieve precisely that goal.  The Co-op, as alleged, maintains the status quo among creditors by preventing Plaintiffs from "improving the participating creditors' positions in the capital structure" at the expense of nonparticipating creditors.  (*Id.* ¶ 65.)  In other words, the Co-op reflects "an effort to collect as much as possible of the amounts due

under" the pre-existing Debt Instruments and parallels the joint activity among creditors in every case where courts held that the antitrust laws do not apply.  *E.g.*, *CompuCredit*, 916 F. Supp. 2d at 1331.

Plaintiffs cannot identify "the reasons such a practice is or might be anticompetitive," *Gatt*, 711 F.3d at 76, because the conduct alleged here lacks "any anti-competitive purpose or effect injurious to consumer welfare."  *Sharon Steel*, 691 F.2d at 1052. Certainly Defendants are not in a position to engage in competition in any traditional sense anyway; the money they are in the business of lending is *already gone*, in the hands of a debtor attempting to use the risk of non-payment to get leverage it did not have when competitive conditions existed.

But in any case, the alleged conduct is "*pro*competitive."  *Akanthos*, 734 F.3d at 1273 (emphasis added).  As the Second Circuit aptly observed, if Defendants "were forced to act individually, each would be compelled to resort to the most extreme action available in order to protect its individual interest," which "might well drive [Plaintiffs] out of business thereby eliminating any opportunity for it to work out of present difficulties and ultimately satisfy the debts." *Sharon Steel*, 691 F.2d at 1052.  "Mutual forbearance by creditors" is thus "in the interests of both debtors and creditors in that it maximizes repayment and gives the debtor a chance of survival."  *Id.*  Plaintiffs' theory that antitrust law requires Defendants to participate in LMEs under the guise of "competition" is plainly wrong.[6]

---

[6]     Plaintiffs allege that they suffered an antitrust injury because Optimum cannot "compet[e] with Defendants as a buyer of its own debt on the open market" and that "[b]ut for this unlawful constraint," "Optimum could itself participate in that open market by repurchasing its debt, and secondary-debt buyers could compete directly with the Cooperative members over Optimum's unmatured debt."  (Compl. ¶ 207.)  But the secondary market for only Optimum's outstanding debt is an implausible market and thus cannot serve as the basis for an antitrust claim.  (*See infra* Section I.C.1.)  And Plaintiffs cannot bootstrap antitrust injury in a non-actionable market to provide

Apparently recognizing that precedent forecloses their theory, the Complaint includes two threadbare fallback allegations that the Co-op "blocks Optimum from issuing new bonds to or borrowing new loans from Cooperative members" and "bars future loans to Optimum." (Compl. ¶¶ 116, 202.)  Plaintiffs miss the point.  To the extent that the Co-op requires its members to consent to future transactions with Optimum, any such restriction is necessary for Defendants to "maximize their ability to collect on an outstanding debt," which antitrust law permits. *CompuCredit*, 916 F. Supp. 2d at 1330.  Without that restriction, subsequent debt could take priority over pre-existing obligations, undermining the Co-op's core function of ensuring orderly repayment and preserving the status quo among creditors.  That is precisely why such restrictions are "typical features" of creditor-cooperation agreements.  (Compl. ¶ 77.)  That sets this case apart from those seldom instances where "debtors are sometimes permitted to bring antitrust claims against creditors." *CompuCredit*, 916 F. Supp. 2d at 1330.

In those rare cases, the defendant creditors conspired to withhold credit from a borrower even though the borrower had no pre-existing debt that remained to be collected.  As a result, the defendants had no "incentive to keep the plaintiffs financially afloat and maximize a return on a preexisting investment; the conspirators were in a take-it-or-leave-it position with no underlying obligations left to be repaid." *Akanthos*, 734 F.3d at 1276-77 (collecting cases, including *Catalano, Inc.* v. *Target Sales, Inc.*, 446 U.S. 643 (1980)).  Here, by contrast, Optimum and Defendants are in a *pre-existing* debtor-creditor relationship that was established in a

---

standing for claims related to the separate alleged Leveraged-Finance Market.  *See George Haug Co.* v. *Rolls Royce Motor Cars Inc.*, 148 F.3d 136, 139 (2d Cir. 1998) (antitrust injury requires "that the challenged action has had an *actual* adverse effect on competition as a whole in *the relevant market*" (emphasis added)).  Finally, *CompuCredit* forecloses Plaintiffs' theory because "[t]he Sherman Act is not implicated" where Optimum offers to repurchase its outstanding debt and Defendants "agreed not to participate" because they seek to "maximize their ability to collect on [the] outstanding debt."  916 F. Supp. 2d at 1328-32.

competitive market, and Defendants have a strong interest in maximizing Optimum's solvency. Defendants are thus entitled to act collectively to "secure that credit which they had already extended." *Falstaff*, 513 F. Supp. at 293.

Any purported restriction on new debt merely effectuates Defendants' rights. For example, if Co-op members could issue new debt to Optimum, the Co-op's lawful purpose would be destroyed, as new debt could take priority over pre-existing debt, thereby minimizing Defendants' abilities to recover. Plaintiffs' allegation that "the Cooperative has driven up the price Optimum paid for capital from non-Cooperative members" is, therefore, inapposite. (Compl. ¶ 206.) Any supposed increase in the cost of capital from outside the Co-op is incidental to the Co-op's permissive, pro-competitive purpose. Plaintiffs' alleged injury thus does not "flow[] from that which makes or might make defendants' acts unlawful" under the antitrust laws. *Gatt*, 711 F.3d at 76.

The Sherman Act is simply "not implicated by Defendants' conduct," *CompuCredit*, 916 F. Supp. 2d at 1332, because that conduct lacks *any* anticompetitive effect. *Sharon Steel Corp.*, 691 F.2d at 1052. Count One must be dismissed for lack of antitrust injury. *See Gatt*, 711 F.3d at 76.

### 2.    Plaintiffs Allege Contractual Injuries, Not Antitrust Injuries.

Even if joint efforts to secure pre-existing debt were anticompetitive (they are not), Plaintiffs still have not alleged antitrust injury, because their alleged harm—loss of leverage in renegotiating their own debt—does not flow from any harm to competition. *See Tommy Lee Handbags Mfg. Ltd.* v. *1948 Corp.*, 971 F. Supp. 2d 368, 384 (S.D.N.Y. 2013). Rather, Plaintiffs' antitrust claim is "simply a contract claim masquerading as a candidate for treble damages." *Steves & Sons, Inc.* v. *JELD-WEN, Inc.*, 988 F.3d 690, 710 (4th Cir. 2021). To the extent that Plaintiffs allege any injury, Plaintiffs cannot show that such injuries "flow[] from that which makes or might

make defendants' acts unlawful" under the antitrust laws, rather than any alleged breach of contract. *Gatt*, 711 F.3d at 76.

"Not every business tort or breach of contract that has an adverse impact on a competitor can form the basis of an antitrust claim." *SEI Global Servs., Inc.* v. *SS&C Advent*, 496 F. Supp. 3d 883, 901 (E.D. Pa. 2020). Courts must therefore exercise great "caution about antitrust injury" in cases "'involv[ing] both contractual and antitrust claims,'" such as here, "since it is easy for a claim of breach—or simply contractual sour grapes—to 'masquerade as a candidate for treble damages.'" *Global Tel*Link Corp.* v. *JACS Sols.*, 708 F. Supp. 3d 784, 796 (E.D. Va. 2023) (cleaned up). Where a plaintiff "would have suffered 'an identical loss' if" defendant "had breached the contract" without committing an antitrust violation, then there is no antitrust injury. *Steves & Sons*, 988 F.3d at 710-11.

Plaintiffs allege that "LMEs are subject to the bargained-for rights and restrictions set forth in the governing credit documents," and that "[c]redit agreements often contemplate future refinancing transactions." (Compl. ¶¶ 66, 71.) In fact, Plaintiffs contend that the Co-op's alleged "LME-blocking function upends the *contractual* bargain Optimum struck with its creditors." (*Id.* ¶¶ 189-90 (emphasis added).) Even assuming that Defendants were obligated to negotiate LMEs with Plaintiffs (they were not), a hypothetical contractual breach would result in an identical injury absent the Co-op: Plaintiffs would be unable to enter an LME.[7] The fact that

---

[7]    Even worse is Plaintiffs' theory that they suffered an antitrust injury because Optimum must pay interest rates priced against a "non-standard benchmark." (Compl. ¶ 209.) Plaintiffs concede that the benchmark interest rate was set by contract. (*Id.* (explaining that LIBOR would serve as the benchmark interest rate under the Credit Agreement and that "if LIBOR were discontinued, Optimum could replace it . . . unless a majority of lenders object[ed]").) If "Optimum and a majority of creditors could not agree on a replacement benchmark," the Credit Agreement provides that "the ABR would become the new benchmark rate." (*Id.*) Defendants exercised their rights under the Credit Agreement and objected to the replacement of LIBOR with SOFR (a different benchmark rate). (*Id.* ¶¶ 211-12.) Optimum and Defendants could not agree

Optimum has negotiated anti-creditor-cooperation provisions in its most recent financing transactions—something for which it could have negotiated with respect to the at-issue debt—only underscores the fact that Plaintiffs' alleged injuries are contractual in nature. (*See supra* Background Section E.)

Because Plaintiffs' alleged injuries are "not dependent on the existence of an antitrust violation," they do not constitute antitrust injuries. *Global Tel\*Link*, 708 F. Supp. 3d at 798. The Court should therefore dismiss Count One for lack of antitrust standing.

**B.    Plaintiffs Do Not Allege a *Per Se* Antitrust Violation.**

The Co-op cannot possibly be *per se* illegal where the line of creditor-cooperation cases *uniformly* holds that creditor collaboration is procompetitive—which is the antithesis of the *per se* rule. That Plaintiffs have labeled the Co-op a "horizontal agreement to fix the prices of Optimum's debt" and an "illegal group boycott" (Compl. ¶¶ 186, 221) does not make it so under the *per se* rule. *See Ace Arts, LLC* v. *Sony/ATV Music Publ'g, LLC*, 56 F. Supp. 3d 436, 448 (S.D.N.Y. 2014) ("Whether or not the Defendants' alleged conduct constitutes a 'horizontal conspiracy,' and therefore is a *per se* violation is a legal conclusion that the Court does not accept as true on a motion to dismiss.").

Courts "presumptively appl[y] rule of reason analysis," which requires a plaintiff to "demonstrate that a particular contract or combination is in fact unreasonable and

---

on a replacement and thus the ABR applies under the terms of the Credit Agreement. (*Id.* ¶¶ 209, 211-12.) The fact that Plaintiffs now regret the terms of the contract they negotiated cannot possibly give rise to an antitrust claim. Nor does the fact that the "Term Loan B-5 creditors" "blocked the amendment in a coordinated manner" (*id.* ¶ 212) constitute "anticompetitive" conduct, as Plaintiffs expressly consented to the requirement that the "Required Lenders" would "act[] together as one [c]lass" in this context. (Ex. 11, § 1.07.) Whatever alleged injury Plaintiffs suffered here (there is none), such injury does not "correspond[] to the rationale for finding a violation of the antitrust laws in the first place." *Tommy Lee*, 971 F. Supp. 2d at 384.

anticompetitive before it will be found unlawful." *Texaco Inc.* v. *Dagher*, 547 U.S. 1, 5 (2006). The *per se* rule "is invoked only in a limited class of cases, where a defendant's actions are so plainly harmful to competition and so obviously lacking in any redeeming pro-competitive values that they are 'conclusively presumed illegal without further examination.'" *Cap. Imaging*, 996 F.2d at 542 (citation omitted). *Per se* treatment, therefore, "is appropriate only after courts have had considerable experience with the type of restraint at issue, and only if courts can predict with confidence that it would be invalidated in all or almost all instances under the rule of reason." *Leegin Creative Leather Prods., Inc.* v. *PSKS, Inc.*, 551 U.S. 877, 886-87 (2007). "As a result of the 'rigorous standard and presumption against applying the per se rule,' courts apply the rule of reason in analyzing most alleged restraints of trade." *Relevent Sports, LLC* v. *Fédération Internationale De Football Ass'n*, 551 F. Supp. 3d 120, 128 (S.D.N.Y. 2021), *vacated and remanded on other grounds*, 61 F.4th 299 (2d Cir. 2023).

Plaintiffs fail to plausibly allege that the Co-op is "plainly anticompetitive and lacks any redeeming virtue" such that this is one of those rare cases where *per se* treatment is appropriate. *Hertz Corp.* v. *City of New York*, 1 F.3d 121, 129 (2d Cir. 1993); *see also Broad. Music*, 441 U.S. at 8-9, 19-20 (explaining that the *per se* inquiry turns not on "easy labels," but on whether both the "purpose" and "effect" of the challenged agreement "facially appears to be one that would always or almost always tend to restrict competition and decrease output"). Far from being a "naked restraint of trade with no purpose except stifling of competition," *Broad. Music*, 441 U.S. at 20, the alleged collective activity at issue here involves a group of creditors—who share common legal rights with respect to Optimum—seeking "to collect as much as possible of the amounts due under competitively determined contracts." *United Airlines*, 406 F.3d at 921. Creditor cooperation also has numerous procompetitive efficiencies that bolster confidence and predictability in the credit

markets.  (*See infra* Section I.C.2.)  As the Second Circuit put it in *Sharon Steel*, "[j]oint activity by creditors facing a debtor is commonly in the interests of all parties" and "concerted activity" among creditors is neither "anti-competitive" nor "injurious to consumer welfare."  691 F.2d at 1052; *see also Akanthos*, 734 F.3d at 1277 ("Collective action in capital markets is far from categorically anticompetitive.").  That is the opposite of what is required for the *per se* rule to apply.  *Broad. Music*, 441 U.S. at 9.

Separately, the *per se* rule cannot apply here because coordination among creditors is inextricably intertwined with the efficiencies achieved in leveraged finance.  The Supreme Court has held that the rule of reason is the proper mode of analysis when the alleged collective activity is an unavoidable "consequence of the integration necessary to achieve" greater efficiency in the market, *id.* at 21, or when the "restraints on competition are essential if the product is to be available at all."  *Nat'l Collegiate Athletic Ass'n* v. *Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 101 (1984).  As the Complaint makes clear, collective action in the alleged Leveraged-Finance Market is far from anomalous; it is fundamental to the market's operation.  According to the Complaint, leveraged companies like Optimum finance their operations through syndicated and/or securitized loans and bonds—complex debt instruments that embed majority voting and class-based decision making and pool capital and disperse risk across many creditors.  (Compl. ¶¶ 46-51, 96 (describing the collaborative process of loan/bond syndication and securitization in the "Leveraged-Finance Market").)  The *per se* rule is, therefore, inapplicable because collective action is necessary to achieve a product—which Plaintiffs allege to be leveraged financing—that companies like Optimum could not otherwise obtain.  (*See id.* ¶¶ 135-38 (alleging that "leveraged borrowers with lower credit ratings" like Optimum rely on this form of financing)); *Broad. Music*, 441 U.S. at 23 ("Joint ventures and other cooperative arrangements are also not usually unlawful,

at least not as price-fixing schemes, where the agreement on price is necessary to market the product at all.").

Accordingly, if the Sherman Act is to apply here at all (it does not), Plaintiffs' claim must be evaluated under the rule of reason. *See Akanthos*, 734 F.3d at 1273 ("It was not *per se* illegal for the noteholders collectively to renegotiate the debt they owned. The noteholders' activity was neither price fixing nor a group boycott."); *e.g.*, *In re Int. Rate Swaps Antitrust Litig.*, 2019 WL 1147149, at *16 (S.D.N.Y. Mar. 13, 2019) (holding that the *per se* rule did not apply where no court had "*per se* condemned a horizontal collaboration that is structurally or thematically similar to that pled").

### C.    Plaintiffs Fail to State a Claim Under the Rule of Reason.

The Complaint also fails to state an antitrust claim under the rule of reason. "The rule-of-reason inquiry requires, at the motion to dismiss stage, that the plaintiff identify the relevant market affected by the challenged conduct and allege an actual adverse effect on competition in the identified market." *Watkins* v. *Smith*, 2012 WL 5868395, at *7 (S.D.N.Y. Nov. 19, 2012). Plaintiffs may carry this burden either directly, by "showing increased prices, reduced quality, or reduced outputs," or "indirectly," by "pleading that a defendant had market power plus 'some other ground for believing that the challenged behavior could harm competition in the market, such as the inherent anticompetitive nature of the defendant's behavior.'" *Cenedella* v. *Metro. Museum of Art*, 348 F. Supp. 3d 346, 362 (S.D.N.Y. 2018). "In pleading an adverse effect, the plaintiff must show that the challenged action had an effect on competition 'as a whole in the relevant market'; proving harm to the plaintiff as an individual competitor is not enough." *Id.*

Plaintiffs fail to carry their initial burden under the rule of reason for at least two reasons. First, both proposed markets are facially implausible. And second, even crediting that

the alleged Leveraged-Finance Market is the relevant market, Plaintiffs fail to show an adverse effect on competition.

### 1.     Both Alleged Markets Are Impermissibly Narrow.

Dismissal of a claim "is proper where the plaintiff has not articulated 'a plausible explanation as to why a market should be limited in a particular way.'" *Cenedella*, 348 F. Supp. 3d at 360.  "The relevant market must be defined as all products reasonably interchangeable by consumers for the same purposes." *Madison 92nd St. Assocs., LLC* v. *Courtyard Mgmt. Corp.*, 624 F. App'x 23, 28 (2d Cir. 2015).  "Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient." *Id.* at 28-29.

Plaintiffs propose two markets:  (i) "the Market for Outstanding Optimum Debt," *i.e.*, the secondary market for pre-existing Optimum debt; and (ii) the U.S. "Leveraged Finance market." (Compl. ¶¶ 127-28.)  These markets fail because they ignore obvious and meaningful substitutes.  While Plaintiffs may *prefer* to engage in transactions in the secondary market for Optimum debt or to raise capital through the alleged U.S. Leveraged-Finance Market, those are not the only ways for Optimum to access capital.  Companies routinely raise capital in myriad other ways, including by issuing new equity, amending credit agreements, asset sales, or foreign transactions.  This is not hypothetical:  since the Co-op formed, Optimum has entered into various transactions under which it has obtained over $4 billion of capital, two of which involved a lender affiliate of Defendant JPMIM.  (*See id.* ¶¶ 118, 152 n.73; *supra* Background Section E.)  Such transactions underscore that the markets alleged in the Complaint are implausibly narrow because they ignore interchangeable substitutes.

Furthermore, the alleged market of only Optimum debt is defective for the additional reason that it attempts to define the market from Plaintiffs' perspective alone. According to Optimum, it wishes to participate in the market for its existing debt by "engag[ing] in post-issuance transactions with creditors who hold Optimum's debt." (Compl. ¶ 179.) But "[t]he test for a relevant market is not commodities reasonably interchangeable by a particular plaintiff, but 'commodities reasonably interchangeable by customers for the same purposes.'" *Queen City Pizza, Inc.* v. *Domino's Pizza, Inc.*, 124 F.3d 430, 438 (3d Cir. 1997) (holding that the relevant market for a pizza maker whose franchise agreement required use of only Domino's-approved products is those products reasonably interchangeable by pizza makers generally). Although Plaintiffs may have a particular interest in transacting in Optimum's outstanding debt, "[a]ntitrust law generally does not cater to the preferences of a single consumer." *United States* v. *Booz Allen Hamilton Inc.*, 2022 WL 9976035, at *12 (D. Md. Oct. 17, 2022) ("[A]ny given consumer may choose 'Pepsi because she prefers the taste, or NBC because she prefers "Friends," but for antitrust purposes, 'Pepsi is one of many sodas, and NBC is just another television network.'" (quoting *Global Disc. Travel Servs., LLC* v. *Trans World Airlines, Inc.*, 960 F. Supp. 701, 705 (S.D.N.Y. 1997))). Accordingly, a "single brand name product," like Optimum's outstanding debt, "cannot define a relevant market." *Integrated Sys. & Power, Inc.* v. *Honeywell Int'l, Inc.*, 713 F. Supp. 2d 286, 298 (S.D.N.Y. 2010); *Planetarium Travel, Inc.* v. *Altour Int'l, Inc.*, 97 F. Supp. 3d 424, 429 (S.D.N.Y. 2015) ("[C]ourts routinely reject markets defined by a single product or brand.").

### 2. Plaintiffs Fail to Show That the Co-op Has an Adverse Effect on Competition.

Even if the Court were to credit the U.S. Leveraged-Finance Market as a plausible antitrust market (it is not), Plaintiffs still fail to adequately allege that cooperation in this context

has an adverse effect on competition, as they must to meet their initial burden under the rule of reason. *See Watkins*, 2012 WL 5868395, at *7. Nor can they, because cooperation agreements serve legitimate procompetitive purposes that outweigh any potential harm to competition. As explained, courts recognize that competition in the lending markets for purposes of the antitrust laws occurs at the time debt is originated, not during post-issuance negotiations. *See United Airlines*, 406 F.3d at 921; *CompuCredit*, 916 F. Supp. 2d at 1331. Cooperation agreements bolster this competition at the lending stage and enhance output by encouraging creditors to participate in syndicated financings to the benefit of borrowers and consumers. They do so by mitigating the threat of opportunistic LMEs or hostile restructurings, which pit creditors against each other, thereby addressing creditor concerns about repayment and risk allocation before capital is extended. The procompetitive results—including lower interest rates, fewer restrictive covenants, and longer maturities—therefore arise because cooperation agreements *remove* potential risk that would otherwise suppress competition at origination. *See Sharon Steel*, 691 F.2d at 1052 (reasoning that "by reducing both losses to creditors and the transaction costs resulting from bankruptcy, such activity reduces the costs of borrowing and the costs of doing business, all of which is to the consumer's advantage"). Given this dynamic, Plaintiffs do not (and cannot) credibly allege that cooperation agreements raise the cost of credit to leveraged borrowers generally within the alleged U.S. Leveraged-Finance Market.

Because Plaintiffs cannot state a claim for violation of the Sherman Act under any mode of analysis, their antitrust claims should be dismissed. *E.g.*, *Integrated Sys. & Power*, 713 F. Supp. 2d at 299 (dismissing antitrust claim under the *per se* rule and rule of reason).[8]

---

[8]    Having failed to state a claim under the Sherman Act, Plaintiffs' Donnelly Act claim, under N.Y. Gen. Bus. Law § 340, must be dismissed, too. *See Cenedella*, 348 F. Supp. 3d at 362-63 (collecting cases recognizing that the Donnelly Act "is generally coextensive with the Sherman

## II.     PLAINTIFFS FAIL TO STATE CONTRACT-RELATED CLAIMS

### A.     Plaintiffs Do Not Allege Failure to Perform.

Plaintiffs' breach-of-contract claim fails because the Complaint does not "identify what provisions of the contract were breached"—a necessary element of a prima facie claim. *Piuggi* v. *Good for You Prods. LLC*, 739 F. Supp. 3d 143, 167 (S.D.N.Y. 2024).  The Complaint relies on the theory that the Debt Instruments "permit Optimum to negotiate and transact with individual creditors," while Defendants "refused to individually negotiate or transact with Optimum." (Compl. ¶¶ 230-32.)  But the Complaint does not allege that any agreement *compelled* Defendants to negotiate with Optimum; nor does it allege that any agreement *prohibited* Defendants from entering into a cooperation agreement.   Plaintiffs' failure to point to an "enforceable obligation" is fatal to their claim.[9]  *See Miller* v. *HSBC Bank U.S.A., N.A.*, 2015 WL 585589, at *2 (S.D.N.Y. Feb. 11, 2015) (rejecting claim against creditor because "[u]nder New York law, a borrower has no entitlement to a permanent mortgage loan modification, and a lender is not liable for breach of contract by failing to offer one").

### B.     Plaintiffs' Implied-Covenant Claim Is Deficient and Duplicative.

Plaintiffs' claim that Defendants breached the implied covenant of good faith and fair dealing (Compl. ¶¶ 236-39) also fails.  The implied covenant requires each contracting party to "fulfill 'any promises which a reasonable person in the position of the promisee would be justified in understanding were included' in the contract."  *19 Recordings Ltd.* v. *Sony Music Ent.*,

---

Act" and that the "standard for a well-pleaded Donnelly Act claim is the same as a claim under Section 1 of the Sherman Act"); *Gatt*, 711 F.3d at 81-82 (affirming dismissal of Sherman Act and Donnelly Act claims for lack of "antitrust standing").

[9]     Plaintiffs' anticipatory-breach theory (Compl. ¶ 234) fails for the same reason:  Nothing in the alleged Cooperation Agreement suggests any anticipated breach of any provision in the Debt Instruments.

165 F. Supp. 3d 156, 161 (S.D.N.Y. 2016).  It arises "only in connection with the rights or obligations set forth in the terms of the contract." *Id.*  When contracts confer discretion on the parties, the implied covenant acts as "an implied promise that neither party 'will act arbitrarily or irrationally' in exercising [it]." *Security Plans, Inc.* v. *CUNA Mut. Ins. Soc'y*, 769 F.3d 807, 810 (2d Cir. 2014).  Optimum's implied-covenant claim fails because it seeks to expand Plaintiffs' contractual rights, requires treating Defendants' sound business discretion as "irrational," and relies on the same facts as the breach-of-contract claim.

First, the implied covenant cannot be used to "create independent contractual rights." *Nat'l Union Fire Ins. Co.* v. *Xerox Corp.*, 807 N.Y.S.2d 344, 346 (App. Div. 2006). Plaintiffs "point to no agreement between the parties that would impose upon [Defendants] a duty to negotiate." *Vill. On Canon* v. *Bankers Trust Co.*, 920 F. Supp. 520, 535 (S.D.N.Y. 1996).  In attempting to imply that their creditors were required to negotiate, Plaintiffs "seek to have this Court create an additional benefit for which they did not bargain." *See Metro. Life Ins. Co.* v. *RJR Nabisco, Inc.*, 716 F. Supp. 1504, 1519 (S.D.N.Y. 1989).  The implied covenant is "to ensure that the [parties] receive[] the benefit of their bargain as determined from the face of the contract at issue," or the "fruits of the agreement." *Id.* at 1517-18.  In long-term debt financing, the "fruits" for lenders are "the periodic and regular payment of interest and the eventual repayment of principal." *Id.*  For Plaintiffs, the "fruit" of the Debt Instruments was operating capital, not forced renegotiations.[10]

---

[10]    That sets this case apart from cases recognizing implied-covenant claims.  In *Dalton* v. *Educational Testing Service*, for example, the court found the implied covenant barred a standardized-testing company from invoking a technical loophole to cancel an SAT score while refusing to consider exculpatory evidence, because good-faith evaluation of the score was central to the parties' bargain.  87 N.Y.2d 384, 387, 392-94 (1995).

Second, Plaintiffs fail to allege that Defendants acted "arbitrarily or irrationally in exercising [their] discretion." *State Farm Mut. Auto. Ins. Co.* v. *Metro Pain Specialists, P.C.*, 2025 WL 1166982, at *7 (E.D.N.Y. Mar. 26, 2025). The Complaint asserts that Defendants "acted in bad faith for their own benefit" in entering the Co-op. (Compl. ¶ 238.) But "acting in one's financial self-interest, for example, in response to market changes, does not constitute bad faith." *Cambridge Cap. LLC* v. *Ruby Has LLC*, 675 F. Supp. 3d 363, 409 (S.D.N.Y. 2023). Defendants have a "'general right to act on [their] own interests in a way that may incidentally lessen' the other party's anticipated fruits from the contract." *M/A-COM Sec. Corp.* v. *Galesi*, 904 F.2d 134, 136 (2d Cir. 1990).

Third, the breach-of-contract and implied-covenant claims are duplicative because they arise from the same operative facts. *See ARI & Co.* v. *Regent Int'l Corp.*, 273 F. Supp. 2d 518, 522 (S.D.N.Y. 2003). To maintain an implied-covenant claim, "a plaintiff must thread the needle" of alleging a duty implied by the contracts' terms, but "distinct from the factual predicate for its contract claims." *WCA Holdings III, LLC* v. *Panasonic Avionics Corp.*, 704 F. Supp. 3d 473, 499 (S.D.N.Y. 2023) (citation omitted). Plaintiffs cannot state an implied-covenant claim by bifurcating their allegations when the claim "could have been encompassed in [their] breach of contract claim." *ARI*, 273 F. Supp. 2d at 523.[11]

---

[11]     Should the Court dismiss Plaintiffs' antitrust claims, their contract claims should also be dismissed for lack of jurisdiction. *See, e.g. Tierney* v. *Davidson*, 133 F.3d 189, 199 (2d Cir. 1998) ("Since the federal claims must be dismissed, we also direct dismissal of the state claims for lack of jurisdiction.").

**CONCLUSION**

For the foregoing reasons, the Complaint should be dismissed in its entirety.

Dated:  February 6, 2026                Respectfully submitted,

*/s/ Kyle W. Mach*
Kyle W. Mach (*pro hac vice*)
SULLIVAN & CROMWELL LLP
550 Hamilton Avenue
Palo Alto, California 94301
Telephone:  (650) 461-5600
Facsimile:  (650) 461-5700
machk@sullcrom.com

Robert J. Giuffra, Jr.
Steven L. Holley
Brian D. Glueckstein
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588
giuffrar@sullcrom.com
holleys@sullcrom.com
gluecksteinb@sullcrom.com

Renata B. Hesse (*pro hac vice*)
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W., Suite 700
Washington, D.C. 20006
Telephone:  (202) 956-7500
Facsimile:  (202) 293-6330
hesser@sullcrom.com

*Attorneys for Defendants*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of S.D.N.Y. Local Civil Rule 7.1(c) and Individual Rule 5(A) because it contains 8,715 words, excluding the portions exempted by S.D.N.Y. Local Civil Rule 7.1(c) and Individual Rule 5(A).

Dated:  February 6, 2026

*/s/ Kyle W. Mach*
Kyle W. Mach