# EXHIBIT 10

2/2/26, 12:56 PM                  Case 1:25-cv-09785-JAV    Cooperation Agreements 101: A Quick Primer on Material Terms and Trends
Document 66-10    Filed 02/06/26    Page 2 of 6

Business Law Today    June 2025

# Cooperation Agreements 101: A Quick Primer on Material Terms and Trends

**Kenneth Rothenberg**

Jun 12, 2025    🕐 4 min read

## Summary

- Learn why cooperation agreements have become so in vogue among ad hoc groups of syndicate lenders.

- A cooperation agreement acts as a building block for the development of a liability management exercise ("LME") with a stressed/distressed borrower, providing pro rata treatment on the ultimate transaction among the participating parties.

- A lender that is an excluded party to a cooperation group risks receiving the worst recovery in an LME. Even for cooperation parties, materially different economic treatment results from being an "initial party" versus a "subsequent party."

- Lenders need to be aware of aggressive sponsor efforts seeking to insert language against cooperation groups in loan documentation.



gremlin via Getty Images

In recent years, there has been a surge in use of cooperation agreements ("Coop Agreements") in US restructurings. This article provides a high-level overview of basic terms and trends with respect to Coop Agreements. The dramatic increase in use of Coop Agreements by ad hoc groups of lenders has arisen primarily as a reaction to excluded lenders being caught on the wrong end of a non–pro rata liability management exercise (also known as "creditor-on-creditor violence"). Liability management exercises ("LMEs") often result in significant disparity of returns for lenders participating in the LME versus nonparticipating lenders, thereby creating an incentive for lenders to not be excluded from an LME.

An LME generally refers to a transaction whereby a borrower/sponsor and certain lenders take advantage of loose loan document provisions to create liquidity, often to the detriment of nonparticipating lenders. The two main types of LMEs utilized are (i) drop-down transactions (whereby key assets are moved into unrestricted/nonguarantor entities, followed by new financing secured by those assets); and (ii) uptier transactions (whereby a subset of lenders elevate their position over other lenders, often evading requirements for pro rata sharing through utilization of an exception).

Coop Agreements have become an integral tool used by ad hoc groups of lenders within a syndicate to protect themselves from being excluded from a potential LME. At their core, Coop Agreements are agreements among an ad hoc group of lenders (each a "Coop Party"), in which such Coop Parties unite with the goal of obtaining a favorable restructuring transaction with a stressed or distressed company to restructure the

company's indebtedness. The key component of Coop Agreements is providing pro rata treatment on the underlying, ultimate transaction among the participating Coop Parties. Hence, lenders may become a party to the Coop to minimize their downside risk of being an excluded lender and receiving non–pro rata treatment.

Coop Agreements often act as a foundational step upon which an LME transaction is devised and will position Coop Parties to negotiate directly with a stressed borrower. Oftentimes the net result of a Coop Agreement is the consummation of an out-of-court transaction support agreement or an in-court restructuring support agreement. Typically, a Coop Agreement will only become effective once the Coop Parties hold a majority of the underlying debt of the borrower. Holding a majority of the debt ensures that the Coop Parties will have "requisite" creditor control under the loan documents to facilitate an LME with the borrower (including potential amendments to underlying loan documents). It is important to note that Coop Agreements are only among creditors—the borrower does not sign the Coop Agreement. This ties into the construct that once the Coop Parties hold a majority of the debt, such parties will be well positioned to negotiate with the borrower.

Under a Coop Agreement, a Coop Party agrees not to enter into a transaction with the borrower away from the other Coop Parties. Once a Coop Party signs onto a Coop Agreement, then any potential transaction to be entered into with the borrower by such Coop Party must be offered to the rest of the Coop Parties for so long as such party is subject to the Coop Agreement. However, entry into a Coop Agreement does not require a Coop Party to participate in an ultimate transaction approved by such group with the borrower. Thus, if you are a party to a Coop Agreement but do not like a transaction proposed by the majority of the group under the Coop Agreement, you are typically not required to participate in such transaction.

To restrict the effect of a Coop Agreement, some sponsors have tried inserting restrictions in loan documents prohibiting creditors from joining Coop Agreements. To date, the author believes most sponsor efforts to insert prohibitions against lenders' forming cooperation groups have been successfully resisted. However, lenders should continue to be on the lookout for provisions inserted by aggressive sponsors trying to limit the ability of lenders to form cooperation groups.

Coop Agreements typically include transfer restrictions ensuring that, if a Coop Party sells or transfers its debt, the transferee (i) is already a Coop Party; (ii) executes a joinder; or (iii) is acting as a qualified market maker. These restrictions ensure that if a Coop Party exits its position, the Coop Parties in the aggregate maintain the requisite "required holders" status necessary to make amendments to facilitate an LME.

It is important to recognize that not all Coop Parties are treated equally. Coop Agreements often differentiate between "initial parties" and "subsequent parties," and the economics

for each may be materially different. Generally, an "initial party" receives both (i) its pro rata share of the underlying economics of an ultimate transaction (e.g., if the ultimate transaction allows a Coop Party to sell its existing debt to the company for senior priming debt at a rate of 75 percent, then a signatory with a $100 existing claim can sell its $100 claim for $75 of priming debt); *and* (ii) the right to participate pro rata in any new money financing, backstop, and related premium and fees. In contrast, a "subsequent party" may only receive its pro rata share of the ultimate transaction. Nonparties may also be offered the opportunity to exchange their debt, albeit at a lower exchange rate than initial parties or subsequent parties. Hence, you often have three levels of recovery in an LME emerging from a Coop Agreement: (i) initial parties (who get the best recovery); (ii) subsequent parties (who get the second-best); and (iii) excluded parties (who get the worst).

The considerations discussed in this introductory article are intended to provide a basic high-level primer for those who are not familiar with Coop Agreements. Any potential signatory to a Coop Agreement should carefully review the underlying terms to ascertain the implications for its particular situation and potential recovery and should consider seeking experienced independent counsel to assist in such determination.

**Author**



### Kenneth Rothenberg

Ken Rothenberg is a New York based partner in Alston & Bird's finance practice and the chair of the Distressed Debt & Claims Trading Team, a niche and complex field requiring particular legal and financial expertise....

Published by the American Bar Association ©2026. Reproduced with permission. All rights reserved. This information or any portion thereof may not be copied or disseminated in any form or by any means or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.

American Bar Association

https://www.americanbar.org/groups/business_law/resources/business-law-today/2025-june/quick-primer-material-terms-trends/