**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| OPTIMUM COMMUNICATIONS, INC.; CSC HOLDINGS, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> APOLLO CAPITAL MANAGEMENT, L.P.; ARES MANAGEMENT LLC; BLACKROCK FINANCIAL MANAGEMENT, INC.; GOLDENTREE ASSET MANAGEMENT LP; J.P. MORGAN INVESTMENT MANAGEMENT INC.; LOOMIS, SAYLES & COMPANY, L.P.; OAKTREE CAPITAL MANAGEMENT, L.P.; PGIM, INC.; Doe Entities #1-#1000 <br><br> Defendants. | Case No. 1:25-cv-9785 (JAV) |

**MEMORANDUM OF *AMICI CURIAE* LSTA, INC., SECURITIES INDUSTRY AND FINANCIAL MARKETS ASSOCIATION, MANAGED FUNDS ASSOCIATION, INVESTMENT COMPANY INSTITUTE, AND CREDITOR RIGHTS COALITION, IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

DATED: March 25, 2026

Jennifer J. Clark*
Corey W. Roush*
Jeremy D. Rozansky*
SIDLEY AUSTIN LLP
1501 K St. NW Washington, DC 20005
(202) 736-8000
jennifer.clark@sidley.com

Elizabeth R. Tabas Carson*
SIDLEY AUSTIN LLP
787 Seventh Ave.
New York, NY 10019

*Attorneys for Amici Curiae LSTA, Inc.; Securities Industry and Financial Markets Association; Managed Funds Association; Investment Company Institute; and Creditor Rights Coalition*

* Application for pro hac vice admission pending

**TABLE OF CONTENTS**

INTEREST OF *AMICI* .............................................................................................. 1

ARGUMENT ............................................................................................................. 3

I.  Cooperation Agreements Are a Critical Tool for Preserving Value for Borrowers and
    Creditors. ....................................................................................................... 3

    A.   Cooperation Agreements Have Become A Necessary and Commonplace Mechanism to
         Counter the Rise of Coercive "Liability Management Exercises," which Threaten
         Company Value and Are Unfair to Creditors. ............................................... 3

    B.   Cooperation Agreements Are Economically Efficient. ..................................... 7

II. Cooperation Agreements Do Not Restrain Competition on the Merits. ............... 9

III.Casting Doubt on Cooperation Agreements Would Have Wide Ramifications for Global
    Credit Markets. .................................................................................................. 12

CONCLUSION ........................................................................................................ 14

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Akanthos Cap. Mgmt., LLC v. Atlanticus Holdings Corp.*,
734 F.3d 1269 (11th Cir. 2013) ....................................................................9, 10, 12

*Begier v. IRS*,
496 U.S. 53 (1990)......................................................................................................5

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
429 U.S. 477 (1977)..................................................................................................10

*In re Chateaugay Corp.*,
961 F.2d 378 (2d Cir. 1992).......................................................................................9

*Chi. Pro. Sports Ltd. P'ship v. Nat'l Basketball Ass'n*,
95 F.3d 593 (7th Cir. 1996) .....................................................................................11

*Harrison Aire, Inc. v. Aerostar Int'l, Inc.*,
423 F.3d 374 (3d Cir. 2005)......................................................................................10

*Loan Syndications & Trading Ass'n v. SEC*,
882 F.3d 220 (D.C. Cir. 2018) ...................................................................................4

*MacDermid Printing Sols. LLC v. Cortron Corp.*,
833 F.3d 172 (2d Cir. 2016)......................................................................................11

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)..................................................................................................12

*Nat'l Collegiate Athletic Ass'n v. Alston*,
594 U.S. 69 (2021)....................................................................................................12

*In re Serta Simmons Bedding, L.L.C.*,
125 F.4th 555 (5th Cir. 2024) .......................................................................1, 5, 7, 11

*Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*,
691 F.2d 1039 (2d Cir. 1982)..............................................................2, 7, 11, 13, 14

*United Airlines, Inc. v. U.S. Bank N.A.*,
406 F.3d 918 (7th Cir. 2005) ..............................................................................2, 10

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004)..................................................................................................12

**Scholarly Authorities**

Douglas G. Baird, *Three Faces of Creditor-on-Creditor Aggression*, 97 Am.
  Bankr. L.J. 213 (2023) ...............................................................................9, 11

Mark J. Roe & Vasile Rotaru, *Liability Management's Limited Runway:
  Corporate Restructuring Today*, 136 Yale L.J. (forthcoming 2026) (Mar. 17,
  2026 draft)...............................................................................5, 7,  8, 9

Samir D. Parikh, *Creditors Strike Back: The Return of the Cooperation
  Agreement*, 73 Duke L.J. 113 (2023)..............................................8, 11, 13

**Other Authorities**

Barclays, *LME: Trading through prisoner's dilemmas* (July 29, 2024)..................12, 13

Ian Feng, *U.S. Liability Management Transactions: Quarterly Update Through
  Q4 2025 and Primer*, Covenant Rev. (Jan. 14, 2026).......................................5, 7, 10

Kenneth Rothenberg, *Cooperation Agreements 101: A Quick Primer On Material
  Terms and Trends,* Bus. L. Today (June 12, 2025) .................................6, 8

Octus, *Pricing the Omni-Blocker: A New Paradigm for Pricing Non-Pro-Rata
  LME Protection* (June 14, 2025)........................................................7, 14

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*: *An Analysis of Antitrust
  Principles and Their Application* (2025) ...................................................11

Robert J. Waldner, *An Overview of the Use of Cooperation Agreements Among
  Lenders in the Syndicated Loan Market*, Rev. Banking & Fin. Servs. (Nov.
  2025) ....................................................................................6, 7

Shan Qureshi & Julian Bulaon, *Testing the Limits: Cooperation Agreements as a
  Shield Against Liability Management in 2024* (June 24, 2024).................................6

*Amici Curiae* LSTA, Inc. ("LSTA"), the Securities Industry and Financial Markets Association ("SIFMA"), the Managed Funds Association ("MFA"), the Investment Company Institute ("ICI"), and the Creditor Rights Coalition ("CRC") respectfully submit this Memorandum in Support of Defendants' Motion to Dismiss the Amended Complaint.

## INTEREST OF *AMICI*

This case asks whether the Sherman Act condemns what creditors to the same syndicated loan have always done: endeavor to ensure that similarly-situated lenders remain able to collect that debt on equal footing, including when the borrower experiences distress. The answer, under decades of settled law, is no.

*Amici* are trade associations that represent multiple participants in the credit markets, including lenders involved in the origination, syndication, and trading of commercial loans. They file this memorandum in support of Defendants because "Cooperation Agreements"—the misplaced target of Plaintiffs' novel antitrust theory—are an essential part of well-functioning credit markets.

Cooperation Agreements ensure that corporate finance's "sacred" norm of pro-rata (or "ratable") treatment of similarly-positioned creditors continues even in times of distress. *In re Serta Simmons Bedding, L.L.C.*, 125 F.4th 555, 565 (5th Cir. 2024). Without Cooperation Agreements, borrowers who find themselves under water can coerce creditors into giving additional financial support or risk losing value. They do so by forcing creditors to choose between two problematic options: (1) join the borrower's short-sighted plan by providing more funding and thereby preserve at least some value if the borrower fails to overcome its distress; or (2) decline to provide additional funds but risk getting nothing and losing previously bargained-for rights while other creditors join the borrower's gambit. That is a prisoner's dilemma, not

1

competition. Cooperation Agreements help avoid this dilemma and have positive ripple effects across financial markets. By ensuring that equal creditors are treated equally, Cooperation Agreements increase creditors' willingness to participate in the corporate debt markets, which in turn improves access to capital, lowers interest rates, and facilitates efficient restructurings, to the benefit of all market participants.

As *Amici* demonstrate herein, the antitrust laws have no quarrel with any of this: cooperation among creditors "in an effort to collect as much as possible of the amounts due under competitively determined contracts" is "not the sort of activity with which the antitrust laws are concerned." *United Airlines, Inc. v. U.S. Bank N.A.*, 406 F.3d 918, 921 (7th Cir. 2005). And as this Circuit has recognized, "[j]oint activity by creditors facing a debtor is commonly in the interests of all parties" because it "maximizes repayment and gives the debtor a chance of survival." *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.,* 691 F.2d 1039, 1052 (2d Cir. 1982).

*Amici* are:

- LSTA (formerly, the "Loan Syndications and Trading Association") is the leading advocate for the U.S. corporate lending market. LSTA's mission is to promote a fair, orderly, efficient, and growing corporate loan market while advancing and balancing the interests of all market participants. Its members include commercial banks, investment banks, broker-dealers, asset managers, institutional lenders, law firms, and market service providers. LSTA undertakes a wide variety of activities in pursuit of its mission, including advocacy, thought leadership, data analytics, education, and standardization of documents, practices and operations.

- SIFMA is the leading trade association for broker-dealers, investment banks, and asset managers operating in the U.S. and global capital markets. On behalf of the industry's nearly one million employees, SIFMA advocates on legislation, regulation, and business policy affecting retail and institutional investors, equity and fixed income markets, and related products and services. SIFMA serves as an industry coordinating body to promote fair and orderly markets, informed regulatory compliance, and efficient market operations and resiliency.

2

- MFA represents the global alternative asset management industry. MFA's mission is to advance the ability of alternative asset managers to raise capital, invest it, and generate returns for their beneficiaries. MFA advocates on behalf of its membership and convenes stakeholders to address global regulatory, operational, and business issues. MFA has more than 180 fund manager members, including traditional hedge funds, private credit funds, and hybrid funds, that employ a diverse set of investment strategies. Member firms help pension plans, university endowments, charitable foundations, and other institutional investors diversify their investments, manage risk, and generate attractive returns throughout the economic cycle.

- ICI is the leading association representing the asset management industry in service of individual investors. ICI's members include mutual funds, exchange-traded funds (ETFs), closed-end funds, and unit investment trusts (UITs) in the United States, and UCITS and similar funds in other jurisdictions. Its members manage $44.7 trillion invested in funds registered under the US Investment Company Act of 1940, serving more than 125 million investors.

- CRC was established to promote transparency and accountability, as well as fair and robust stakeholder participation in bankruptcy proceedings, through thought leadership and advocacy. The Coalition has over 3,800 member-subscribers, comprised of sophisticated fund managers, lenders, legal advisors, financial advisors, and academics and regularly publishes original content that discusses, educates, and advocates for positions affecting creditor rights. It provides curated content to highlight bankruptcy and restructuring issues affecting institutional fixed-income markets and convenes industry leaders and stakeholders at in-person events.

## ARGUMENT

I. **Cooperation Agreements Are a Critical Tool for Preserving Value for Borrowers and Creditors.**

    A. **Cooperation Agreements Have Become A Necessary and Commonplace Mechanism to Counter the Rise of Coercive "Liability Management Exercises," which Threaten Company Value and Are Unfair to Creditors.**

Plaintiffs characterize Cooperation Agreements as "weapon[s]" lenders use to "force [borrowers] into a Hobson's choice." Am. Compl. ¶¶ 113, 126. The reality is just the opposite. Cooperation Agreements are a defensive shield. They have arisen in response to a weapon wielded by *borrowers*: the euphemistically-named liability management exercise ("LME"), a

type of exploitative, zero-sum transaction that strikes at foundational norms of corporate debt by manufacturing post-hoc winners and losers within the same creditor pool. Generally stated, an LME is a transaction in which a distressed borrower seeks to restructure its liabilities. *See id.* ¶¶ 65-67. LMEs become "coercive" when the borrower creates a scenario where participating creditors receive value for their past loan, and creditors who do not—and, in many cases, cannot—participate see their loan value dramatically diminished.

To understand why Cooperation Agreements are necessary, consider the following illustration of a common type of coercive LME known as an "up-tier."

In good economic conditions, a financially sound company borrows $100 million in syndicated loans. A loan is "syndicated" when multiple investors "pool money to issue a single loan," *id.* ¶ 47, usually directed by a bank called the "lead arranger," *Loan Syndications & Trading Ass'n v. SEC*, 882 F.3d 220, 223 (D.C. Cir. 2018). At this stage, such investors compete to "arrange" and syndicate the loan by offering the borrower the best terms. After the loans are extended, they are "traded amongst financial institutions in a secondary market place." *Id.*

Several years after borrowing $100 million, the company becomes distressed and sees its enterprise value fall precipitously (say, for ease of illustration, to $50 million). Instead of negotiating with existing lenders to obtain loan modifications or additional financing, as contemplated by the loan documents, the company engages in an "up-tier" LME. The company strikes a deal with lenders who collectively own a sufficient share, say 51%, of the prior debt to amend the credit agreement to allow new borrowing and remove previously bargained-for creditor protections. In return, the 51% lenders get to exchange their old (distressed) loan for $50 million in new debt with superior priority and a more lucrative interest rate. Throughout these contortions, the company's value is unimproved, remaining at $50 million. Before the LME, the 51% lenders held debt worth just over half of the value of the borrower (so just over $25 million), while the 49% lenders held debt worth just under half the borrower's value. After the LME, the 51% lenders hold debt worth $50 million, while the 49% lenders are left out in the

4

cold. If the company were to settle the loans at this point, the 51% lenders would effectively be repaid in full while the 49% lenders get nothing.

As this all-too-common scenario illustrates, by putting creditors in a prisoner's dilemma in which the options are to go along with the borrower's gambit or risk losing value, coercive LMEs pose an existential threat to "an important background norm of corporate finance" known as "ratable [or pro-rata] treatment." *Serta*, 125 F.4th at 565. "Pursuant to this norm, a borrower must treat all of its similarly situated lenders, well, similarly." *Id.* "Ratable treatment is such an important norm that it is often described as a lender's 'sacred right' under syndicated loan agreements." *Id.* Indeed, syndicated loan agreements reflect this "sacred right": they provide for equal treatment of similarly-situated creditors, pro-rata sharing, and unanimous consent on core economic terms. Syndicated loans thus share the same core principles as the Bankruptcy Code, which likewise promotes equal treatment of similarly-situated creditors. *See Begier v. IRS*, 496 U.S. 53, 58 (1990) ("Equality of distribution among creditors is a central policy of the Bankruptcy Code. According to that policy, creditors of equal priority should receive pro rata shares of the debtor's property.").

Coercive LMEs—and the concurrent threat to ratable treatment—have grown "geometrically" in recent years. Mark J. Roe & Vasile Rotaru, *Liability Management's Limited Runway: Corporate Restructuring Today*, 136 Yale L.J. __ (forthcoming 2026) (manuscript at 6) (Mar. 17, 2026 draft) ("*Limited Runway*"), https://tinyurl.com/yvaznhcd. While there were only one or two coercive LMEs per year in the 2010s, they have since skyrocketed, going from 8 in 2022 to 30 in 2023 to 49 and 47 in 2024 and 2025, respectively. Ian Feng, *U.S. Liability Management Transactions: Quarterly Update Through Q4 2025 and Primer*, Covenant Rev. 2 (Jan. 14, 2026) ("*Quarterly Update*").

In response, lenders have employed a shield against this destruction of ratable treatment: the Cooperation Agreement.[1] In basic terms, the creditors party to the agreement commit not to reach a side deal when the distressed borrower tries to put them in the prisoner's dilemma of a coercive LME. Am. Compl. ¶ 78. *See* Robert J. Waldner, *An Overview of the Use of Cooperation Agreements Among Lenders in the Syndicated Loan Market*, Rev. Banking & Fin. Servs. 153-54 (Nov. 2025) ("A lender that signs a cooperation agreement typically agrees that it will not negotiate or participate in any transaction with the borrower or other lenders in respect of the borrower's debt unless such transaction is supported by a specified portion of the cooperating lender group."). Instead, the creditors, speaking with one voice, negotiate with the distressed company to restructure its debt (including sometimes offering new liquidity) in a way that maintains ratable treatment. Waldner, *supra*, at 154.

The Amended Complaint acknowledges that Cooperation Agreements have these features; it just obscures their purpose. Cooperation Agreements "bar the cooperative's members and their affiliates from negotiating unilaterally with the borrower," thereby ensuring that members have a recourse to preserve the status quo if the borrower seeks to impose a coercive LME. Am. Compl. ¶ 78. Cooperation Agreements also ensure that neither the members nor the borrower can circumvent its terms by "selling, transferring, pledging, or otherwise disposing of their loans" or by "extend[ing] new credit to the borrower" on an individual basis. *Id.* Cooperation Agreements are thus simply a solution to a particular kind of post-issuance threat to the "sacred right" of ratable treatment.

---

[1] *See* Shan Qureshi & Julian Bulaon, *Testing the Limits: Cooperation Agreements as a Shield Against Liability Management in 2024*, Octus (June 24, 2024) (the "popularity [of cooperation agreements] among creditor groups exploded in 2024 in response to the unprecedented surge in liability management activity"); Kenneth Rothenberg, *Cooperation Agreements 101: A Quick Primer On Material Terms and Trends,* Bus. L. Today (June 12, 2025) (also at Dkt. 88-10) ("The dramatic increase in use of Coop Agreements … has arisen primarily as a reaction to excluded lenders being caught on the wrong end of a non-pro rata liability management exercise.").

### B.    Cooperation Agreements Are Economically Efficient.

Cooperation Agreements are a case-in-point of the Second Circuit's observation that "[j]oint activity by creditors facing a debtor is commonly in the interests of all parties." *Sharon Steel Corp.*, 691 F.2d at 1052. This is true for several reasons.

First, Cooperation Agreements protect would-be minority lenders from the value-destroying "prisoner's dilemma" created by coercive LMEs. The costs of coercive LMEs "are born entirely by the minority lenders, who end up with subordinated debt worth less than before." *Serta*, 125 F.4th at 567. For instance, in the *Serta* LME, participating lenders were slated to recover 79.5% of their claims while non-participating lenders would recover only 1.5%. Waldner, *supra*, at 153. According to one estimate, coercive LMEs on average move more than 40% of value away from the minority lenders. Octus, *Pricing the Omni-Blocker: A New Paradigm for Pricing Non-Pro-Rata LME Protection* (June 14, 2025). In the world of coercive LME schemes, lenders fear they could wind up among the minority lenders deprived of all value. The availability of Cooperation Agreements serves to reassure creditors that they will not be left on the outside looking in and, as a result, encourages creditors to participate in corporate debt markets. That in turn benefits borrowers. With more potential creditors—and therefore more competition for providing capital—borrowers receive better terms, including better interest rates, fewer and less restrictive covenants, prepayment flexibility, the ability to obtain additional funding, and longer maturities.

The alternative to Cooperation Agreements—rampant use of coercive LMEs—presents long-run risks for borrowers. An exhaustive recent study of 89 "coercive, non-pro-rata restructurings" found that such LMEs do not just "shif[t] value from some creditors to others" but actually "degrad[e]" the borrower, by "creat[ing] a more complex capital structure" without "address[ing] underlying credit issues." *Limited Runway* at 46; *Quarterly Update* at 3. Indeed,

LMEs rarely improve credit ratings. *Limited Runway* at 24 (more than 88% of LME issuers remained rated CCC+ or below after the transaction). What's more, the resulting complex capital structure is its own disadvantage. "[W]eakened post-LME capital structures constrain … future options for handling the company's operational challenges. Higher-priority debt can block new financing and even deter trade credit. And more complex capital structures make future recapitalizations harder." *Id.* at 22. In addition, coercive LMEs frequently result in expensive and contentious litigation that further increases costs to all stakeholders.

To that end, coercive LMEs do not typically put borrowers in a better financial position or meaningfully reduce the risk of bankruptcy or default. Within the first year following a coercive LME, more than half of the borrowers went into bankruptcy or default. *Id.* at 12. After three years, 93% had gone into bankruptcy or default. *Id.* Further, because the borrower adopted a more complex capital structure, the eventual bankruptcy proceedings took longer and were costlier. *Id.* at 23. In short, a borrower emerges from an LME as "a zombie company that generates only enough revenue to service its debt, limping along until there is very little left to salvage." Samir D. Parikh, *Creditors Strike Back: The Return of the Cooperation Agreement*, 73 Duke L.J. Online 113, at *4-5 (2023).

Second, Cooperation Agreements reduce transaction costs, to the benefit of both borrower and creditor. Similar to how borrowers initially work with one lead arranger, Cooperation Agreements ensure that distressed borrowers need not corral a large number of disparate creditors to amend the credit agreement or to find sustainable sources of liquidity. *See* Rothenberg, *supra*, 2-3. In addition, Cooperation Agreements tend to help the parties avoid bankruptcy or at least avoid costlier forms of bankruptcy. By organizing creditors in times of distress, the agreements help parties resolve issues out of court or facilitate speedier prepackages

and prearranged bankruptcies that cost a fraction of the "three-year free-fall bankruptcies" that are more likely to occur without Cooperation Agreements. *Limited Runway* at 16; Douglas G. Baird, *Three Faces of Creditor-on-Creditor Aggression*, 97 Am. Bankr. L.J. 213, 215 (2023); *cf. In re Chateaugay Corp.*, 961 F.2d 378, 382 (2d Cir. 1992) (noting "the strong bankruptcy policy in favor of the speedy, inexpensive, negotiated resolution of disputes" outside of court).

Given findings indicating that coercive LMEs are bad for lenders *and* borrowers, one might wonder why borrowers increasingly engage in them. The answer appears to be misaligned incentives: if the distressed company files for bankruptcy, its controlling stockholders face the Bankruptcy Code's absolute priority rule, under which stockholders receive nothing while creditors are paid. *See Limited Runway* at 28-29. Resorting to an LME can extend the runway for the borrower, giving the stockholders more time to implement higher-risk strategies to try to turn the business around or to sell the business before bankruptcy. Rather than risking no recovery on their equity in bankruptcy, the controlling stockholders play for the long-shot of some recovery under an LME at the expense of their creditors. *Id.*

Cooperation Agreements counterbalance these misaligned incentives, ensuring that similarly-situated creditors are treated similarly, as contemplated by the contracts they signed in making the loan.

## II.    **Cooperation Agreements Do Not Restrain Competition on the Merits.**

Properly understood, Cooperation Agreements are a tool used to preserve ratable treatment in "[n]egotiations between a creditor and a debtor to refinance debt." *Akanthos Cap. Mgmt., LLC v. Atlanticus Holdings Corp.*, 734 F.3d 1269, 1276 (11th Cir. 2013) (per curiam) (Pryor, J., specially concurring). Those creditor-debtor refinancing negotiations fundamentally are "different from" what concerns the antitrust laws: the anticompetitive distortion of

"negotiations between two parties *not* bound by an existing agreement who negotiate a sale of services, goods, or credit." *Id.* (emphasis added).

That is a decisive point. To state an antitrust claim, a plaintiff must allege its harm is of "the type the antitrust laws were intended to prevent." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). Here, because Plaintiffs' allegations concern only "an effort to collect as much as possible of the amounts due under competitively determined contracts," which "is not the sort of activity with which the antitrust laws are concerned," Plaintiffs' antitrust claim fails at the threshold. *United Airlines*, 406 F.3d at 921.

The analysis of market competition belongs "at the time loans are made," *id.*, not during the tussle over the debt created by the *already existing* loans. The fact that market competition occurs at the time the loan is issued, and not when lenders and borrowers meet to refinance in times of distress, is easily proved. The very question of whether there can be a Cooperation Agreement is often part of the *initial negotiations* over syndicated loan agreements. *Cf. Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, 423 F.3d 374, 382 (3d Cir. 2005) ("[A]ftermarket behavior generally is disciplined by competition in the primary product market."). Specifically, in recent years parties, including Optimum, have started discussing whether to include in the *initial* loan agreement provisions to prohibit creditors from entering Cooperation Agreements. *Quarterly Update* at 6-7. However, "nearly all anti-cooperation provisions have failed to clear the market." *Id.* at 7. In other words, borrowers have generally been unable to get loans when they tried to force lenders to agree to be subject to future coercive LMEs unprotected by Cooperation Agreements. Ironically enough, Optimum itself is the exception: its November 2025 and January 2026 transactions *included anti-Coop provisions*. Dkt. 88-4 at 132-33; Dkt. 88-6 at 136.

The Sherman Act's indifference to Cooperation Agreements is further confirmed by the fact that such agreements do not restrain any output-expanding competition. Cooperation Agreements are a mechanism to prevent coercive LMEs that *shift* value rather than create it. *See*

10

*Serta*, 125 F.4th at 565 (noting LMEs "create a zero-sum game").[2] That undermines Plaintiffs' whole theory. "The core question in antitrust is output. Unless a contract reduces output in some market, to the detriment of consumers, there is no antitrust problem." *Chi. Pro. Sports Ltd. P'ship v. Nat'l Basketball Ass'n*, 95 F.3d 593, 597 (7th Cir. 1996); *see also MacDermid Printing Sols. LLC v. Cortron Corp.*, 833 F.3d 172, 183 (2d Cir. 2016) ("[I]n no precedential opinion in this Circuit has a plaintiff successfully proved an adverse effect on competition without offering evidence of changed prices, output, or quality."). Plaintiffs' contrary assertion—that Cooperation Agreements affect economic output by limiting borrowers' access to new capital—is facially implausible. There are numerous ways to access new capital that do not destroy ratable treatment and that Cooperation Agreements will not affect, as exemplified by Optimum itself, which obtained over $4 billion in capital *after* the Cooperation Agreement. Dkt. 87 at 23.

If anything, as explained above, Cooperation Agreements *improve* long-run economic output and have *procompetitive* effects because they encourage lenders to confidently lend to borrowers and help avoid coercive LMEs that reduce lenders' recoveries, raise transaction costs for all parties, and can leave the borrower as a less-efficient "zombie company" that will likely face reduced access to capital in the future. The Second Circuit has confirmed as much, explaining that "[j]oint activity by creditors facing a debtor is commonly in the interests of all parties" because it "maximizes repayment and gives the debtor a chance of survival." *Sharon Steel Corp.*, 691 F.2d at 1052; *see also* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶2135d (2025) ("To the extent that firms can join together to collect preexisting debts or enforce other legal rights, they are simply

---

[2] *See also* Baird, *supra*, at 233 ("The transfer of value from the minority [creditors] to the majority is a zero-sum game."); Parikh, *supra*, at *4, 6, 10 (coercive LMEs are "purely self-interested behavior designed to seize and *redistribute* value" and "essentially a money grab." (emphasis added)).

reducing their costs."); *Akanthos Cap. Mgmt.*, 734 F.3d at 1277 (noting that lenders have a fundamental "incentive to keep the plaintiffs financially afloat and maximize a return on a preexisting investment").

### III.    Casting Doubt on Cooperation Agreements Would Have Wide Ramifications for Global Credit Markets.

The Supreme Court has instructed lower courts to be attentive to the risk of condemning a legitimate business practice when asked to consider whether an activity is anticompetitive. Even "[u]nder the best of circumstances," applying the antitrust laws "can be difficult"—and mistaken condemnations of legitimate business arrangements "are especially costly, because they chill the very [procompetitive] conduct the antitrust laws are designed to protect." *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 414 (2004) (citation omitted); *cf. Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986) ("[W]e must be concerned lest a rule or precedent that authorizes a search for a particular type of undesirable pricing behavior end up discouraging legitimate price competition." (citation omitted)). "Indeed, static judicial decrees in ever-evolving markets may themselves facilitate collusion or frustrate entry and competition." *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 99 (2021).

Conferring antitrust standing on the Plaintiffs in this case would open Cooperation Agreements, which "have become an integral part of investing in leveraged finance," to actual or potential antitrust scrutiny and treble damages. Barclays, *LME: Trading through prisoner's dilemmas* 11 (July 29, 2024). That would in turn have numerous unintended consequences and harm the global credit market overall.

For starters, calling into question whether lenders can form Cooperation Agreements would increase transaction costs for new loans and potentially hold up efforts to find solutions in distressed loans. Loan market participants currently negotiate under established background

assumptions, including that "[j]oint activity by creditors facing a debtor is commonly in the interests of all parties" and lawful because it "reduces the costs of borrowing and the costs of doing business." *Sharon Steel*, 691 F.2d at 1052. Casting doubt on Cooperation Agreements would destabilize this foundational legal understanding and introduce uncertainty into the negotiation of new credit agreements. That would in turn lead to (a) increased legal fees as parties attempt to structure around legal ambiguity, (b) longer negotiation timelines as parties attempt to future-proof credit documentation, (c) additional transaction costs as parties develop less efficient mechanisms to ensure pro-rata recovery and lender coordination, and (d) deals delayed or forestalled entirely.

Worse, this case threatens to upend fundamental assumptions upon which *existing* deals rely. Hundreds of credit agreements have been negotiated with the understanding that lenders may lawfully cooperate to protect their contractual rights. *See* Parikh, *supra*, at *23 (collecting examples of Cooperation Agreements in high-profile distressed situations). A ruling casting doubt on Cooperation Agreements could retroactively upend these arrangements, stymy ongoing negotiations, and cause the unwinding of negotiated restructurings. The uncertainty could extend to loan trading practices, which have developed specific protocols around cooperation agreement paper versus non-cooperation-agreement paper. *See* Barclays, *supra*, at 5. Without Cooperation Agreements' unique ability to provide transparency for all stakeholders—including lenders, borrowers, and stockholders—and thereby facilitate efficient and effective restructuring, the result will be more bankruptcies, and those bankruptcies will be more expensive. *Supra* 8-9.

All this uncertainty and increased costs would inevitably be priced into loans, increasing the cost to access capital. One industry analysis estimates that protection from non-pro-rata coercive LMEs (which Cooperation Agreements reliably provide) is worth approximately 60

basis points per year to lenders. Octus, *Pricing the Omni-Blocker*, *supra*. In other words, if lenders cannot rely on Cooperation Agreements to provide this protection, they will demand equivalent compensation through substantially higher interest rates.

In short, thanks in part to the availability of Cooperation Agreements, credit markets have reached an efficient and fair equilibrium that protects the expectation of ratable treatment to the ultimate benefit of all stakeholders. This is a classic example of where "[j]oint activity by creditors facing a debtor … maximizes repayment and gives the debtor a chance of survival." *Sharon Steel*, 691 F.2d at 1052. If aberrant antitrust theories and ad hoc "static judicial decrees" intrude into that equilibrium, the result could be to derail transactions and make participation in the credit market more expensive for everyone. Put another way, credit markets where Cooperation Agreements are possible and relied upon is "in the interests of all parties"; subverting the Sherman Act to condemn those arrangements is not.

## CONCLUSION

The Amended Complaint should be dismissed with prejudice.

14

DATED: March 25, 2026

Respectfully submitted,

*/s/ Jennifer J. Clark*
Jennifer J. Clark\*
Corey W. Roush\*
Jeremy D. Rozansky\*
SIDLEY AUSTIN LLP
1501 K St. NW Washington, DC 20005
(202) 736-8000
jennifer.clark@sidley.com

Elizabeth R. Tabas Carson\*
SIDLEY AUSTIN LLP
787 Seventh Ave.
New York, NY 10019

*Attorneys for Amici Curiae LSTA, Inc.;*
*Securities Industry and Financial Markets*
*Association; Managed Funds Association;*
*Investment Company Institute; and Creditor*
*Rights Coalition*


\* Application for pro hac vice admission
pending

## CERTIFICATE OF COMPLIANCE

This amicus curiae brief contains 4,329 words, less than half the type-volume limitations for principle briefs under S.D.N.Y. Local Civil Rule 7.1(c) and Individual Rule 5(A), excluding the portions exempted by S.D.N.Y. Local Civil Rule 7.1(c) and Individual Rule 5(A).


Dated: March 25, 2026                                        */s/ Jennifer J. Clark*
                                                             Jennifer J. Clark