**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| OPTIMUM COMMUNICATIONS, INC.; CSC HOLDINGS, LLC, | |
| Plaintiffs, | Case No. 1:25-cv-9785 (JAV) |
| v. | |
| APOLLO CAPITAL MANAGEMENT, L.P.; ARES MANAGEMENT LLC; BLACKROCK FINANCIAL MANAGEMENT, INC.; GOLDENTREE ASSET MANAGEMENT LP; J.P. MORGAN INVESTMENT MANAGEMENT INC.; LOOMIS, SAYLES & COMPANY, L.P.; OAKTREE CAPITAL MANAGEMENT, L.P.; PGIM, INC.; Doe Entities #1-#1000, | ORAL ARGUMENT REQUESTED |
| Defendants. | |

**DEFENDANTS' REPLY MEMORANDUM OF LAW**
**IN SUPPORT OF THEIR MOTION TO DISMISS THE AMENDED COMPLAINT**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................................1

ARGUMENT ..............................................................................................................................1

I.    PLAINTIFFS FAIL TO STATE AN ANTITRUST CLAIM. ...........................................1

    A.    Plaintiffs Fail to Distinguish Defendants' Authorities............................................ 1

    B.    The Opposition Fails to Show Antitrust Injury....................................................... 4

    C.    The Opposition Confirms That *Per Se* Treatment Is Inappropriate........................ 6

    D.    Plaintiffs Fail to State a Rule-of-Reason Claim...................................................... 8

        1.    Plaintiffs Ignore Valid Market Substitutes. ...................................................8

        2.    Plaintiffs' Arguments About Harm to Competition Are Meritless............10

II.   PLAINTIFFS' CONTRACT-RELATED CLAIMS FAIL. ...............................................11

    A.    Plaintiffs Fail to Identify a Breached Contract Provision. .................................... 11

    B.    Plaintiffs' Implied-Covenant Claim Fails Because Plaintiffs Received the
        Benefit of Their Bargain. ...................................................................................... 12

    C.    Plaintiffs Continue to Offer Only Conclusory Group Allegations of
        Tortious-Interference. ............................................................................................ 12

CONCLUSION...........................................................................................................................13

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Akanthos Cap. Mgmt., LLC* v. *Atlanticus Holdings Corp.*,
    734 F.3d 1269 (11th Cir. 2013) ...............................................................................3, 7, 8, 10

*Atl. Richfield Co.* v. *USA Petroleum Co.*,
    495 U.S. 328 (1990)...............................................................................................................4

*Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977)...............................................................................................................5

*Cap. Imaging Assocs., P.C.* v. *Mohawk Valley Med. Assocs., Inc.*,
    996 F.2d 537 (2d Cir. 1993)..................................................................................................10

*Catalano, Inc.* v. *Target Sales, Inc.*,
    446 U.S. 643 (1980)...............................................................................................................7

*Cenedella* v. *Metro. Museum of Art*,
    348 F. Supp. 3d 346 (S.D.N.Y. 2018)...............................................................................8, 11

*CompuCredit Holdings Corp.* v. *Akanthos Cap. Mgmt, LLC*,
    916 F. Supp. 2d 1326 (N.D. Ga. 2011) ..............................................................................2, 3

*Daniel* v. *Am. Bd. of Emergency Med.*,
    428 F.3d 408 (2d Cir. 2005)...................................................................................................5

*Falstaff Brewing Corp.* v. *New York Life Ins. Co.*,
    513 F. Supp. 289 (N.D. Cal. 1978) ...............................................................................1, 2, 3, 7

*First Nat'l Bank of Louisville* v. *Cont'l Ill. Nat'l Bank & Tr. Co. of Chicago*,
    933 F.2d 466 (7th Cir. 1991) ...............................................................................................11

*FTC* v. *Indiana Fed'n of Dentists*,
    476 U.S. 447 (1986)...........................................................................................................6, 8

*FTC* v. *Staples, Inc.*,
    190 F. Supp. 3d 100 (D.D.C. 2016)........................................................................................9

*FTC* v. *Tapestry, Inc.*,
    755 F. Supp. 3d 386 (S.D.N.Y. 2024).....................................................................................8

*Fund Liquidation Holdings LLC* v. *UBS AG*,
    2021 WL 4482826 (S.D.N.Y. Sept. 30, 2021).......................................................................12

*Gatt Commc'ns, Inc.* v. *PMC Assocs., L.L.C.*,
　711 F.3d 68 (2d Cir. 2013)...............................................................................................4

*Gelboim* v. *Bank of Am. Corp.*,
　823 F.3d 759 (2d Cir. 2016)...............................................................................................5

*Global Tel\*Link Corp.* v. *JACS Sols. Inc.*,
　708 F. Supp. 3d 784 (E.D. Va. 2023) ...............................................................................6

*Gym Door Repairs, Inc.* v. *Young Equip. Sales, Inc.*,
　206 F. Supp. 3d 869 (S.D.N.Y. 2016).............................................................................12

*Leegin Creative Leather Prods., Inc.* v. *PSKS, Inc.*,
　551 U.S. 877 (2007)...........................................................................................................6

*In re Libor-Based Fin. Instruments Antitrust Litig.*,
　2015 WL 4634541 (S.D.N.Y. Aug. 4, 2015)....................................................................2

*Miller* v. *HSBC Bank U.S.A., N.A.*,
　2015 WL 585589 (S.D.N.Y. Feb. 11, 2015)...................................................................11

*Nat'l Collegiate Athletic Ass'n* v. *Bd. of Regents of Univ. of Okla.*,
　468 U.S. 85 (1984).............................................................................................................7

*Newcal Indus., Inc.* v. *Ikon Off. Sol.*,
　513 F.3d 1038 (9th Cir. 2008) .......................................................................................9, 10

*N. Am. Soccer League* v. *Nat'l Football League*,
　670 F.2d 1249 (2d Cir. 1982)............................................................................................8

*Nw. Wholesale Stationers, Inc.* v. *Pac. Stationery & Printing Co.*,
　472 U.S. 284 (1985)...........................................................................................................6

*NYU Hosps. Ctr.* v. *League of Voluntary Hosps. & Homes of New York*,
　318 F. Supp. 3d 622 (S.D.N.Y. 2018)...........................................................................6, 7

*Palladino* v. *JPMorgan Chase & Co.*,
　761 F. Supp. 3d 521 (E.D.N.Y. 2024) ..............................................................................4

*Queen City Pizza, Inc.* v. *Domino's Pizza, Inc.*,
　124 F.3d 430 (3d Cir. 1997)..............................................................................................9

*Resol. Tr. Corp.* v. *Lesal Assocs.*,
　1992 WL 98843 (S.D.N.Y. May 6, 1992) .......................................................................12

*Sharma* v. *Chem. Bank*,
　723 F. Supp. 200 (S.D.N.Y. 1989) .................................................................................11

*Sharon Steel Corp.* v. *Chase Manhattan Bank, N.A.*,
 691 F.2d 1039 (2d Cir. 1982)............................................................................................1, 2, 4

*Taco, Inc.* v. *Am. Home Assurance Co.*,
 2025 WL 2419707 (S.D.N.Y. Aug. 21, 2025).......................................................................12

*United Airlines, Inc.* v. *U.S. Bank N.A.*,
 406 F.3d 918 (7th Cir. 2005) ...............................................................................................1, 2

*United States* v. *Live Nation Ent., Inc.*,
 2026 WL 456804 (S.D.N.Y. Feb. 18, 2026)............................................................................9

*Vinas* v. *Chubb Corp.*,
 499 F. Supp. 2d 427 (S.D.N.Y. 2007)...................................................................................13

**INTRODUCTION**

Plaintiffs concede that the Debt Instruments were entered at competitively determined prices.  Optimum voluntarily incurred that debt and accepted its terms.  Now, facing approximately $23 billion in obligations, Plaintiffs seek to recast their creditors' collective efforts to enforce those preexisting, competitively determined, contractual terms as an antitrust violation.  But the antitrust laws do not require creditors to choose between preserving the value of their contractual rights and incurring antitrust exposure, and every court to consider similar allegations has rejected that theory.  Plaintiffs offer no basis for a different result.

**ARGUMENT**

**I.    PLAINTIFFS FAIL TO STATE AN ANTITRUST CLAIM.**

**A.    Plaintiffs Fail to Distinguish Defendants' Authorities.**

Caselaw makes clear that "[c]ompetition comes at the time loans are made," *United Airlines, Inc.* v. *U.S. Bank N.A.*, 406 F.3d 918, 921 (7th Cir. 2005), that "cooperation in an effort to collect as much as possible of the amounts due under competitively determined contracts is not the sort of activity with which the antitrust laws are concerned," *id.*, and that an argument that creditors violate the antitrust laws by collaborating to secure what they are already owed "border[s] on the frivolous," *Sharon Steel Corp.* v. *Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1052 (2d Cir. 1982); *see Falstaff Brewing Corp.* v. *New York Life Ins. Co.*, 513 F. Supp. 289, 290-93 (N.D. Cal. 1978) (lenders' concerted action not subject to antitrust laws because lenders "were not competing with the banks or other institutions to offer or to supply [plaintiff] with more credit, but were attempting to secure that credit which they had already extended").

In all ways that count, Plaintiffs' allegations mirror the facts in cases holding creditor cooperation lawful under the antitrust laws.  Optimum carries a $23 billion debt load that exposes it to financial risk.  (AC ¶ 19; *see* ECF No. 88, Ex. 1 at 26-29, Ex. 9.)  Facing liquidity

concerns, Optimum seeks to renegotiate its existing debt obligations through transactions with selected creditors.  (AC ¶ 1.)  Plaintiffs do not dispute—nor could they—that Defendants' conduct is aimed at protecting their ability to collect a pre-existing debt.  That is the same kind of collective creditor conduct courts have repeatedly held to fall outside of the antitrust laws.  *Sharon Steel*, 691 F.2d at 1052 ("Joint activity by creditors facing a debtor is commonly in the interests of all parties" and lacks "anti-competitive purpose or effect"); *CompuCredit Holdings Corp.* v. *Akanthos Cap. Mgmt*, 916 F. Supp. 2d 1326, 1328 (N.D. Ga. 2011) ("[A]gree[ment] not to participate [in tender offer] because . . . the price [is] too low" did not implicate Sherman Act); *Falstaff*, 513 F. Supp. at 293 (collaboration not unlawful because lenders "were attempting to secure that credit which they had already extended").

Plaintiffs' attempts to distinguish these cases collapse on inspection.  Their differing procedural postures are irrelevant, because the cases pronounced legal rules.  *See In re Libor-Based Fin. Instruments Antitrust Litig.*, 2015 WL 4634541, at *78 (S.D.N.Y. Aug. 4, 2015), *amended*, 2015 WL 13122396 (S.D.N.Y. Oct. 19, 2015) ("[W]hen the court must decide a purely legal question of how a civil cause of action is defined, opinions resolving motions on the pleadings, motions for summary judgment, and post-trial appeals are fungible.").  The Seventh Circuit's statement that "[c]ompetition comes at the time loans are made" was a broad, legal pronouncement.  *United Airlines*, 406 F.3d at 921.  The Second Circuit spoke about "[j]oint activity by creditors" broadly—discussing the "common[]" characteristics of these collaborations.  *Sharon Steel*, 691 F.2d at 1052.  And *CompuCredit* was decided on the pleadings, confirming that these questions are appropriate for a Rule 12 motion.  916 F. Supp. 2d at 1326.

Plaintiffs argue that the borrowers in these cases were insolvent.  That is wrong.  The borrowers were solvent in both *Sharon Steel*, 691 F.2d at 1052 ("[T]he present case does not

involve an insolvent corporation."), and *CompuCredit*, 916 F. Supp. 2d at 1330-31 (borrower had not "breached the term of its indentures" and was "not in bankruptcy"). Those borrowers faced liquidity concerns, but the same is true here.[1] (AC ¶ 19 (detailing $23 billion debt load); Mot. 7-8; Exs. 1, 9.) Moreover, the distinction is not meaningful: whether a plaintiff "breached the terms of its indentures" or is "in bankruptcy" "ha[s] no bearing on the applicability of the Sherman Act." *CompuCredit*, 916 F. Supp. 2d at 1330-31. What matters is the Co-op serves the lawful purpose of preventing Optimum from avoiding its existing contractual debt obligations to the Co-op's members.

Plaintiffs' distinctions based on the alleged ban on individual negotiations and future credit also fail. Those terms prevent new debt from subverting existing debt and are therefore necessary to the Co-op's lawful purpose: ensuring Defendants can "secure that credit which they had already extended." *Falstaff*, 513 F. Supp. at 293; (Mot. 15-16). And Plaintiffs' contention that restrictions on future credit are always unlawful is unsupported. True, "debtors are sometimes permitted to bring antitrust claims against creditors," *CompuCredit*, 916 F. Supp. 2d at 1330, but those cases involved defendants with no "incentive to keep the plaintiffs financially afloat and maximize a return on a preexisting investment; the conspirators were in a take-it-or-leave-it position with no underlying obligations left to be repaid." *Akanthos Cap. Mgmt., LLC* v. *Atlanticus Holdings Corp.*, 734 F.3d 1269, 1277 (11th Cir. 2013) (Pryor, J., concurring). That distinction is critical. Here, "[t]he parties are in a preexisting debtor-creditor relationship, and [Defendants] have rights that they can exercise against" Optimum consistent with the antitrust laws, including "maximiz[ing] . . . repayment." *Id.* at 1275. Any restriction on new debt merely

---

[1]    Defendants do not concede that Plaintiffs are solvent, but Defendants accept Plaintiffs' allegations for purposes of this motion.

effectuates those rights and thus lacks any "anti-competitive purpose or effect." *Sharon Steel*, 691 F.2d at 1052.

**B.      The Opposition Fails to Show Antitrust Injury.**

Antitrust injury occurs only when the alleged harm is "attributable to an anti-competitive aspect of the practice under scrutiny." *Atl. Richfield Co.* v. *USA Petroleum Co.*, 495 U.S. 328, 334 (1990).  Plaintiffs concede that "[o]f course, Optimum originally borrowed from Defendants under competitive conditions," providing them the benefits of competition in the original price and terms of the debt.  (Opp. 22.)  This is the beginning and end of the antitrust-injury inquiry.  Collective action to enforce those competitive terms may frustrate Plaintiffs' desire to avoid the deals it entered, but that is not antitrust injury.  *See Sharon Steel*, 691 F.2d at 1052.  Antitrust law is not a weapon for Plaintiffs, now in possession of Defendants' capital, to force discounts that create "losers" among its creditors.  (AC ¶ 75.)  Plaintiffs' alleged injuries do not "flow[] from that which makes or might make defendants' acts" anticompetitive, *Gatt Commc'ns, Inc.* v. *PMC Assocs., L.L.C.*, 711 F.3d 68, 76 (2d Cir. 2013) (brackets omitted), and thus are not antitrust injury.

Plaintiffs seek to avoid this conclusion by arguing that, to determine if they suffered antitrust injury, the court must "assume" that Defendants violated the antitrust laws.  (Opp. 26.)  But that argument is immaterial where, as here, the alleged injury does not reflect "an anti-competitive aspect of the practice under scrutiny." *Atl. Richfield Co.*, 495 U.S. at 334.  It is also wrong.  A court *may*—but is not required to—assume a violation to answer the antitrust-injury question. *E.g.*, *Palladino* v. *JPMorgan Chase & Co.*, 761 F. Supp. 3d 521, 534 (E.D.N.Y. 2024) ("[C]ourts *may* assum[e] the existence of a violation in addressing the issue of standing."

-4-

(emphasis added) (quotation marks omitted)).[2]  Where, as here, precedent forecloses an antitrust violation as a matter of law (Mot. I.A), there is nothing to "assume."

But even assuming an antitrust violation, Plaintiffs' claim still fails because they must separately allege antitrust injury.  *Daniel* v. *Am. Bd. of Emergency Med.*, 428 F.3d 408, 438 (2d Cir. 2005).  *Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977), makes this clear.  There, the defendant conceded that a "jury could have found the [conduct] unlawful," and that the plaintiffs suffered injury, but the Court still found no antitrust injury because the injury did not "reflect the *anticompetitive* effect either of the violation or of *anticompetitive* acts made possible by the violation."  *Id.* at 484, 488-89 (emphases added).

Instead of addressing Defendants' argument that Plaintiffs' alleged injury does not result from anticompetitive conduct, Plaintiffs argue that whether the conduct was anticompetitive is for the merits.  (Opp. 26.)  But as *Brunswick* demonstrates, Plaintiffs must separately establish antitrust standing *even if* the conduct is anticompetitive, and to do so, they must show that the injury "reflect[s] the anticompetitive effect" of the conduct.  *Brunswick*, 429 U.S. at 489.  Plaintiffs' concession—that the debt was competitively priced—confirms they cannot.

Plaintiffs also cast Kirkland's withdrawal as antitrust injury.  But Kirkland is not part of the alleged antitrust markets (Mot. 16), and Plaintiffs do not allege that they were "exclud[ed] . . . from the Leveraged-Finance Market" by "the Kirkland boycott" (Opp. 25).  They do not allege, for example, that they could not retain alternate transaction counsel or that their new counsel is inferior.  To the contrary, Optimum retained replacement counsel.  (AC ¶ 228.)

---

[2]    The assumption is an analytical "expedient," sometimes useful to avoid "confusion" or a "quagmire" regarding the analytical "interplay between" an antitrust violation and antitrust standing.  *Gelboim* v. *Bank of Am. Corp.*, 823 F.3d 759, 770 (2d Cir. 2016).

At most, Plaintiffs allege contractual injury.  Plaintiffs admit that Defendants lawfully could have included terms in the Debt Instruments barring LMEs.  (Opp. 24 n.9.)  The core of their argument is that Defendants, having failed to obtain an express ban on LMEs, have thwarted Plaintiffs' contractual expectations.  (*E.g.*, AC ¶ 205.)  That confirms that this dispute flows from "contractual sour grapes," *Global Tel\*Link Corp.* v. *JACS Sols. Inc.*, 708 F. Supp. 3d 784, 796 (E.D. Va. 2023), not anticompetitive conduct.

### C.    The Opposition Confirms That *Per Se* Treatment Is Inappropriate.

*Per se* treatment is reserved for restraints that courts have determined, based on experience, would be invalidated under the rule of reason in almost all instances.  *Leegin Creative Leather Prods., Inc.* v. *PSKS, Inc.*, 551 U.S. 877, 886-87 (2007).  Plaintiffs identify no case holding a creditor cooperative to be unlawful.  In fact, courts consistently recognize that creditor cooperation is lawful and procompetitive.  (Mot. I.A.)  Given this contrary authority, creditor cooperatives would not be "invalidated in all or almost all instances under the rule of reason." *Leegin*, 551 U.S. at 886-87.  That alone mandates dismissal.

Labeling the Co-op a "group boycott" or "price fixing" (Opp. 9-10) does not change that result.  As Plaintiffs concede, not all group boycotts are *per se* unlawful.  (*Id.* 9.)  Concerted refusals to deal receive *per se* treatment when they "disadvantage competitors."  *Nw. Wholesale Stationers, Inc.* v. *Pac. Stationery & Printing Co.*, 472 U.S. 284, 294 (1985); *Indiana Fed'n of Dentists*, 476 U.S. 447, 458 (1986) ("[T]he category of restraints classed as group boycotts is not to be expanded indiscriminately, and the *per se* approach has generally been limited to cases in which firms with market power boycott suppliers or customers in order to discourage them from doing business with a competitor.").  "The classic 'group boycott' is a concerted attempt by a group of competitors at one level to protect themselves from competition from non-group members who seek to compete at that level."  *NYU Hosps. Ctr.* v. *League of Voluntary Hosps. & Homes of*

*New York*, 318 F. Supp. 3d 622, 634 (S.D.N.Y. 2018) (citation omitted).  Plaintiffs cannot allege that the Co-op harms them as Defendants' competitor:  Optimum is a "telecommunications company" (AC ¶ 89), not a lender.  Nor can they argue that Defendants seek to harm Optimum as a competitor of other telecommunications companies:  as creditors, Defendants have an incentive not to harm Optimum "because the value of their investment in the debt depends on [Optimum's] ability to pay its debts as they mature."  *Akanthos*, 734 F.3d at 1278.

Plaintiffs also are wrong that the *per se* label lets courts "dispense with weighing" procompetitive benefits.  (Opp. 11.)  "The decision to apply the per se rule turns on 'whether the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output . . . or instead one designed to 'increase economic efficiency and render markets more, rather than less, competitive.'"  *NYU Hosps.*, 318 F. Supp. 3d at 633-34 (citation omitted).  That entails analysis of the efficiencies achieved by creditor cooperatives, many of which courts recognize, and which Defendants detailed in their motion.  (Mot. I.A; *id.* 20-21.) Indeed, coordination among creditors is necessary for the alleged Leveraged-Finance Market to function.  (*See* AC ¶¶ 47-52; Mot. 20-21); *Nat'l Collegiate Athletic Ass'n* v. *Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 101 (1984).

Nor do Plaintiffs allege price fixing.  Plaintiffs cast the Co-op as "fix[ing] the price of Optimum's debt" at "par."  (Opp. 10.)  But "par" is the price that was determined *before* the Co-op was formed, and Plaintiffs concede that that price was competitively determined.  (Opp. 22.)  Defendants are entitled to seek what they are already owed.  "[A]ttempting to secure . . . credit" that was "already extended, the terms of which ha[ve] already been negotiated . . . is in fact the very opposite of price-fixing."  *Falstaff*, 513 F. Supp. at 293.  That distinguishes *Catalano,*

*Inc.* v. *Target Sales, Inc.*, where the defendants were not collecting on pre-existing debt but, rather, setting terms for new transactions.  446 U.S. 643, 644-45 (1980); *see Akanthos*, 734 F.3d at 1275.

> **D.      Plaintiffs Fail to State a Rule-of-Reason Claim.**

> **1.      Plaintiffs Ignore Valid Market Substitutes.**

Even under a "relatively permissive pleading standard" (Opp. 13), Plaintiffs fail to revive their market allegations.  Plaintiffs concede that interchangeability is key to market definition (*id.*) but offer no good reason to ignore valid substitutes.  Plaintiffs cite cases to support that other ways of raising capital outside of the alleged Leveraged-Finance Market are not valid substitutes, but those cases are easily distinguishable.  *North American Soccer League* v. *National Football League*, for example, finds that "while capital *may be fungible* in other businesses, it is not fungible in the business of producing major league professional sports" because "league members look not merely for money but for a compatible fellow owner, preferably having entrepreneurial sports skill, with whom the other members can operate their joint business enterprise."  670 F.2d 1249, 1253 (2d Cir. 1982) (emphasis added).  Optimum is not in such business and does not need lenders with particular skills.  *FTC* v. *Indiana Federation of Dentists* is about whether competition was suppressed, not about relevant markets.  476 U.S. at 457.  And *FTC* v. *Tapestry, Inc.* finds that mass-market and luxury handbags are not reasonably interchangeable even though they are "functionally similar."  755 F. Supp. 3d 386, 454 (S.D.N.Y. 2024).  But distinctions between "Gucci" and "Coach" do not apply here:  capital is capital.

As Defendants' motion explained, Plaintiffs have obtained approximately $4 billion in financing since the Co-op was formed.  (Mot. 7.)  Plaintiffs also concede that they obtained capital from the "private-credit market" that they seek to exclude as a substitute.  (Opp. 14.)  That Plaintiffs can, and did, obtain substitute capital confirms that Plaintiffs have alleged an impermissibly narrow market.  *See Cenedella* v. *Metro. Museum of Art*, 348 F. Supp. 3d 346,

361-62 (S.D.N.Y. 2018) (dismissing alleged market as too narrow because it ignored "reasonably interchangeable substitutes").

The alleged single-debtor market for "Outstanding Optimum Debt" fares even worse. Plaintiffs argue that "Optimum cannot substitute into other borrowers' debt" (Opp. 15), but if that were enough to create an antitrust market, *every* individual securities issuer would be its own "market," and all majority owners of a given security would be subject to monopolization claims. That is wrong because the test for a relevant market is "commodities reasonably interchangeable by consumers for the same purposes," *not* "commodities reasonably interchangeable by a particular plaintiff." *Queen City Pizza, Inc.* v. *Domino's Pizza, Inc.*, 124 F.3d 430, 438 (3d Cir. 1997).

Plaintiffs' citations do not support a contrary conclusion. Plaintiffs cite the *Merger Guidelines* to support a single-borrower market, but they conflate the unique single-customer market contemplated by the *Guidelines* and targeted-customer markets generally. (Opp. 14-15.) The only *single*-customer market contemplated in the *Merger Guidelines* is a "procurement auction," which Plaintiffs have not alleged. (AC ¶ 194 n.98.) *United States* v. *Live Nation Entertainment., Inc.*, which Plaintiffs cite, proves the point. There, the court explained that "[i]n a targeted customer market, the product is the same, but the market is drawn more narrowly around the providers who sell to a subset of the customers." 2026 WL 456804, at *12 (S.D.N.Y. Feb. 18, 2026). For example, a pharmaceutical company might sell to managed care organizations and to pharmacies. *Id.* at *13. In such circumstances, "the presence of distinct groups of customers with differing needs and constraints may justify drawing separate markets for each of them." *Id.*[3]

---

[3]  Similarly, *FTC* v. *Staples, Inc.* permitted a narrow customer market because the customers were distinct and the industry recognized them as distinct. 190 F. Supp. 3d 100, 121 (D.D.C. 2016). *Newcal Industries, Inc.* v. *Ikon Office Solution*, 513 F.3d 1038 (9th Cir. 2008), is irrelevant.

Plaintiffs allege nothing comparable.  They do not allege that Optimum has needs different from other highly leveraged borrowers.  Plaintiffs' attempt to create a single-debtor "market" should be rejected.

### 2.    Plaintiffs' Arguments About Harm to Competition Are Meritless.

Plaintiffs allege that the Co-op "raised Optimum's cost of capital," "'reduced output' . . . by freezing Optimum out of both markets," "block[ed] Optimum from negotiating LMEs with willing creditors," and "blacklist[ed] Optimum from obtaining *future* credit."  (Opp. 16-17.)  Those arguments fail because they allege harm only to *Optimum*—not to the U.S. Leveraged-Finance Market or the "Market for Outstanding Optimum Debt" as a whole.  *E.g.*, *Cap. Imaging Assocs., P.C.* v. *Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 543 (2d Cir. 1993) ("Under [the rule of reason] test plaintiff bears the initial burden of showing that the challenged action has had an *actual* adverse effect on competition as a whole in the relevant market; to prove it has been harmed as an individual competitor will not suffice.").[4]

Plaintiffs' only allegations of harm to the U.S. Leveraged-Finance Market *as a whole* are that it "locks up creditors' capital," "warps market-wide prices by distorting key leveraged-finance indices pegged to Optimum's debt," and "encourages collusion."  (Opp. 18.) But the suggestion that the Co-op "locks up" a meaningful percentage of *all* capital available to the market is absurd.  In any event, Plaintiffs' alternative to "lock[ed] up" capital is *lost* capital.

---

*Newcal* held that a determination of market *power* cannot rest solely on contractual rights.  *Id.* at 1048.

[4]    Plaintiffs' statement that "Defendants' own cases confirm that '[e]xclusive agreements among potential competitors are dangerous'" (Opp. 17) is misleading because it drops the remainder of the sentence:  "*but when the noteholders acted together to secure their debt, they were securing their debt in an efficient manner, not in an exclusive manner.*"  *Akanthos*, 734 F.3d at 1277 (emphasis added).

The alternative is that Optimum forces haircuts on lenders in violation of their contractually negotiated repayment rights, which results in the same purported harm of "preventing them from investing elsewhere or lending to other borrowers" over which Plaintiffs feign concern. (Opp. 18.) Worse still, if the alleged "distort[ion]" of indices "pegged to" an entity's debt could be the basis for an antitrust violation, *any* harm to *any* public company or borrower to which indices are pegged would be an antitrust violation. Plaintiffs cite no authority for that facially implausible proposition.[5]

## II.    PLAINTIFFS' CONTRACT-RELATED CLAIMS FAIL.

### A.    Plaintiffs Fail to Identify a Breached Contract Provision.

Plaintiffs' contract claim relies on the premise that the Debt Instruments "require Defendants to give Optimum the opportunity to secure majority consent for refinancing steps." (Opp. 28.) But no contractual provision dictates the terms for any creditor's decision to consent. "Had the parties intended to restrict [Defendants'] right to withhold [consent], they could easily have done so." *Sharma* v. *Chem. Bank*, 723 F. Supp. 200, 203 (S.D.N.Y. 1989). As Defendants' unrebutted cases make clear, Plaintiffs' claim fails because the provisions that allow amendments by mutual consent do not create any "enforceable obligation." *See Miller* v. *HSBC Bank U.S.A., N.A.*, 2015 WL 585589, at *2-3 (S.D.N.Y. Feb. 11, 2015) (rejecting claim against creditor because borrower lacked entitlement to loan modification). Without any provision barring a side deal regarding creditor consent, there is no "argu[ment] that the agreement had been violated to [Plaintiffs'] detriment." *First Nat'l Bank of Louisville* v. *Cont'l Ill. Nat'l Bank & Tr. Co. of Chicago*, 933 F.2d 466, 469 (7th Cir. 1991).

---

[5]    Because Plaintiffs' Sherman Act claim fails, their Donnelly Act claim must also be dismissed. *Cenedella*, 348 F. Supp. 3d at 362-63.

**B.      Plaintiffs' Implied-Covenant Claim Fails Because Plaintiffs Received the Benefit of Their Bargain.**

The implied-covenant claim fails for similar reasons.  Defendants have not deprived Plaintiffs of the "fruit" of the Debt Instruments—operating capital.  (Mot. 28.)  Modifications are not the "fruit" of the Debt Instruments, because they are available only with bilateral consent and Plaintiffs have no power to dictate the terms of that consent.  That distinguishes Plaintiffs' cases.  In *Fund Liquidation Holdings LLC* v. *UBS AG*, the defendants allegedly manipulated Yen LIBOR, thereby negating the plaintiffs' contract for "maximum returns permitted 'by market forces.'"  2021 WL 4482826, at *12 (S.D.N.Y. Sept. 30, 2021).  In *Taco, Inc.* v. *Am. Home Assurance Co.*, the defendant's decision to destroy the plaintiff's insurance policy and ignore its existence erased utility associated with the plaintiff's umbrella insurance.  2025 WL 2419707, at *5 (S.D.N.Y. Aug. 21, 2025).  Here, the Debt Instruments do not grant Plaintiffs any expectation of modified terms.  *Resol. Tr. Corp.* v. *Lesal Assocs.*, 1992 WL 98843, at *5 (S.D.N.Y. May 6, 1992) ("[T]he implied covenant . . . does not obligate the promisor . . . to renegotiate the contract.").

**C.      Plaintiffs Continue to Offer Only Conclusory Group Allegations of Tortious-Interference.**

Plaintiffs' opposition fails to cite allegations as to all Defendants.  The Opposition relies on a truncated quote from a *Wall Street Journal* article as its "source[]" for allegations as to each Defendant.  (Opp. 30.)  But the article merely reports that "some defendants have had discussions internally, among each other and with external advisers about curbing their use of Kirkland for certain legal work."  (May 6, 2026 Declaration of Kyle W. Mach, Ex. 14 at 2.)  That does not support that all Defendants "ganged up to threaten Kirkland with a boycott."  (Opp. 31.)  Nor can Plaintiffs salvage their claim by belatedly invoking conspirator liability (*id.* 30) when the Amended Complaint contains no well-pled allegations that each Defendant "entered into an agreement with others to commit" tortious interference.  *See Gym Door Repairs, Inc.* v. *Young*

*Equip. Sales, Inc.*, 206 F. Supp. 3d 869, 914 (S.D.N.Y. 2016) (rejecting "wholly conclusory" conspiracy allegations).

Finally, Plaintiffs fail to allege "wrongful means." (Mot. 29.) Plaintiffs fail to allege *any* antitrust violation, and the alleged "Kirkland boycott" itself did not violate the Sherman Act, because there is no antitrust injury or unreasonable restraint in a relevant market. Plaintiffs' invocation of "extreme and unfair" economic pressure fails, because that demands conduct so "extreme" as to "approach[] a separate crime or tort." *Vinas* v. *Chubb Corp.*, 499 F. Supp. 2d 427, 435 (S.D.N.Y. 2007) (threat to terminate business relationship not "extreme and unfair" economic pressure). Plaintiffs merely describe a client's decision to choose counsel that is not representing a litigation adversary.

## CONCLUSION

The Amended Complaint should be dismissed.

Dated: May 6, 2026                    Respectfully submitted,

                                      */s/ Kyle W. Mach*
                                      Kyle W. Mach (*pro hac vice*)
                                      SULLIVAN & CROMWELL LLP
                                      550 Hamilton Avenue
                                      Palo Alto, California  94301
                                      Telephone:  (650) 461-5600
                                      Facsimile:  (650) 461-5700
                                      machk@sullcrom.com

                                      Robert J. Giuffra, Jr.
                                      Brian D. Glueckstein
                                      SULLIVAN & CROMWELL LLP
                                      125 Broad Street
                                      New York, New York  10004
                                      Telephone:  (212) 558-4000
                                      Facsimile:  (212) 558-3588
                                      giuffrar@sullcrom.com
                                      gluecksteinb@sullcrom.com

Renata B. Hesse (*pro hac vice*)
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W., Suite 700
Washington, D.C.  20006
Telephone:  (202) 956-7500
Facsimile:  (202) 293-6330
hesser@sullcrom.com

*Attorneys for Defendants*

-14-

-15-

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of S.D.N.Y. Local Civil Rule 7.1(c), Individual Rule 5(A), and the Court's March 13, 2026 Order (ECF No. 78) because it contains 3,900 words, excluding the portions exempted by S.D.N.Y. Local Civil Rule 7.1(c) and Individual Rule 5(A).

Dated:  May 6, 2026                          */s/ Kyle W. Mach*
                                            Kyle W. Mach